**PLANNED PARENTHOOD OF SOUTHEASTERN PENNSYLVANIA, Reproductive Health and Counselling Center, Women's Health Services, Inc., Women's Suburban Clinic, Allentown Women's Center, and Thomas Allen, M.D., on behalf of himself and all others similarly situated, Plaintiffs,**

v.

**Robert P. CASEY, N. Mark Richards, Ernest Preate, personally and in their official capacities, and Michael D. Marino, personally and in his official capacity, together with all others similarly situated, Defendants.**

Civ. A. No. 88–3228.

United States District Court,
E.D. Pennsylvania.

Aug. 24, 1990.

16. As I indicated above, (see note 1), this opinion is to be reported at 741 F.Supp. 515.

Thomas E. Zemaitis, Pepper, Hamilton & Scheetz, Philadelphia, Pa., Kathryn Kolbert, American Civil Liberties Union, New York City, Linda J. Wharton, Women's Law Project, Philadelphia, Pa., for plaintiffs.

Kate L. Mershimer, Sandra W. Stoner, Office of Atty. Gen., Com. of Pa., Harrisburg, Pa., for defendants.

## OPINION

HUYETT, District Judge.

### INTRODUCTION

This court is required to address again the difficult and controversial issue of the permissible degree of governmental regulation of a woman's abortion decision. In this action for declaratory and injunctive relief, plaintiffs challenge the 1988 and

1989 amendments to Pennsylvania's Abortion Control Act of 1982 ("the Act"), Act of March 25, 1988, 1988 Pa.Laws 262, No. 31, §§ 3–10 ("Act 31") and Act of November 17, 1989, 1989 Pa.Laws 592, No. 64, §§ 1–9 ("Act 64"), amending 18 Pa.Cons.Stat.Ann. §§ 3201–20 (Purdon 1983 and 1990 Supp.).[1] Plaintiffs assert that Act 31 and Act 64 violate the United States Constitution and 42 U.S.C. § 1983 (1981). I have subject matter jurisdiction over this controversy pursuant to 28 U.S.C. § 1331 (1966 and 1990 Supp.), 28 U.S.C. § 1343(a)(3), (4) (1976 and 1990 Supp.), and the fourteenth amendment to the United States Constitution.

Just three days prior to the scheduled effective date of Act 31, following a hearing, I granted plaintiffs' motion for a temporary restraining order and enjoined defendants from: (1) enforcing the provisions of section 3206 [2] and (2) publicly disclosing or otherwise making available for public inspection and copying any report filed pursuant to sections 3207(b) or 3214(f).[3] An evidentiary hearing and oral argument on plaintiffs' motion for a preliminary injunction was held on May 9, 1988. With the consent of the parties, I ordered that the earlier temporary restraining order would remain in effect until such time as I ruled on the motion for a preliminary injunction following the hearing. See Order (May 9,

1988). Two weeks later, on May 23, 1988, I preliminarily enjoined various portions of the Act.[4] *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 686 F.Supp. 1089 (E.D.Pa.1988) (*"Casey I"*). Defendants did not appeal this decision.

Thereafter, I stayed all proceedings pending issuance of the decision of the United States Supreme Court in *Webster v. Reproductive Health Services*.[5] At about the time of the Supreme Court's decision in *Webster*, the Pennsylvania legislature began debating various amendments to the Act. Several months later, on November 17, 1989, Act 64 was adopted to become effective in sixty days. With the consent of the defendants and leave of the court, plaintiffs filed an amended complaint to extend the scope of their challenge against the Act to include the 1989 amendments. After a conference held in chambers, I extended, over the objection of defendants, the preliminary injunction order to encompass the 1989 amendments to the Act. See *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 736 F.Supp. 633 (E.D.Pa.1990) (*"Casey II"*).

The trial of this action on the merits was held during the week of July 30, 1990. The parties have entered into a comprehensive stipulation of uncontested facts and a supplemental stipulation of uncontested facts

---

1. Hereinafter, all citations to 18 Pa.Con.Stat. Ann. §§ 3201–20 refer to the amended Act, unless otherwise specified.

2. Section 3206 of Act 31 required minor women seeking abortions in Pennsylvania to obtain informed parental consent therefor, or, in the alternative, to apply to the Court of Common Pleas of Pennsylvania for judicial authorization for an abortion. I concluded as follows:

 the evidence presented in numerous affidavits attached to the motion for a temporary restraining order and in affidavits presented at the hearing held on [April 21, 1988] establishes that the courts of common pleas of many counties in Pennsylvania have taken no steps to ensure that the provisions of Section 3206 are properly implemented. Specifically, as of this time there are no procedures in place in the courts of common pleas to ensure expedition of the proceedings or to ensure confidentiality. There is also substantial evidence in the record that no steps have been taken to ensure that individuals are available to pro-

vide legal representation for minors or to act as guardians *ad litem*. More importantly, it appears that key personnel in many of the courts of common pleas are unaware of the requirements of the statute. The Commonwealth failed to present any evidence which suggests that this situation will change before April 24, 1988.
 See Temporary Restraining Order at ¶ 3 (April 21, 1988).

3. Sections 3207(b) and 3214(f) of Act 31 required the public disclosure of certain reports, if the facility filing the report received state appropriated funds within the preceding twelve month period.

4. The various portions of the Act enjoined by my May 23, 1988 decision will be discussed below in the context of the sections of the Act at issue in this case.

5. —— U.S. ——, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989).

for the purposes of trial.[6] Based upon the stipulation of uncontested facts and the supplemental stipulation of uncontested facts, the evidence presented at trial, and the evidence presented at the hearing on plaintiffs' motion for a preliminary injunction which the parties have agreed would be admissible at the trial on the merits,[7] I make the following findings of fact and conclusions of law. However, because in many ways the Pennsylvania legislature has come full circle by re-enacting many provisions of the Act which were deemed unconstitutional at various stages during the 1982 action involving the 1982 Act, I shall first summarize the lengthy history of abortion legislation in Pennsylvania.

## I.

### HISTORY OF ABORTION REGULATION IN PENNSYLVANIA[8]

In its landmark decision in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the Supreme Court invalidated statutes, like Pennsylvania's,[9] containing general prohibitions against abortions, because such statutes unconstitutionally violated a woman's fundamental right to privacy. *See also Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). In the year following *Roe v. Wade*, over the Gov-

ernor's veto, the state legislature enacted Pennsylvania's first comprehensive "Abortion Control Act." *See* Abortion Control Act of 1974, 1974 Pa.Laws 639, No. 209 (amended 1978, repealed 1982). After extensive and substantial litigation, various provisions of the 1974 Act, including sections relating to spousal and parental consent to abortion procedures, to the proscription of advertising for abortion procedures, to the choice of post-viability abortion procedures, and to the criminal standard governing the performance of abortions at viability, were struck down. *See Planned Parenthood Ass'n v. Fitzpatrick*, 401 F.Supp. 554 (E.D.Pa.1975) (three judge panel), *aff'd mem. in part sub nom., Franklin v. Fitzpatrick*, 428 U.S. 901, 96 S.Ct. 3202, 49 L.Ed.2d 1205 and *vacated and remanded mem. in part sub nom., Beal v. Franklin*, 428 U.S. 901, 96 S.Ct. 3201, 49 L.Ed.2d 1204 (1976), *modified on remand*, Civil Action No. 74–2440 (E.D.Pa. Sept. 16, 1977) (unreported), *aff'd sub nom., Colautti v. Franklin*, 439 U.S. 379, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979).[10] *See also Doe v. Zimmerman*, 405 F.Supp. 534 (M.D.Pa.1975) (three judge panel).

In 1978, the legislature attempted to restrict a woman's access to abortions by limiting medical assistance funding for the

---

**6.** These documents have been admitted into evidence and marked as Court's Exhibit 1 and Court's Exhibit 1–A for ease of reference. All subsequent references to either document shall be by exhibit number and the relevant paragraph number.

**7.** Specifically, I refer to the testimony and verifications of Sue Roselle, Sylvia Stengle, and Cathy Dratman, M.D. I note that defendants object to the admissibility of the verifications of these witnesses. However, these witnesses testified at the preliminary injunction hearing and were subject to cross-examination at that time. Therefore, defendants had ample opportunity to examine these witnesses concerning the contents of the verifications, as well as to object to the contents of the verifications. Further, Ms. Stengle and Ms. Roselle were included on defendants' witness list, *see* Defendants' Pretrial Brief at 4, and defendants could have called them to challenge their earlier testimony and verifications. Finally, Ms. Roselle testified at trial for plaintiffs and was subject to extensive cross-examination at that time. For these reasons, I overruled defendants' objection at the time of

trial. *See* Pretrial Conference Transcript at 28–30.

**8.** For a more detailed discussion of this historical material, see *Thornburgh v. American College of Obstetricians and Gynecologists*, 476 U.S. 747, 751–54, 106 S.Ct. 2169, 2173–75, 90 L.Ed.2d 779 (1986) ("*Thornburgh*") and *American College of Obstetricians and Gynecologists, Pennsylvania Section v. Thornburgh*, 737 F.2d 283, 287–90 (3d Cir.1984) ("*American College II*").

**9.** Prior to *Roe v. Wade*, the relevant law in Pennsylvania provided that any person who "unlawfully" caused a woman's miscarriage committed a felony punishable by fine or imprisonment. *See* Penal Code of 1939, 1939 Pa. Laws 872, 958, No. 375, § 718, *saved from repeal*, Crimes Code of 1972, 1972 Pa.Laws 1482, 1611, No. 334, § 5 (repealed 1974). *See American College II*, 737 F.2d at 287 n. 1.

**10.** For a summary of the history of the cases involving the Abortion Control Act of 1974, see *Colautti v. Franklin*, 439 U.S. at 384–86, 99 S.Ct. at 679–80.

procedure. *See* Act of September 26, 1978, 1978 Pa.Laws 773, No. 148, §§ 1–2. A successful challenge was mounted against this effort. *Roe v. Casey*, 464 F.Supp. 487 (E.D.Pa.1978), *aff'd*, 623 F.2d 829 (3d Cir. 1980).

Thereafter, a bill based on a model developed by Americans United For Life, a non-profit organization, was introduced by the House as an amendment to a Senate bill regulating "tough guy" competitions. *See* Note, *Toward Constitutional Abortion Control Legislation: The Pennsylvania Approach*, 87 Dick.L.Rev. 373, 382 n. 84 (1983). Despite being rejected by the relevant legislative committee, the bill was passed overwhelmingly. The Senate, after brief discussion, concurred with the House amendment. While acknowledging his personal opposition to abortion, Dick Thornburgh, then Governor of Pennsylvania, vetoed the bill and explained his action as follows:

I am concerned that [some] provisions, and to some extent, the overall tone and tenor of the bill, would have the effect of imposing an undue, and, in some cases, unconstitutional burden upon even informed, mature adults intent upon obtaining an abortion under circumstances in which the U.S. Supreme Court has determined they are entitled to do so.…

Likewise, I am concerned that some of the detailed, complex and burdensome requirements of the bill, accompanied as they are by severe criminal penalties, could well foster an atmosphere in which many physicians would be deterred from providing the kind of abortion-related medical services to which the U.S. Supreme Court has held their patients are constitutionally entitled. This could well disrupt the traditional doctor-patient relationship and impinge upon the right of physicians to practice. Of even greater concern is the potential for more experienced and conscientious physicians to refrain from involvement in even medically necessary abortions, and to abandon the field to marginal practitioners. It could even lead to a resurgence of "back alley" abortions, which no thoughtful person would wish to happen.…

I am also concerned that in its entirety the bill in its current form goes further than is necessary in protecting the state interests in this area.… In so doing, it threatens to create additional regulation and bureaucracy and to unduly involve government in the private lives of its citizens.

*See* Veto Message to the Senate at 7 (December 23, 1981) [Plaintiffs' Exhibit 60]. After revision and introduction on the floor of the House as an amendment to a bill relating to paramilitary training, the Abortion Control Act of 1982 was passed by both the House and Senate. Signed by Governor Thornburgh on June 11, 1982, the Act was to take effect within 180 days, on December 8, 1982, from its enactment.

The Abortion Control Act of 1982 imposed detailed regulations on abortions which required that: (1) a pregnant woman wait a mandatory 24 hours prior to undergoing an abortion procedure after giving her consent to the procedure; (2) a physician personally provide certain specified information to a woman seeking an abortion as a part of the informed consent process; (3) unemancipated minors obtain parental or judicial consent for an abortion procedure; and (4) all second trimester abortions be performed in a hospital. The 1982 Act also strictly limited post-viability abortions; dictated the use of specific procedures and, in some cases, the presence of a second physician to save the aborted fetus; imposed detailed reporting regulations; required fetal pathology reports; restricted the availability of public funds for the performance of abortions; and regulated private insurance coverage for the performance of abortions. Further, the 1982 Act subjected physicians and clinics violating the Act to criminal prosecution, as well as civil tort liability and revocation or suspension of licensure.

Before the Act took effect, the American College of Obstetricians and Gynecologists ("ACOG"), Pennsylvania Section, various abortion clinics and physicians, among others, filed suit in this court alleging that the 1982 Act was unconstitutional in its entirety and immediately filed a motion for a

preliminary injunction. *See American College of Obstetricians and Gynecologists, Pennsylvania Section, et al. v. Thornburgh, et al.*, Civil Action No. 82–4336. Based upon what the Third Circuit later described as "an unusually complete factual and legal presentation from which to address the important constitutional issues at stake," *see American College II*, 737 F.2d at 290, I concluded that the 1982 Act as a whole was constitutional with the exception of the 24–hour waiting period contained in section 3205. *American College of Obstetricians and Gynecologists, Pennsylvania Section v. Thornburgh*, 552 F.Supp. 791 (E.D.Pa.1982) (*"American College I"*).

Plaintiffs immediately filed a notice of appeal, and the Commonwealth filed a cross-appeal challenging my ruling on the 24–hour waiting period provision. The Third Circuit, on December 9, 1982, granted the plaintiffs' motion for stay of enforcement of the entire Act pending appeal. After expedited briefing and argument, the Third Circuit withheld opinion pending three decisions of the Supreme Court which were under submission.[11] After consideration of supplemental briefs and reargument, the Third Circuit ruled that various sections of the 1982 Act were unconstitutional, including the detailed reporting provisions imposed upon physicians, the requirement of discriminatory insurance, the compulsory "informed consent" informa-

tion which must be given to a pregnant woman seeking an abortion, and the sections attempting to control the method of abortion and mandate the attendance of a second physician under certain circumstances. *American College II*, 737 F.2d at 283. Further, in light of the decisions in *Akron* and *Ashcroft*, the Commonwealth conceded, and the Third Circuit agreed, that the 24–hour waiting period, the physician-only disclosure requirements, and the proscription against second trimester abortions unless performed in a hospital were unconstitutional. *Id.* at 293. The Supreme Court subsequently affirmed by a five to four vote. *Thornburgh*, 476 U.S. at 747, 106 S.Ct. at 2169.[12]

Thereafter, Pennsylvania's legislature adopted the 1988 and 1989 amendments to the Act. These amendments include many provisions similar, if not identical, to the provisions of the 1982 version of the Act struck down by this court, the Third Circuit, and the United States Supreme Court, as well as other provisions to which plaintiffs object. These include a mandatory 24–hour waiting period for all women seeking to have an abortion; a parental informed consent/judicial by-pass procedure for minor women seeking to terminate their pregnancy; spousal notification provisions; physician-only disclosure requirements; and various reporting and disclosure requirements.[13]

---

**11.** *City of Akron v. Akron Center for Reproductive Health, Inc.*, 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983) (*"Akron"*); *Planned Parenthood Ass'n of Kansas City, Mo., Inc. v. Ashcroft*, 462 U.S. 476, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983) (*"Ashcroft"*); *Simopoulos v. Virginia*, 462 U.S. 506, 103 S.Ct. 2532, 76 L.Ed.2d 755 (1983).

**12.** Subsequent to the Third Circuit's decision, I enjoined, upon motion of the plaintiffs, the enforcement of the public disclosure provisions of the 1982 Act. *American College of Obstetricians and Gynecologists, Pennsylvania Section v. Thornburgh*, 613 F.Supp. 656 (E.D.Pa.1985) (*"American College III"*). The Supreme Court declined to reach this issue. *Thornburgh*, 476 U.S. at 758 n. 9, 106 S.Ct. at 2177 n. 9. Further, after the Supreme Court's decision in *Thornburgh*, I continued the preliminary injunction as it applied to the rules promulgated by the Pennsylvania Supreme Court governing the judicial by-pass procedure for minors seeking an abor-

tion. *See American College of Obstetricians and Gynecologists, Pennsylvania Section v. Thornburgh*, 656 F.Supp. 879 (E.D.Pa.1987) (*"American College IV"*).

**13.** Prior to the enactment of the 1988 amendments, Governor Casey vetoed an earlier version of the 1988 amendments, but identified a need for the "strongest possible measure [of] controlling abortion consistent with the Constitution and [his] oath to it." *See* Veto Message to the House at 2 (December 17, 1987) [Plaintiffs' Exhibit 62]. In so doing, Governor Casey, "opposed to abortion on every moral ground," recognized the invalidity of physician-only counseling requirements and further stated:

Other rulings by the [Supreme] Court have declared that a state may not compel disclosure of information protected by an individual's right of privacy to *any* third-party; that a state lacks a legally justifiable interest in simply knowing the identity of a woman seeking

## II.

### FINDINGS OF FACT

A. *The Parties and Witnesses.*

1. Plaintiff Thomas Allen testified as an expert at trial in the field of obstetrics and gynecology. He is qualified to testify as an expert in this field, and I found his testimony to be credible in all respects. Dr. Allen is a physician licensed to practice medicine in Pennsylvania and is an Associate Clinical Professor in the Department of Obstetrics and Gynecology at the University of Pittsburgh. He graduated from the University of Pittsburgh School of Medicine in 1943. He is an emeritus staff member of Magee Women's Hospital, and is Medical Director of Women's Health Services, Inc. He has been a Diplomate of the American College of Obstetrics and Gynecology since 1954, has been a Fellow of the American College of Obstetrics and Gynecology since 1955, and a Fellow of the Pittsburgh Obstetrical and Gynecological Society since 1974. From 1972 to the present, Dr. Allen has been active in planning, establishing and administering Women's Health Services, Pittsburgh's first free standing abortion clinic. From 1970 to 1979, he was active in establishing and contributing services to the Pittsburgh Free Clinic. Dr. Allen has a private obstetrical and gynecological practice with one other specialist. [Court's Exhibit 1 at ¶ 1; Plaintiffs' Exhibit 81; Trial Testimony of Dr. Allen, Vol. I at 35–39].

2. Plaintiff Planned Parenthood of Southeastern Pennsylvania ("PPSP") is a non-profit corporation providing comprehensive family planning, medical and counseling services (including birth control education), pregnancy testing and counseling, gynecological care, first trimester abortions, and vasectomies at medical clinics in Philadelphia, Montgomery and Delaware Counties. The Center City Philadelphia clinic offers these services Monday through Friday. Abortions are performed on Wednesdays, Thursdays, Fridays and Saturdays at PPSP's Center City Philadelphia Clinic. [Court's Exhibit 1 at ¶ 2].

3. Plaintiff Reproductive Health and Counseling Center ("RHCC") is a for-profit corporation in Chester, Pennsylvania, which operates a clinic that performs first and early second trimester abortions. [Court's Exhibit 1 at ¶ 12].

4. Plaintiff Women's Health Services, Inc. ("WHS") in Pittsburgh, Pennsylvania, is a non-profit health center providing fertility control education, pregnancy counseling, general counseling for individuals and couples, PMS counseling and treatment, contraceptive and gynecological care, public education, and first and early second trimester abortions. [Court's Exhibit I at ¶ 25].

5. Plaintiff Women's Suburban Clinic ("WSC") is a non-profit corporation in Paoli, Pennsylvania which operates a health care facility providing abortions, ongoing gynecological services, mini-laparoscopies, pregnancy testing, community education, and other counseling services. [Court's Exhibit 1 at ¶ 42].

6. Plaintiff Allentown Women's Center ("AWC") is a for-profit corporation in Allentown, Pennsylvania which operates a clinic providing pregnancy testing and counseling, contraceptive and gynecological care, and first trimester abortions. [Court's Exhibit 1 at ¶ 55].

7. Defendant Robert P. Casey is the Governor of the Commonwealth of Pennsylvania. [Plaintiffs' Amended Complaint and Defendants' Answer to Amended Complaint at ¶ 13].

8. Defendant N. Mark Richards, M.D., is the Secretary of Health of the Commonwealth of Pennsylvania. [Plaintiffs' Amended Complaint and Defendants' Answer to Amended Complaint at ¶ 14].

9. Defendant Ernest Preate, Jr., is the Attorney General of the Commonwealth of Pennsylvania. [Plaintiffs' Amended Com-

an abortion; and that a state cannot intervene in a marital relationship to dictate the relationships between husband and wife. In striking down spousal consent requirements, the Court has held that a state cannot delegate to *any* third-party—even a husband—the power that the state cannot exercise itself. *Id.* at 5 (emphasis supplied).

plaint and Defendants' Answer to Amended Complaint at ¶ 15].

10. Defendant Michael D. Marino is the District Attorney for Montgomery County, Pennsylvania.[14] [Plaintiffs' Amended Complaint and Defendants' Answer to Amended Complaint at ¶ 16].

11. Sue Roselle testified at the hearing on plaintiffs' motion for a preliminary injunction and at trial. I found her testimony on both occasions to be credible in all respects. Ms. Roselle is the Executive Director of WHS. As Executive Director, she is responsible for the ongoing operation of the clinic and for staff selection, and she reports to the Board of Directors of WHS. She holds a master's degree in social work from the University of Illinois at Urbana, and a M.S.B.A. in management from Robert Morris College. She is Treasurer of the Pennsylvania Chapter of the National Association of Social Workers, a member of the Academy of Certified Social Workers, President of Pennsylvanians for a Right to a Private Life, and serves on the Health Services Committee of the American Red Cross, Pittsburgh–Allegheny Chapter. She has over ten years' experience in health care administration, including medical services and home health care. She is a former director for emergency medical service systems for the 12 counties of southwestern Pennsylvania. [*See Casey I,* 686 F.Supp. at 1093 (¶ 11)].

12. Sylvia Stengle testified at the hearing on plaintiffs' motion for a preliminary injunction. I found her testimony to be credible in all respects. Ms. Stengle is the founder and Director of AWC. She is responsible for the ongoing operation of the clinic and hiring. She holds a bachelor's degree from the University of Wisconsin, and has taken graduate courses in sociology and psychology. Prior to founding AWC in 1978, she was the Education Director for Planned Parenthood of Northampton County, Pennsylvania. She has been personally involved in counseling since 1973, and now supervises the AWC counseling staff. She serves on the Board of Directors of the National Abortion Rights Action League. [*See Casey I,* 686 F.Supp. at 1093–94 (¶ 12)].

13. Dr. Cathy Dratman testified at the hearing on plaintiffs' motion for a preliminary injunction. I found her testimony to be credible in all respects. Dr. Dratman is licensed to practice medicine in Pennsylvania and New Jersey. She is a graduate of Hahnemann Medical College, and completed her internship and residency at Pennsylvania Hospital in Philadelphia. She is board certified by the American Board of Obstetrics and Gynecology. She has been Medical Director of PPSP since 1986, and has a private obstetrical and gynecological practice in New Jersey. She does not presently perform abortions, but in the past has performed and referred patients for first and second trimester abortions up to 20 weeks gestation. As Medical Director of PPSP, she maintains close contact with, and generally oversees, all abortion procedures performed at the clinic. [*Casey I,* 868 F.Supp. at 1094 (¶ 13)].

14. Dr. Steven J. Davidson testified at trial as an expert in the field of emergency medicine. He is qualified to testify as an expert in emergency medicine, and I found his testimony credible in all respects. Dr. Davidson is a physician licensed to practice medicine in Pennsylvania and California. He is a Division Head of Pre–Hospital Care and Professor of Emergency Medicine at the Medical College of Pennsylvania where he teaches, both clinically and didactically, medical students, interns, residents and house staff. He received his bachelor's degree in chemistry with honors from Temple University in 1971 and graduated from Temple University Medical School in 1975. Dr. Davidson's internship and residency, in emergency medicine, took place in the Medical College of Pennsylvania. Subsequently, he was awarded a master's degree in business administration from the Wharton School of the University of Pennsylvania in 1989.

Dr. Davidson's hospital appointments include attending physician at the hospital at

---

**14.** By stipulation filed on July 24, 1990, the parties have voluntarily dismissed defendant Marino from this action pursuant to Rule 41(a)(1) of the Federal Rules of Civil Procedure.

the Medical College of Pennsylvania, associate in the Department of Emergency Medicine at the Mercy Catholic Medical Center, and he serves on the intensive care unit, attending staff and affiliate staff, at Jefferson Hospital. He presently sees patients in emergency rooms approximately 600 hours annually.[15] He has been a Fellow of the American College of Emergency Physicians since 1982, and has been a Diplomate of the American Board of Emergency Medicine since 1980. Finally, he is the author or co-author of numerous publications and has given numerous presentations on topics in the field of emergency medicine. [Trial Testimony of Dr. Davidson, Vol. I at 10–14; Plaintiffs' Exhibit 77].

15. Dr. Michael Alan Grodin testified at trial as an expert in the field of medical ethics. He is qualified to testify as an expert in medical ethics, and I found his testimony credible in all respects. Dr. Grodin is a physician licensed to practice medicine in Massachusetts and New York. He received his bachelor's degree from Massachusetts Institute of Technology in 1973 and graduated from Albert Einstein College of Medicine in 1976. Dr. Grodin was an intern and junior resident in pediatrics at Harbor General Hospital in Torrance, California (UCLA), and completed his residency in pediatrics at Massachusetts General Hospital and Boston City Hospital (Harvard University). While at Boston City Hospital, he was Chief Resident in Pediatrics. Subsequently, he completed a clinical fellowship in pediatric cardiology at Children's Hospital Medical Center in Boston.

Dr. Grodin is a pediatrician and a professor with over eleven years of experience in the field of medical ethics. He has taught courses and lectured within the Boston University Schools of Liberal Arts, Medicine, Law, Public Health, Social Work, and Theology over the past eleven years. He is presently Associate Director of the Law, Medicine and Ethics Program and Director of Medical Ethics at Boston University Schools of Medicine and Public Health,

where he is also Associate Professor of Health Law, Pediatrics, and Socio–Medical Sciences and Community Medicine. In addition, he is Adjunct Associate Professor of Philosophy in the College of Liberal Arts at Boston University.

Dr. Grodin is a Medical Ethicist and Human Studies Chairman for the Department of Health and Hospitals of the City of Boston, and serves on the Institutional Review Board and Ethics Advisory Group–Institutional Ethics Committee of Boston City Hospital. He is a staff pediatrician at Associated Pediatricians of Boston, an associate visiting pediatrician at Boston City Hospital, and a senior associate in pediatrics at Beth Israel Hospital in Boston. In addition, he serves on the boards of directors of the American Society of Law and Medicine, and Public Responsibility in Medicine and Research. He is a member of the National Committee on Bioethics of ACOG. Finally, he served as medical ethics reviewer for The New England Journal of Medicine and Oxford University Press, authored or co-authored numerous publications in the areas of moral dilemmas in medicine and problematic decision-making in clinical medicine, and has delivered numerous presentations on various topics in the field of medical ethics. [Trial Testimony of Dr. Grodin at 91–96; Plaintiffs' Exhibit 78].

16. Dr. Ronald J. Bolognese testified at trial as an expert in the fields of obstetrics, gynecology and perinatal medicine. He is qualified to testify as an expert in these areas, and I found his testimony credible in all respects. Dr. Bolognese is a physician licensed to practice medicine in Pennsylvania and New Jersey. He received his bachelor's degree from Princeton University in 1959 and graduated from the University of Pennsylvania School of Medicine in 1967. Dr. Bolognese completed his internship at Bryn Mawr Hospital and his residency in obstetrics and gynecology at Pennsylvania Hospital in Philadelphia.

Dr. Bolognese was the Chief of Obstetrics and Gynecology at Williams Air Force Base Hospital in Arizona from 1967 to

15. A full-time clinical practice in emergency medicine is generally considered to encompass approximately 2,000 hours of practice a year. [Trial Testimony of Dr. Davidson, Vol. I at 12].

1969. He has specialty certifications from ACOG and the Maternal–Fetal Medicine Board, a division of ACOG.[16] He is the Director of the Section on Perinatology of the Department of Obstetrics and Gynecology at Pennsylvania Hospital. Since 1985, he has been the Chairman of the Department of Obstetrics and Gynecology at Pennsylvania Hospital. He has been a Professor of Obstetrics and Gynecology at the University of Pennsylvania School of Medicine since 1982, after serving as a clinical assistant professor and associate professor of obstetrics and gynecology. Finally, he is the author or co-author of numerous publications and has delivered several presentations on topics in his fields of expertise. [Trial Testimony of Dr. Bolognese, Vol. I at 137–141; Plaintiffs' Exhibit 79].

17. Dr. Lenore E.A. Walker testified at trial as an expert in the field of family violence. She is qualified to testify as an expert in the area of family violence and the effects of battering on women, children and other members of their families, and I found her testimony credible in all respects. Dr. Walker is licensed to practice psychology in Colorado and New Jersey. She received her bachelor's degree in psychology from Hunter College of the City University of New York in 1962, her master's degree in clinical school psychology from City College of the City University of New York in 1967, and her doctorate degree from Rutgers University's School of Psychology in 1972.

Dr. Walker has more than twenty years of experience as a licensed clinical, forensic, and school psychologist. She is currently the president of Walker and Associates in Denver and the founder and Executive Director of the Domestic Violence Institute, a non-profit organization which conducts research in the area of family violence. Dr. Walker is a Fellow of and has served on the Council of Representatives of the American Psychological Association and as chair of its Women's Caucus. In 1987, she was the recipient of the Board of Professional Affairs Distinguished Professional Contributions to Psychology in the Public Interest Award, one of the American Psychological Associations highest honors. Dr. Walker is also an adjunct professor of psychology at the University of Denver. During her career she has been Chairperson of the Department of Psychology and Associate Professor of Psychology at Colorado's Women's College, an Assistant Professor of Psychiatry at Rutgers University's Medical School, and an Assistant Professor at Rutgers University's Graduate School of Applied and Professional Psychology.

Dr. Walker was one of the first scientists in the country to conduct clinical research on intra-family violence and is one of the foremost experts on the psychology of battered women and families. From 1978 to 1981, she acted as the principal investigator for a National Institute for Mental Health funded study on the "battered women syndrome." She is the author or co-author of numerous publications, including *The Battered Woman*, her first book published in 1979 for which she received a Distinguished Media Award from the Association for Women in Psychology. She serves as an assistant editor for a number of major "referee" journals [17] in her field, has delivered several presentations on topics in her field, and consulted with governmental agencies and testified, in criminal and civil cases in thirty states and federal courts, as an expert on domestic violence and the battered women syndrome. [Trial Testimony of Dr. Walker, Vol. II at 3–9; Plaintiffs' Exhibit 80].

18. Jean A. Dillon [18] testified at trial, and I found her testimony credible in all

---

16. In 1974, ACOG established the subspecialty of perinatology, which is maternal fetal medicine or high risk obstetrics, for physicians with additional training and expertise in this area. Dr. Bolognese was one of the original fourteen physicians certified in this subspecialty. [Trial Testimony of Dr. Bolognese, Vol. I at 139–140].

17. "Referee" journals are publications in which all articles are subjected to peer review to determine worthiness for publication prior to publication. [Trial Testimony of Dr. Walker, Vol. II at 8].

18. In an oral motion in limine, defendants objected to the testimony of Ms. Dillon on several grounds and sought to exclude her from testify-

respects. She is a counselor for Women's Resource Center of Monroe County, Inc., a non-profit organization that provides counseling services to battered women, victims of sexual abuse, and children in domestic violence situations. Women's Resource Center of Monroe County is a member organization of the Pennsylvania Coalition Against Domestic Violence which provides similar services to battered women and children. Ms. Dillon provides protection from abuse accompaniment for battered women and children to courthouses, shelters women in need of a safe house, and spends many hours working on a crisis intervention hotline annually. Also, she is a former victim of spousal abuse. [Trial Testimony of Ms. Dillon, Vol. III at 143–165].

19. Dr. Vincent M. Rue testified at trial as an expert in the areas of problem pregnancy decision-making, marital family relationships, and psychological effects following an abortion. Dr. Rue received a bachelor's degree in sociology from St. John's University, a master's degree in clinical social work from St. Louis University, and doctorate degree in family relations from the University of North Carolina, School of Home Economics at Greensboro. He is co-founder and co-director of the Institute for Abortion Recovery and Research in New Hampshire, and Executive Director of Sir Thomas Moore Clinic in California. In addition, from 1975 to 1980, he was an Associate Professor of Family Relations at the School of Fine and Applied Arts of California State University at Los Angeles, and was an Adjunct Associate Professor at the School of Professional Psychology at United States International University in San Diego.

Dr. Rue is a licensed marriage and family counselor in California, and a trained psychotherapist. He is not a psychologist and has never conducted a controlled research study. While Dr. Rue has produced various published works in his field, he has never had any of his work published in a referee journal. Because he is not a physician, Dr. Rue has never provided informed consent for an abortion or any other medical procedure. In addition, he has not conducted any research on the informed consent procedures utilized in abortion clinics in Pennsylvania. [Trial Testimony of Dr. Rue, Vol. II at 143–155; Defendants' Exhibit 62].

Dr. Rue submitted a study he co-authored with others, *The Psychological Aftermath of Abortion,* to Surgeon General C. Everett Koop and the House of Representatives Committee on Government Operations as a part of a federal investigation of the medical and psychological effects of abortion which purports to establish the existence of a psychological disorder denominated "post abortion syndrome." After submission for peer review by scientists with the Center for Disease Control, the National Center for Health Statistics and other scientific institutions, his study was found to have "no value" and to be "based upon a priori beliefs rather than an objective review of the evidence." *See The Federal Role in Determining the Medical and Psychological Impact of Abortion on Women,* Committee on Government Operations, H.R. 101–392, 101st Cong. 1st Sess. (Dec. 11, 1989) at 12 [Plaintiffs' Exhibit 67 at 12]. The Board of Directors of the American Psychological Association, after review of all of the scientific literature, has determined that there are no scientific studies which support the existence of a "post abortion syndrome" as suggested by Dr. Rue. [Trial Testimony of Dr. Rue, Vol. II at 51].

Because Dr. Rue lacks the academic qualifications and scientific credentials possessed by plaintiffs' witnesses, I conclude that his testimony, which is based primarily, if not solely, upon his limited clinical experience, is not credible. His testimony is devoid of the analytical force and scien-

ing at trial. At the pretrial conference, I orally denied defendants' motion in limine. *See* Pretrial Conference Transcript at 5–16. Subsequently, I issued an order memorializing my denial of defendants' motion and explaining my

reasons therefor. *See* Order (July 31, 1990). I incorporate herein by reference my ruling at the pretrial conference and in my July 31, 1990 order herein by reference.

tific rigor which typified the testimony of plaintiffs' expert psychologist, Dr. Walker. Moreover, his admitted personal opposition to abortion, even in cases of rape and incest, suggests a possible personal bias. Finally, his testimony concerning informed consent is suspect in light of his lack of direct involvement in obtaining informed consent for any medical treatment or procedure.

20. Dr. Watson Allen Bowes, Jr., testified at trial as an expert in the fields of high risk obstetrics and maternal fetal medicine. He is qualified to testify as an expert in these fields, and I found his testimony credible in certain respects but subject to certain limitations caused by his admitted philosophical opposition to abortion.[19] In addition, because Dr. Bowes is not a certified specialist in emergency medicine, like Dr. Davidson, his testimony on issues pertaining to this area is not entitled to the same weight as the testimony of Dr. Davidson.

Dr. Bowes is a physician licensed to practice medicine in North Carolina and Colorado. He received his bachelor's degree from Washington and Lee University in 1955 and graduated from the University of Colorado School of Medicine in 1959. Dr. Bowes completed his internship at Mary Hitchcock Memorial Hospital, his residency (general practice) at the University of Colorado, and his residency (obstetrics and gynecology) at the University of Colorado School of Medicine. In addition, he was a Fellow in Obstetrics and Gynecology, Reproductive Physiology Laboratory at the University of Colorado School of Medicine.

Dr. Bowes is certified by ACOG, as well as ACOG's Division of Maternal–Fetal Medicine. He is presently a Professor in the Department of Obstetrics and Gynecology at the University of North Carolina School of Medicine at Chapel Hill. Previously, he taught obstetrics and gynecology at the University of Colorado as an assistant professor, associate professor and full professor. Finally, he is the author of various publications in his field. [Trial Testimony of Dr. Bowes, Vol. III at 25–32; Defendants' Exhibit 61].

21. Patricia Potrzebowski, Ph.D., testified at trial, and I found her testimony credible in all respects. She is the Director of the Division of Health Statistics and Research, State Health Data Center, Department of Health. She has a bachelor's degree in biology from Schimer College, Mount Carroll, Illinois. In 1974, she obtained a doctorate degree in human genetics from the Graduate School of Public Health from the University of Pittsburgh. She has been the Director of the Division of Health Statistics since late 1976 or early 1977. [Trial Testimony of Dr. Potrzebowski, Vol. III at 88–90; *see also Casey I,* 686 F.Supp. at 1094 (¶ 14)].

B. *Procedures and Practices of Plaintiffs.*

(1) Planned Parenthood of Southeastern Pennsylvania

22. PPSP performs approximately 2,800 first trimester abortions a year. The abortion procedure presently costs full payment patients $240, if the woman is 12 weeks or less from her last menstrual period. All fees cover only the direct costs of the procedure, including personal counseling, medical testing and examination, the abortion procedure, medical supervision during the post-surgical recovery, and a post-abortion examination. [Court's Exhibit 1 at ¶ 3].

23. PPSP charges $180 for abortions for women who are on medical assistance but whose abortions are not reimbursable by the state. [Court's Exhibit 1 at ¶ 4].

24. PPSP accepts state medical assistance reimbursement in lieu of direct payment for abortions for victims of rape and incest, and for women with life-threatening conditions. In 1987, approximately 53 of

---

19. Dr. Bowes testified that he would not perform an abortion under any circumstances except when the life of the mother is threatened. Further, he has been a member of the American Association of Pro–Life Obstetricians, an organization of obstetricians and gynecologists opposed to the performance of abortions except where necessary to save the life of the mother. [Trial Testimony of Dr. Bowes, Vol. III at 30–31].

the abortions performed at PPSP were reimbursed by the Commonwealth. [Court's Exhibit 1 at ¶ 5].

25. When a woman believing she is pregnant presents herself at a PPSP clinic, she is given a pregnancy test and examined by a nurse practitioner or physician. Women who believe they have just recently become pregnant are offered early detection by means of a blood test or special urine test. Once it is determined that she is pregnant, the woman is encouraged to participate in an individual options counseling session with a PPSP counselor. [Court's Exhibit 1 at ¶ 7].

26. Options counselors are volunteers or staff counselors who have completed a special training program under the supervision of PPSP counselors and other senior staff members. This training program consists of 43 hours of group sessions that focus on factual information regarding adoption, abortion, contraception and referral resources. The course also gives participants the opportunity to evaluate, explore and share their attitudes and feelings. The course is certified by Temple University, and participants receive four CEU credits for completion of the training. [Court's Exhibit 1 at ¶ 8].

27. Abortion counselors are members of PPSP's counseling staff or college student interns working under the supervision of a staff counselor. These counselors have college backgrounds and experience in a health or social services related field. All abortion counselors have had on-site training in pregnancy counseling and abortion care and are required to participate in ongoing in-service training. [Court's Exhibit 1 at ¶ 9].

28. Each PPSP client participates in an individual abortion counseling session on the day her procedure is scheduled. In this session, the counselor and the woman discuss the woman's medical history, personal situation and feelings about abortion. The counselor explains the abortion procedure and its risks. Post-abortion care and contraceptive plans are also explored. If the client has been accompanied to the clinic by a person she wishes to involve in the counseling, that person will be included in part of this session. In some cases the abortion counselor will serve as the support person and accompany the woman through the procedure. [Court's Exhibit 1 at ¶ 10].

29. To assure that minors are informed of all options and are making a free and informed choice, PPSP counseling sessions for minors are more extensive. In the course of the counseling session, minors are given detailed information on the procedure and its risks. Minor women are also counseled on future contraceptive care. When a minor does elect to involve a parent or other supportive adult such as an aunt, guardian or older sibling, the counselor will first meet privately with the minor. Then, at the counselor's discretion and with the minor's consent, the parent or adult will be brought in for joint counseling. [Court's Exhibit 1 at ¶ 11].

30. Many of PPSP's abortion patients come from referrals from other clinics where they previously have received options counseling. [Court's Exhibit 1–A at ¶ 115].

31. During options counseling at PPSP, the counselors discuss with the woman the option of keeping her baby or giving it up for adoption. [Court's Exhibit 1–A at ¶ 116].

32. It is typical for a woman to receive counseling about her options once she has her pregnancy diagnosed at one of PPSP's centers, and to receive counseling again at the surgical center in Center City. [Court's Exhibit 1–A at ¶ 123].

33. In 1987, PPSP performed 359 abortions for women under the age of 18. [Court's Exhibit 1 at ¶ 6].

34. PPSP encourages minors to bring a parent with them. [Court's Exhibit 1–A at ¶ 114].

35. Approximately 65% of the minors bring a parent with them to the counseling session in PPSP's experience. [Court's Exhibit 1–A at ¶ 117].

36. PPSP refers women with medical problems that make them high-risk patients to hospitals. [Court's Exhibit 1–A at ¶ 113].

37. PPSP advises minors (and others) that if anything unusual or any sort of complications occur to let PPSP know and come back for treatment or to go to an emergency room for treatment. [Court's Exhibit 1–A at ¶ 124].

38. PPSP collects information for its internal use concerning medical complications following an abortion. [Court's Exhibit 1–A at ¶ 122].

### (2) Reproductive Health and Counselling Center

39. RHCC performs approximately 2,900 first and early second trimester abortions annually. [Court's Exhibit 1 at ¶ 12].

40. RHCC employs a staff of approximately four physicians, one nurse practitioner, and two full-time and two part-time counselors. Abortions are performed on Tuesday, Wednesday and Friday afternoons. Additional counseling sessions are available by appointment. [Court's Exhibit 1 at ¶ 13].

41. At RHCC, one physician works at a time during those hours of operation when abortions are performed. [Court's Exhibit 1–A at ¶ 141].

42. First trimester abortions (up to 12 weeks from the last menstrual period) with local anesthesia cost RHCC clients $220. For abortions from 12 to 16 weeks from the last menstrual period the cost is $375, plus an additional $70 for a required ultrasound. [Court's Exhibit 1 at ¶ 14].

43. If RHCC's clients are eligible for medical assistance reimbursement, RHCC seeks reimbursement from the Commonwealth. In 1987, RHCC was reimbursed for no more than 20 such abortions. The reimbursement rate was $59.50 to the clinic and $81.50 to the physician. [Court's Exhibit 1 at ¶ 15].

44. Where a client receives medical assistance from the state but is not eligible for medical assistance for an abortion, RHCC provides a $50 cost reduction for first trimester abortions with local anesthesia. [Court's Exhibit 1 at ¶ 16].

45. While RHCC's clients come primarily from Delaware, Philadelphia, Chester and Bucks Counties, approximately 3–4% of its clients come from areas in excess of three hours travelling time. [Court's Exhibit 1 at ¶ 17].

46. A woman's first contact with RHCC is usually by telephone. Women who call RHCC may or may not have had a pregnancy test prior to calling. Telephone counselors refer the women to RHCC or to the agency closest to her home or place of work for the test. [Court's Exhibit 1 at ¶ 19].

47. If a woman has a positive pregnancy test and wants to terminate the pregnancy, RHCC will schedule an abortion appointment, usually within one week's time. If the woman indicates uncertainty about her decision, the telephone counselor will recommend her making an appointment to talk further with an options counselor about her decision. [Court's Exhibit 1 at ¶ 20].

48. At an options counseling session, an RHCC counselor talks with the woman about her feelings about her pregnancy. The purpose of the session is to let the woman know about each of the three options available to her: carrying to term and keeping the child, carrying to term and giving the child up for adoption, and abortion. Where appropriate, the woman is urged to talk about these options with supporting family members and friends. The role of the counselor in these sessions is to support the decision of the woman and to provide information that would be necessary as she acts on her decision. [Court's Exhibit 1 at ¶ 22].

49. Pre-abortion counseling at RHCC, which each woman must participate in on the day of her abortion and which is different from options counseling, involves a discussion of the woman's decision, a review of her medical history and a description of the risks and complications of the abortion procedure. The informed consent part of the session is done with groups of four women. The counselor describes the medical procedure, reviews the risks and complications, and answers questions or addresses concerns. RHCC also provides counseling to the person or persons who accompa-

ny women for abortions. [Court's Exhibit 1 at ¶ 23].

50. Pre-abortion and options counselors are trained and supervised by RHCC's head counselor who has nine years counseling experience. [Court's Exhibit 1 at ¶ 24].

51. Telephone counselors' salaries at RHCC are between $6 and $6.30 an hour. For options counselors, salaries begin at $6.30 an hour. [Court's Exhibit 1–A at ¶ 134].

52. RHCC counselors are not required to have a bachelor's degree. [Court's Exhibit 1–A at ¶ 135].

53. If a woman receives options counseling and pre-abortion counseling at RHCC, such counseling occurs on different days, with options counseling being available on Tuesdays and Thursdays. [Court's Exhibit 1–A at ¶ 136].

54. In 1987, RHCC performed abortions on 349 minors. Approximately 60% of these minors were accompanied by a parent. That percentage has decreased to approximately 50%. All minors who choose not to be accompanied by a parent are required to bring a responsible adult with them to RHCC who will stay in the building as long as the minor is there and will accompany the minor home. [Court's Exhibit 1 at ¶ 18; Court's Exhibit 1–A at 145].

55. RHCC strongly urges options counseling for all minors who have not involved their parents in the decision. [Court's Exhibit 1 at ¶ 21].

56. In general, RHCC supports and encourages parental involvement in the abortion decision where possible. [Court's Exhibit 1–A at ¶ 137].

57. If a parent accompanies a minor to RHCC for the abortion procedure, the minor reviews the risks and informed consent provision in the group session while the waiting room counselor goes over that information, including possible complications, with the parent. [Court's Exhibit 1–A at ¶ 138].

58. RHCC keeps statistics on complications. [Court's Exhibit 1–A at ¶ 139].

59. The Medical History Form used by RHCC was being used prior to the 1988 amendments to the Act. [Court's Exhibit 1–A at ¶ 142].

60. RHCC submits quarterly reports of complications to the National Abortion Federation. [Court's Exhibit 1–A at ¶ 143].

61. Doctors at RHCC sign the individual reporting forms (Report of Induced Termination of Pregnancy) submitted to the Pennsylvania Department of Health ("PaDOH") immediately following the abortion procedure. [Court's Exhibit 1–A at ¶ 144].

62. No physician at RHCC has ceased performing abortions because their identity is listed on PaDOH pregnancy termination forms. [Court's Exhibit 1–A at ¶ 140].

(3) Women's Health Services and Dr. Allen

63. WHS has a staff of approximately 75 people (including 8 physicians, 14 nurses and 33 counselors) and offers ongoing programs which are inclusive of approximately 2,700 client contacts a month. [Court's Exhibit 1 at ¶ 25].

64. Free pregnancy testing and counseling are available at WHS daily, Monday through Saturday. Abortions are performed Tuesdays, Fridays and Saturdays. Gynecology clinics are held on Wednesdays, Thursdays, and any other day a patient's condition dictates. Once their pregnancy is diagnosed, clients usually schedule their abortions by telephone. [Court's Exhibit 1 at ¶ 26].

65. WHS provides approximately 12,900 free pregnancy tests and 7,000 first trimester and early second trimester abortions each year. The abortion procedure at WHS costs as follows: $330 if twelve weeks or less from the last menstrual period; and $430 if thirteen to fourteen weeks from the last menstrual period; and $650 if fifteen to sixteen weeks from the last menstrual period. The fee includes the abortion procedure, laboratory testing, personal counseling, contraceptive care, pathological examination and medical supervision during the post-surgical recovery period. [Court Exhibit 1 at ¶ 27].

66. WHS does not perform abortions after 17 weeks gestation. [Court's Exhibit 1–A at ¶ 85].

67. If clients are eligible for medical assistance, WHS takes the necessary information and seeks reimbursement from the Commonwealth. Medical assistance is available only where the abortion is necessary because of the life-threatening condition, or because the patient was a victim of rape or incest. In 1989, WHS was reimbursed for 46 such abortions. [Court's Exhibit 1 at ¶ 28].

68. Where a client receives medical assistance from the state, but is not eligible for medical assistance for an abortion, WHS nevertheless will discount the cost of the abortion. Last year, WHS accommodated 1,170 clients who were unable to pay the full amount. WHS has never turned away any client seeking an abortion merely because of inability to pay. [Court's Exhibit 1 at ¶ 29].

69. WHS's clients come primarily from Allegheny County. In 1989, however, 909 of their abortion patients came from areas in excess of two hours travelling time (100 miles) from the clinic. [Court's Exhibit 1 at ¶ 30].

70. When a patient presents herself at the WHS clinic, she receives a pregnancy test and blood tests. [Court's Exhibit 1 at ¶ 32].

71. As to WHS, free pregnancy tests and counseling are available Monday through Saturday, but 95% of counseling services are provided on the same day of the abortion. [Court's Exhibit 1–A at ¶ 110].

72. Both Magee and WHS take a patient's history prior to performing the abortion. [Court's Exhibit 1–A at ¶ 90].

73. In Dr. Allen's private practice, a patient completes a history form, which is a sort of health questionnaire, which is then amplified by a nurse's questions and further amplified by the physician when he sees her. [Court's Exhibit 1–A at ¶ 91].

74. At WHS, the patient completes the history form, which is gone over by a counselor, and then the physician reviews it prior to performing the abortion. [Court's Exhibit 1–A at ¶ 92].

75. All women are required to have an individual interview with a counselor on the day of their abortion. During this interview, a woman is counseled with respect to her options and her decision to have an abortion. Information regarding the risks and benefits of the abortion procedure and the patient's medical history is provided to her. In that connection, the counselor seeks to ensure that the woman is not unduly ambivalent about her decision and that she is not being coerced. In addition, the counselor discusses future contraceptive use with the patient. [Court's Exhibit 1 at ¶ 33].

76. If the client appears ambivalent about her decision, the counselor will refer her to one of the staff therapists and the abortion will be rescheduled to give the patient more time to consider her options. On rare occasions, the clinic will refuse to perform the abortion, if convinced of the patient's continued ambivalence. [Court's Exhibit 1 at ¶ 34].

77. Options counseling is provided on the day of the procedure by WHS professional counselors who are selected on the basis of personal qualifications and maturity. [Court's Exhibit 1 at ¶ 36].

78. Extensive and intensive problem pregnancy counseling is available at WHS at no charge to clients either before or after a decision with respect to an abortion has been made, regardless of what that decision may be. Personal counseling is also available after the abortion procedure and clients are encouraged to take advantage of that service. [Court's Exhibit 1 at ¶ 37].

79. At WHS, the average counseling takes 20 minutes. [Court's Exhibit 1–A at ¶ 102].

80. In 1989, 703 of WHS's abortion patients were under the age of 18. WHS presently encourages minors to bring a parent or other adult with them. Because WHS believes that parental involvement should be encouraged, clinic counselors are instructed to offer to speak with the mi-

nor's parents, if the minor would prefer that to making direct contact herself. When minors refuse to inform their parents under any circumstances, their wishes are currently respected. [Court's Exhibit 1 at ¶ 31].

81. Fifty percent of the minors who go to WHS are accompanied by a parent. When a parent accompanies a minor seeking an abortion, WHS first counsels the minor with respect to her options and her decision to have an abortion, and also provides her with information on future contraceptive use. The parent is then asked to join the minor, at which time the abortion procedure and possible complications are described. The counselor also answers any questions they might have. An informed consent form is then read out loud to the parent and minor while they follow along with their own copies. Each then signs the form in the medical record. [Court's Exhibit 1 at ¶ 35; Court's Exhibit 1–A at ¶¶ 97, 101].

82. No abortion can be performed on a minor at Magee without a parent's written consent. [Court's Exhibit 1–A at ¶ 94].

83. Approximately 30% of Dr. Allen's patients seeking abortions are minors. [Court's Exhibit 1–A at ¶ 95].

84. If a parent comes with a minor for an abortion procedure at Magee, Dr. Allen will speak to the parent too. If a parent comes with a minor for an abortion procedure at WHS, a counselor speaks to the parent. [Court's Exhibit 1–A at ¶ 96].

85. At present, WHS's director of personal counseling holds a Ph.D. [Court's Exhibit 1 at ¶ 38].

86. Personal counselors at WHS are professional therapists who have at least five years of clinically supervised experience at the master's degree level or above. [Court's Exhibit 1 at ¶ 39].

87. Both paraprofessional and professional counselors at WHS are required to begin their employment with a week of classroom preparation, consisting of approximately 35 hours of medical and counseling orientation ⁺to the abortion clinic. This instruction is provided by the associ-

ate medical director, director of counseling, and director of clinical services. [Court's Exhibit 1 at ¶ 40].

88. The medical information to be presented by counselors at WHS is developed under the supervision of a physician, the WHS associate medical director. The counseling protocols are developed and presented under the supervision of the director of counseling who holds a Ph.D. from the University of Pittsburgh. WHS also has an ongoing training module comprised of monthly inservices and quarterly individual supervision. [Court's Exhibit 1 at ¶ 41].

89. Dr. Allen always does some counseling with his patient prior to the procedure and goes over the informed consent form with them. [Court's Exhibit 1–A at ¶ 89].

90. Dr. Allen signs PaDOH reporting forms for Magee but WHS uses his signature stamp for such forms. [Court's Exhibit 1–A at ¶ 93].

91. WHS has a hot-line for women to call if they have any unusual symptoms or problems after an abortion to make sure there is immediate treatment. [Court's Exhibit 1–A at ¶ 103].

92. WHS provides information to the National Abortion Federation and the Alan Guttmacher Institute, including information concerning complications and the frequency that WHS's patients report to them or WHS observes them. [Court's Exhibit 1–A at ¶ 105].

93. If a medical emergency resulting from an abortion performed at WHS occurs, an ambulance is called to take the person to the hospital. [Court's Exhibit 1–A at ¶ 111].

(4) Women's Suburban Clinic

94. WSC performs approximately 3,350 first trimester abortions a year. Abortions are performed Tuesdays, Wednesdays and Thursdays. [Court's Exhibit 1 at ¶ 43].

95. The fee for an abortion at WSC is $275. At present, WSC accepts state medical assistance reimbursement for abortions for cases of rape, incest and life endangerment. Approximately 40 such claims are

reimbursed by the Commonwealth annually. [Court's Exhibit 1 at ¶ 45].

96. Appointments for counseling and abortions are made through WSC telephone counselors. A positive pregnancy test is required before an abortion is scheduled. [Court's Exhibit 1 at ¶ 46].

97. The telephone counselors at WSC make appointments and receive clients but they do not counsel about pregnancy options. [Court's Exhibit 1-A at ¶ 125].

98. Depending on the patient interest and availability, appointments are made at WSC in one of the following ways:

a. If a woman requests counseling and the abortion on the same day, the first available appointment is given. There is often a one to two week wait in obtaining an appointment. Approximately 70% of the abortion appointments are scheduled this way.

b. If a woman wants to see a counselor prior to the day of her abortion, a pre-abortion session is scheduled. Approximately 30% of the abortion appointments are scheduled this way. [Court's Exhibit 1 at ¶ 47].

99. A woman who calls WSC and expresses concern and confusion over an unwanted pregnancy is offered an opportunity to see a counselor to discuss her options. Resource information is available for options including keeping the child, foster care and adoption. Information concerning maternity homes is also available for those women who wish to carry their pregnancy to term. [Court's Exhibit 1 at ¶ 49].

100. All counseling at WSC is provided on an individual basis by a trained counselor. All but one member of WSC's counseling staff have master's degrees. The other has a bachelor's degree with several years experience in counseling and family planning. All have backgrounds in various fields of human services. [Court's Exhibit 1 at ¶ 50].

101. It is WSC's policy that in order to counsel effectively, without becoming overstressed by the emotional demands of the job, counselors are not permitted to provide counseling for more than 20 hours a week. [Court's Exhibit 1 at ¶ 51].

102. WSC encourages that partners and/or parents be seen by the counselor during or after the counseling session. However, all clients are first seen alone by a WSC counselor. [Court's Exhibit 1 at ¶ 52].

103. Counseling at WSC is provided in an objective, nonjudgmental manner. The client's decision is reviewed and explored. The counselor also reviews the client's medical history, describes the abortion procedure, reviews birth control methods and goes over the informed consent form. Disclosure of medical risks and benefits is made as well. Also, post-abortion information, including what to do in the event of an emergency, is reviewed. [Court's Exhibit 1 at ¶ 53].

104. For women who express ambivalence over their abortion decision, the WSC counselor will further explore the issues. If the counselor feels that the woman is not sure of her decision, it is suggested that she take some time to reevaluate her choice. Additional counseling is available to assist the woman to come to a decision with which she feels comfortable. [Court's Exhibit 1 at ¶ 54].

105. Counselors at WSC start at $8.50 per hour and are all part-time employees. [Court's Exhibit 1-A at ¶ 126].

106. Of the approximately 3,350 abortions WSC performed in 1987, 410 (12.25%) were performed on minors. [Court's Exhibit 1 at ¶ 44].

107. WSC encourages minors to attend with a parent. [Court's Exhibit 1-A at ¶ 127].

108. All minors who have not informed a parent about their decision to have an abortion are asked to come to WSC for precounseling before the abortion appointment. This is done to give adolescents the opportunity to explore with a counselor their reasons for not involving their par-

ents and affords them the time and opportunity to reevaluate that decision prior to the abortion. [Court's Exhibit 1 at ¶ 48].

109. If a parent comes in with a minor to WSC, the minor is first seen alone by the counselor and then the parent joins the counseling session. [Court's Exhibit 1–A at ¶ 130].

110. WSC does not perform abortions due to medical emergencies defined by the Act or otherwise. [Court's Exhibit 1–A at ¶ 128].

111. If an emergency occurs when performing an abortion at WSC, a crash cart is used to stabilize the woman and then, in all probability, the woman would be transferred to a hospital based upon the physician's or medical director's decision. [Court's Exhibit 1–A at ¶ 129].

112. WSC maintains or collects internal data regarding complications that occur during the performance of abortions. [Court's Exhibit 1–A at ¶ 133].

(5) Allentown Women's Center

113. AWC provides approximately 5,300 pregnancy tests and 4,000 first trimester abortions each year. [Court's Exhibit 1 at ¶ 56].

114. Abortions are performed at AWC three to five days a week, depending on patient need. [Court's Exhibit 1 at ¶ 57].

115. The abortion procedure at AWC costs $280, with additional charges for services such as RhoGam shots for women more than twelve weeks pregnant, and general anesthesia. The fee includes personal counseling both before and after the abortion, the abortion procedure, laboratory testing, and medical supervision during the post-surgical period. [Court's Exhibit 1 at ¶ 58].

116. For patients who receive medical assistance from the Commonwealth, AWC's fee for abortion is $225. [Court's Exhibit 1 at ¶ 59].

117. In the case of those medical assistance patients who require an abortion because of a life-threatening disease or be-

cause they were victims of rape or incest, AWC has received reimbursement from the state, so that no fee was charged directly to the patient. In 1987, AWC received less than $4,000 in medical assistance funds. [Court's Exhibit 1 at ¶ 60].

118. AWC's patients come primarily from an 18–county area in northern Pennsylvania encompassing the counties of Lehigh, Northampton, Carbon, Schuylkill, Luzerne, Lackawanna, Lebanon, Berks, Bucks, Pike, Chester, Lancaster, Susquehanna, Wayne, Monroe, Montgomery, Columbia and Wyoming. Many of these counties have no clinics or hospitals at which abortions are performed, AWC being the closest facility to which women can come. [Court's Exhibit 1 at ¶ 61].

119. In most cases, appointments for counseling and abortions at AWC are made through AWC's telephone counselors. A positive pregnancy test is required before an abortion will be scheduled. When a woman calls requesting an abortion, the telephone counselor collects personal data, menstrual history and medical history. If the caller is a minor, the telephone interview is more extended to assure that the minor fully understands what she must do and what the procedure will involve. [Court's Exhibit 1 at ¶ 64].

120. When a telephone counselor makes an appointment, pre-abortion instructions are given to the woman. These instructions include what the woman must do and what she must bring with her on the day of the appointment. [Court's Exhibit 1 at ¶ 65].

121. Any woman who calls AWC and expresses concern and confusion over an unwanted pregnancy is offered an opportunity to see a counselor to discuss her options. Resource information is available for options, including keeping the child, foster care and adoption. Information concerning prenatal care, welfare and support services is also available for those women who wish to carry their pregnancy to term. [Court's Exhibit 1 at ¶ 66].

122. A nurse practitioner or physician's assistant is available to examine all women

and, where necessary, provide a pregnancy test and blood work-up. In addition, all women are required to have an individual interview with a counselor on the day their abortion is scheduled. In this interview, the abortion procedure and other alternatives are explained to the woman. [Court's Exhibit 1 at ¶ 67].

123. If the patient appears ambivalent about her decision to have an abortion, the AWC counselor will review options and suggest that the patient take more time to consider her decision before terminating the pregnancy. On occasion, the clinic has refused to permit an abortion if, after consultation, the counselor and the clinic supervisor are convinced of the woman's extreme ambivalence, coercion, or that she is otherwise overly distraught. Sometimes, but infrequently, they will refer these women to outside counselors. [Court's Exhibit 1 at ¶ 68].

124. In 1987, 563 of AWC's abortion patients were 17 or under. Of these, 3 were age 13; 32 were age 14; 64 were age 15; 178 were age 16; and 286 were age 17. [Court's Exhibit 1 at ¶ 62].

125. AWC encourages its minor patients to involve their parents in the abortion decision and to bring a parent or other supporting adult with them at the time of counseling and the procedure. Clinic counselors are routinely available to speak with a minor's parents. When a minor refuses to inform her parents under any circumstances, AWC respects those wishes. [Court's Exhibit 1 at ¶ 63].

126. When a parent does accompany a minor to the AWC clinic, a counselor will first meet privately with the minor. After assuring that the minor has reached her decision to have an abortion freely and without coercion, the counselor will give the minor the option to continue the counseling sessions jointly with her parent, or to be counselled separately. In either case, the counselor will describe the procedure and possible complications as well as answer any questions she or her parent may have. The minor is then asked to sign an informed consent form. [Court's Exhibit 1 at ¶ 69].

127. When a minor chooses not to have a parent involved, AWC counselors explore and encourage the involvement of a supporting adult. Counseling of a minor who has not informed her parents is more extensive and includes a discussion of why she has chosen not to involve her parents. [Court's Exhibit 1 at ¶ 70].

128. The options counseling provided on the day of the procedure at AWC is conducted by paraprofessional staff counselors who are selected on the basis of personal qualifications. Most of the counseling staff have bachelor's degrees. Two are presently working on master's degrees. All have backgrounds in various fields of human service. [Court's Exhibit 1 at ¶ 71].

129. All of AWC's counselors are required to begin their employment with at least a week of orientation. Instruction is provided by the Director, a nurse practitioner, the Patient Services Coordinator and other counseling staff. During the first several months of work, the new staff has frequent meetings either on an individual basis or as a group with administrative staff to reinforce correct integration of medical information and continued development of interviewing skills. [Court's Exhibit 1 at ¶ 72].

130. All medical information is developed and presented under the supervision of a physician who is AWC's medical director. The counseling protocols are developed under the supervision of the Patient Services Coordinator. [Court's Exhibit 1 at ¶ 73].

131. There is no minimum education requirement for AWC's counselors. [Court's Exhibit 1–A at ¶ 146].

132. AWC does not accept state appropriated funds. [Court's Exhibit 1–A at ¶ 148].

133. AWC provides information to the National Abortion Federation regarding AWC's complication rate. [Court's Exhibit 1–A at ¶ 149].

134. AWC, prior to 1988, advertised in the newspapers although it does not pres-

ently advertise there. AWC does advertise in telephone directories. [Court's Exhibit 1–A at ¶ 150].

### C. *Other Relevant Statistical Evidence.*

135. The following table represents the number of abortions performed in Pennsylvania and reported to PaDOH over the past ten years:

| YEAR | NUMBER OF ABORTIONS PERFORMED |
|---|---|
| 1989 [20] | 51,341 |
| 1988 | 50,786 |
| 1987 | 51,360 |
| 1986 | 51,666 |
| 1985 | 53,465 |
| 1984 | 59,258 |
| 1983 | 59,288 |
| 1982 | 60,772 |
| 1981 | 62,701 |
| 1980 | 65,777 |

[Court's Exhibit 1 at ¶ 76; Trial Testimony of Dr. Potrzebowski, Vol. III at 118; *see also Casey I,* 686 F.Supp. at 1101 (¶ 95)].

136. Of the 50,786 abortions performed in Pennsylvania in 1988, 47,548 (93.6%) were performed within the first three months of pregnancy. [Court's Exhibit 1 at ¶ 77]. Conversely, 3,238 (6.4%) were performed after the first three months of pregnancy.

137. Plaintiffs are unaware of any free standing abortion clinics in Pennsylvania that perform pregnancy termination procedures after the 18th week of gestation. [Court's Exhibit 1–A at ¶ 109].

138. Patients under the age of 18 accounted for 11.6%, or 5,888 of the abortions reported in Pennsylvania in 1988. [Court's Exhibit 1 at ¶ 78].

139. Of the 50,786 abortions performed in Pennsylvania and reported to PaDOH, 47,802 were performed on Pennsylvania residents. Residents of other states and territories accounted for 2,975 abortions,

and residents of other countries accounted for 9. Of the 1988 abortion patients residing in Pennsylvania, 15,269 (30%) resided in Philadelphia; 7,337 (14%) resided in Allegheny County; 2,863 (6%) resided in Montgomery County; 2,270 (4%) resided in Delaware County; and 2,141 (4%) resided in Bucks County. [Court's Exhibit 1 at ¶ 79].

140. The following table represents the numbers of induced terminations of pregnancies performed on minors, as reported to PaDOH, in Pennsylvania in 1988 by age of woman:

| AGE (YEARS) | NUMBER |
|---|---|
| 11 or less | 1 |
| 12 | 20 |
| 13 | 113 |
| 14 | 377 |
| 15 | 855 |
| 16 | 1,702 |
| 17 | 2,820 |

[Court's Exhibit 1 at ¶ 80].

141. During 1989, minor women received abortions at plaintiff-clinics as follows:

| CLINIC | AGE GROUP | NUMBER |
|---|---|---|
| RHCC | 14 years and under— | 27 |
| | 15–17 years— | 267 |
| AWC | 13 years old— | 4 |
| | 14 years old— | 22 |
| | 15 years old— | 71 |
| | 16 years old— | 160 |
| | 17 years old— | 257 |
| WSC | 12 years old— | 1 |
| | 13 years old— | 6 |
| | 14 years old— | 15 |
| | 15 years old— | 27 |
| | 16 years old— | 66 |
| | 17 years old— | 119 |
| PPSP | 12 years old— | 2 |
| | 13 years old— | 14 |
| | 14 years old— | 27 |
| | 15 years old— | 80 |
| | 16 years old— | 122 |
| | 17 years old— | 189 |
| WHS | 12 years old— | 2 |
| | 13 years old— | 11 |
| | 14 years old— | 33 |
| | 15 years old— | 117 |
| | 16 years old— | 226 |
| | 17 years old— | 314 |

[Court's Exhibit 1–A at ¶ 82].

**20.** The 1989 statistics provided by Dr. Potrzebowski are only provisional figures.

142. Of all abortions performed in Pennsylvania in 1988 and reported to Pa-DOH, 50,256 involved a dilation, evacuation, and curettage procedure. Intrauterine prostaglandin instillation was the procedure for 41. One abortion procedure was performed by a hysterotomy procedure, and none was performed by a hysterectomy. [Court's Exhibit 1 at ¶ 81].

143. According to the provisional statistical compilations of PaDOH, 391 pregnancy complications were reported in 1989. Of the 391 complications reported in 1989, 5 were caused by malignancy, 7 by endocervical polyps, 3 by rubella, 2 by hydatid moles, and 374 by other causes for which no further statistical breakdown presently exists. [Trial Testimony of Dr. Potrzebowski, Vol. III at 120].

144. The risk of death from an abortion is dependent upon numerous factors, which factors include length of gestation, the type of procedure used to perform the abortion, the medical condition of the patient, and the skill of the physician performing the abortion. [Court's Exhibit 1–A at ¶ 83].

145. From the standpoint of risks of complications and mortality, eight weeks gestation is the safest time, statistically, for the performance of an abortion. [Trial Testimony of Dr. Allen, Vol. I at 46, 71–72]. Beyond eight weeks gestation, the risk of complications (by approximately 30%) and mortality increase (by approximately 50%) with each additional week of gestation. [Trial Testimony of Dr. Allen, Vol. I at 45; Trial Testimony of Dr. Bowes, Vol. III at 54–56].

146. An abortion is twice as safe as a tonsillectomy and 100 times safer than an appendectomy. [Trial Testimony of Dr. Allen, Vol. I at 47]. The following table represents the risk of mortality from an abortion procedure, according to data complied by the Center for Disease Control:

| GESTATIONAL AGE (in weeks) | NUMBER OF DEATHS (per 100,000) |
| --- | --- |
| 8 or less | .5 |
| 9 to 10 | .8 |
| 11 to 12 | 1.1 |
| 13 to 15 | 1.5 |
| 16 to 20 | 7.8 |
| over 20 | 3.6 |

[Trial Testimony of Dr. Bowes, Vol. III at 55–56].

D. *The Act.*

147. On March 25, 1988, Act No. 31, amending the Pennsylvania Abortion Control Act of 1982, 18 Pa.C.S.A. §§ 3201–20, was enacted. Act 31 was scheduled to take effect thirty (30) days after enactment, on April 24, 1988. [Court's Exhibit 1 at ¶ 74].

148. On November 17, 1989, Act No. 64, further amending the Pennsylvania Abortion Control Act of 1982 was enacted. Act 64 was scheduled to take effect sixty (60) days after enactment, on January 16, 1990. [Court's Exhibit 1 at ¶ 75].

(1) Definition of Medical Emergency (Section 3203)

149. Section 3203 of the Act defines the term "medical emergency" as "[t]hat condition which, on the basis of the physician's good faith clinical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible impairment of major bodily function." 18 Pa.Con.Stat. Ann. § 3203. The Act does not further define the terms "serious risk," "substantial and irreversible impairment," or "major bodily function."

150. This definition applies to the following provisions of the Act containing medical emergency exceptions: section 3205 (informed consent); section 3206 (parental consent or judicial by-pass); section 3209 (spousal notification); section 3210 (determination of gestational age); and 3211 (performance of abortions after 24 weeks gestation). Penalties for violation of these provisions include suspension or revocation of the physician's license or criminal conviction for a third degree felony or third degree misdemeanor.

151. The 1989 amendments to the Act did not change the definition of medical

emergency despite my ruling on plaintiffs' motion for a preliminary injunction which invalidated this definition and enjoined all those sections of the Act which contained the term. *See Casey I,* 686 F.Supp. at 1136–37. Prior to the 1988 amendments, "medical emergency" was defined as "[t]hat condition which, on the basis of the physician's best clinical judgment, so complicates a pregnancy as to necessitate the immediate abortion of same to avert the death of the mother or for which a 24–hour delay will create grave peril of immediate and irreversible loss of major bodily function." *See* 1982 Pa.Laws 476, 478, § 1.

152. According to the generally accepted definition of a medical emergency in emergency medicine, an emergency is any medical condition that requires intervention, both diagnostic and treatment, quickly. [Trial Testimony of Dr. Davidson, Vol. I at 14–15]. In emergency medicine, it is essential that doctors be flexible in their response to their patients. Every patient is different and each emergency condition presents the physician with a dynamic situation in which judgments must be made quickly and, if necessary, quickly altered or adjusted. [Trial Testimony of Dr. Davidson, Vol. I at 14, 21–22].

153. Pennsylvania's Emergency Medical Services Act defines a medical emergency as "a combination of circumstances resulting in a need for immediate medical intervention." *See* 35 Pa.Stat.Ann. § 6923 (Purdon 1990 Supp.).

154. The definition of medical emergency in the Act departs from the normal medical definition of an emergency and is inconsistent with that contained in Pennsylvania's Emergency Medical Services Act. [Trial Testimony of Dr. Davidson, Vol. I at 15–17; Trial Testimony of Dr. Bolognese, Vol. I at 142; Preliminary Injunction Hearing Testimony of Dr. Dratman at 61]. Defendants' expert, Dr. Bowes, agrees that the definition of medical emergency in the Act differs from other definitions commonly used in the medical profession. [Trial Testimony of Dr. Bowes, Vol. III at 81–82].

155. No other law infringes so heavily on a physician's discretion to decide when he or she is faced with a medical emergency as the provisions of the Act. [Trial Testimony of Dr. Davidson, Vol. I at 15–16; Trial Testimony of Dr. Bowes, Vol. III at 81–82].

156. Under typical emergency conditions, the definition of "medical emergency" of the Act would cause the physician confusion regarding the proper treatment of the patient and hinder his or her ability to make a rapid response to the detriment of the health of their patient, or it would cause physicians to unknowingly violate the Act by acting in accordance with their medical training and professional judgment rather than conforming to the requirements of the Act. [Trial Testimony of Dr. Bolognese, Vol. I at 143–44].

157. The Act's narrow definition of medical emergency may require a physician to act in ways that do not protect or restore the health of his or her patient in instances where a delay in the abortion procedure will pose a risk to the patient's health, but an immediate abortion may not be necessary to avert her death or to prevent a serious risk of the substantial and irreversible loss of a major bodily function. [Trial Testimony of Dr. Davidson, Vol I at 20–21].

158. The restrictive definition of medical emergency in the Act could exacerbate existing emergency situations. Or the definition could create emergencies because physicians fearful of civil or criminal sanctions under the Act may delay treatment of an emergency or hesitate to act in the best interests of his or her patient. [Trial Testimony of Dr. Davidson, Vol. I at 34–35; Trial Testimony of Dr. Bolognese, Vol. I at 143–44].

159. The definition of medical emergency in the Act permits the physician to exercise his or her "good faith clinical judgment" in determining whether a medical emergency exists. However, this does not alter the fact that a "serious risk of substantial and irreversible impairment of major bodily function" must exist for a situation to constitute a medical emergency under the Act. Nor does it alter the fact that

the definition of medical emergency in the Act is inconsistent with the generally accepted definition of medical emergency in the medical profession. Further, the risk of loss of license or criminal liability hinders the physician's ability to rely upon his or her good faith clinical judgment.[21] [Trial Testimony of Dr. Davidson, Vol. I at 34–35; Trial Testimony of Dr. Bolognese, Vol. I. at 143–44; Preliminary Injunction Hearing Testimony of Dr. Dratman at 63].

160. Under no other circumstances would a physician be required to delay treatment when presented with a patient with a risk, as opposed to a "serious risk," of an impairment, as opposed to a "substantial and irreversible impairment," of any bodily function, as opposed to a "major bodily function." Such a requirement is contrary to generally accepted standards of emergency medical care, and interferes with a physician's ability to act in accordance with his best medical judgment.

161. A patient's entitlement to immediate medical care, under the Act, would depend upon the individual physician's assessment of the severity of the condition and whether that physician considered the impairment to be: (1) substantial and irreversible and (2) to a major bodily function. Different interpretations of the Act could result in different patients, with similar or identical symptoms, in need of emergency medical care receiving different treatment. This difference of opinion is amply illustrated by the testimony of Dr. Bowes and Dr. Bolognese. Dr. Bowes, an obstetrician and gynecologist, did not include the uterus or other female reproductive organs within his definition of major bodily function. Dr. Bolognese, also an obstetrician and gynecologist, on the other hand, testified that he would include such organs within this definition. [Trial Testimony of Dr. Bolognese, Vol. I at 142; Trial Testimony of Dr. Bowes, Vol. III at 34–35].

162. Plaintiffs have presented three examples of how the definition of medical emergency contained in the Act may depart from standard medical practice in emergency situations.

163. Frequently pregnant women present themselves to hospital emergency rooms complaining of vaginal bleeding, lower abdominal pain, and progressive cervical dilation, which are the symptoms of an inevitable abortion. In a 40,000 visit a year emergency room, women arrive experiencing inevitable abortions once a week. Dr. Davidson personally treats women suffering from inevitable abortions two or three times a year. Further, this occurrence is sufficiently common to permit medical trainees at the Hospital of the Medical College of Pennsylvania to see an inevitable abortion in the emergency room anywhere between five and fifty times over the course of a three-year program. [Trial Testimony of Dr. Davidson, Vol. I at 22, 26–27].

164. It is common practice for an emergency room physician, when treating a woman with an inevitable abortion, to use an instrument to remove products of conception, including parts of the placenta or fetal parts, to alleviate the bleeding. This would constitute a partial abortion. [Trial Testimony of Dr. Davidson, Vol. I at 23, 26–27].

165. The appropriate and safest treatment for a patient experiencing an inevitable abortion is to empty the uterus immediately by dilating the cervix and evacuating the uterus. Failure to terminate the pregnancy immediately via dilation and curettage, or some other method, could expose the patient to increased risks to her health, including shock and the need for a blood transfusion, as well as continued pain and discomfort. However, with proper treatment, an inevitable abortion is generally not life threatening or likely to cause any permanent physical impairment. [Trial

---

**21.** While defendants' expert witness Dr. Bowes testified that he did not think such consequences would affect a physician's judgment since practicing medicine is already wrought with stress, he admitted that the potential criminal liability established by the Act could cause physicians to become more cautious in their practice of medicine and add stress to an already stressful profession. [Trial Testimony of Dr. Bowes, Vol. III at 76, 83].

Testimony of Dr. Davidson, Vol. I at 23–25].

166. An inevitable abortion is a condition for which immediate medical treatment is required in the exercise of good medical judgment but does not fall within the Act's definition of medical emergency. There is no medical reason to delay the performance of an abortion, when a woman is suffering from an inevitable abortion. Therefore, compliance with the Act would require a departure from standard of care presently existing in medical practice, and could jeopardize the health of pregnant women. [Trial Testimony of Dr. Davidson, Vol. I at 26–28, 34–35].

167. A premature ruptured membrane is another common medical condition which could be suffered by a pregnant woman both before and after the fetus reaches the stage of viability. Between six and ten percent of the births in the United States are premature. Of those premature births, twenty-five to thirty percent of them are preceded by a premature ruptured membrane. Ruptured membranes commonly occur in women of poorer personal health or women with poorer obstetrical care, as well as with drug users or women with poor personal hygiene. [Trial Testimony of Dr. Bolognese, Vol. I. at 148].

168. When an infection occurs after a rupture, the accepted course of treatment is to terminate the pregnancy immediately. Failure to terminate the pregnancy could expose the patient to increased risks to her health, including spread of the infection throughout her body, overwhelming septic infection, shock and disseminated intravascular coagulopathy. [Trial Testimony of Dr. Bolognese, Vol. I at 151–52].

169. For pregnancy of 24 gestational weeks or less, the likelihood of a successful outcome of the pregnancy ranges from extremely poor to impossible because of the absence of amniotic fluid which permits the development of the lungs. Under these circumstances, immediate termination of the pregnancy is usually recommended. [Trial Testimony of Dr. Bolognese, Vol. I at 149–50].

170. The standard method to terminate the pregnancy when infection occurs is a vaginal delivery which is induced by the administration of Pitocin. However, delay could cause the uterus to become infected. An infection in the uterus may hinder the physician's ability to induce labor through the use of Pitocin. In these cases, a vaginal delivery must be utilized, which places the woman at greater risk. In some cases, the physician may have to remove the uterus. [Trial Testimony of Dr. Bolognese, Vol. I at 152–53].

171. Among the patients treated in an obstetrical practice, particularly high risk obstetrics, are pregnant women, including minors, who are experiencing complications known as preeclampsia (toxemia of pregnancy). Preeclampsia is a combination of symptoms related to an immunological disorder which tends to occur more frequently in first time pregnancies and younger patients. The recommended course of treatment is the induction of labor for a vaginal delivery. Delay could worsen maternal health and cause a loss of oxygen to the fetus. Eclampsia, a seizure disorder caused by edema or excess fluid, and HELLP Syndrome, an adult respiratory distress syndrome caused by fluid retention in the lungs, are possible further developments of preeclampsia. While a patient with preeclampsia is at risk, there is no immediate "serious risk of substantial and irreversible impairment of [a] major bodily function." However, once the symptoms manifest themselves, there is no medical reason for delay. [Trial Testimony of Dr. Bolognese, Vol. I at 154–56; Preliminary Injunction Hearing Testimony of Dr. Dratman at 59–61].

172. An example of how the definition of medical emergency in the Act may depart from medical practices is illustrated by the following hypothetical. A 16 year-old woman is 18 weeks pregnant. She is swollen; her blood pressure is elevated; her urine contains a considerable amount of protein; her reflexes are very brisk. She is diagnosed as having a clinical syndrome known as preeclampsia. The only treatment for this condition is to terminate the pregnancy. Under normal obstetrical prac-

tice, her condition would be considered to pose a medical emergency. However, while eclampsia could cause seizures which could, in turn, lead to a concussion or other serious medical conditions, there is no clear risk of "substantial and irreversible impairment of major bodily function." [Preliminary Injunction Hearing Testimony of Dr. Dratman at 59–61]. Therefore, this case would not fall within the definition of medical emergency contained in the Act.

173. If required to adhere to the definition of medical emergency contained in the Act, as opposed to the less restrictive definition used by physicians in other circumstances, a physician could delay in his or her treatment, namely the performance of an abortion, of a patient with a ruptured membrane or preeclampsia. Under these circumstances, preeclampsia and a ruptured membrane would not fall within the definition of medical emergency contained in section 3203, but would be considered an emergency warranting immediate treatment by the physician. Therefore, compliance with the Act would require a departure from standard of care presently existing in medical practice, and could ultimately jeopardize the health of the pregnant woman. [Trial Testimony of Dr. Davidson, Vol. I at 26–28, 34–35].

174. While Dr. Bowes testified that he was unaware of any condition where a patient would require an immediate abortion that would not fall within the Act's definition of medical emergency, his testimony on the subject actually supports the opinions of Dr. Davidson and Dr. Bolognese. For example, he testified that a medical emergency within the meaning of the Act would exist when a woman is experiencing an inevitable abortion but only when "serious" hemorrhaging is occurring in the patient. In respect to preeclampsia, he stated that a medical emergency within the meaning of the Act would exist "in the cases in which [preeclampsia] becomes severe" and "the patient's blood pressure is very high and other complications are occurring." When discussing a ruptured membrane, he

stated that this condition only becomes a medical emergency within the meaning of the Act when the patient develops a fever and the infection reaches the fetus. [Trial Testimony of Dr. Bowes, Vol. III at 37–42]. The credible testimony of Dr. Davidson, Dr. Bolognese and Dr. Dratman establishes that, viewing the term with the ordinary meaning given to it in the profession, the Act would not consider any of the three aforementioned conditions an emergency until much later in the progression of the seriousness of the condition.

(2) Informed Consent and Twenty–Four Hour Waiting Period (Section 3205)

175. Section 3205(a) of the Act, as amended, reads, in pertinent part, as follows:

Except in cases of a medical emergency, consent to an abortion is voluntary and informed if and only if:

(1) At least 24 hours prior to the abortion, the physician who is to perform the abortion or the referring physician has orally informed the woman of:

(i) The nature of the proposed procedure or treatment and of those risks and alternatives to the procedure or treatment that a reasonable patient would consider material to the decision of whether or not to undergo the abortion.

(ii) The probable gestational age of the unborn child at the time the abortion is to be performed.

(iii) The medical risks associated with carrying her child to term.

(2) At least 24 hours prior to the abortion, the physician who is to perform the abortion or the referring physician, or a qualified physician assistant, health care practitioner, technician, social worker to whom the responsibility has been delegated by either physician, has informed the pregnant woman that:

(i) The department [22] publishes printed materials which describe the unborn child and list agencies which offer alternatives to abortion and that she has a

22. The "department" is defined by the Act as "[t]he Department of Health of the Common-

wealth of Pennsylvania." See 18 Pa.Cons.Stat. Ann. § 3203.

right to review the printed materials and that a copy will be provided to her free of charge if she chooses to review it. (ii) Medical Assistance benefits may be available for prenatal care, childbirth and neonatal care, and that more detailed information on the availability of such assistance is contained in the printed materials published by the department. (iii) The father of the unborn child is liable to assist in the support of her child, even in instances where he has offered to pay for the abortion. In the case of rape, this information may be omitted.

(3) A copy of the printed materials has been provided to the pregnant woman if she chooses to view these materials.

(4) The pregnant woman certifies in writing, prior to the abortion, that the information required to be provided under paragraphs (1), (2) and (3) has been provided.

18 Pa.Con.Stat.Ann. § 3205(a).

176. The 1989 amendments substantially alter the earlier 1988 amendments to subsections (a) and (c) of section 3205. *See* 1988 Pa.Laws 262, 263–65, § 4. In Act 64, the legislature essentially reenacted most aspects of the 1982 version of the Act found unconstitutional in prior litigation. For example, the 1982 version of section 3205 required a 24–hour waiting period, required a doctor only to advise the woman of (1) the nature and risks of the proposed procedure, (2) the gestational age of the unborn child, and (3) the medical risks associated with carrying the child to term, and required someone to advise the woman of the availability of (1) medical assistance benefits, (2) a list of agencies which offer alternatives to abortion, (3) printed materials describing the fetus at various different stages, and (4) paternal liability to assist in the support of her child. *See* 1982 Pa.Laws 476, 479–81, § 1.

177. Section 3208(a) of the Act, as amended, requires PaDOH to prepare, publish and update on an annual basis easily comprehensible printed materials which would comply with the informed consent requirements of section 3205(a). The printed information must be prepared in English, Spanish and Vietnamese. *See* 18 Pa. Con.Stat.Ann. § 3208(a). All materials must be printed in typeface large enough to be clearly legible, 18 Pa.Con.Stat.Ann. § 3208(b), and available at no cost from PaDOH to any person, facility or hospital. 18 Pa.Con.Stat.Ann. § 3208(c).

178. The 1989 version of section 3208 is virtually identical to the version of this section as it existed in 1988. However, Act 64 eliminated the requirement that the materials concerning the availability of social service agencies contain the following statement:

There are many public and private agencies willing and able to help you to carry your child to term, and to assist you and your child after your child is born, whether you choose to keep your child or to place her or him for adoption. The Commonwealth of Pennsylvania strongly urges you to contact them before making a final decision about abortion.

*See* 1988 Pa.Laws 262, 268–69, § 4. The earlier version of section 3208 is similar to the existing version to the extent that it requires the preparation of "[g]eographically indexed materials designed to inform the woman" of agencies available that provide alternatives to abortion and "[m]aterials designed to inform the woman of the probable anatomical and physiological characteristics of the child at two-week gestational increments." *See* 1982 Pa.Laws 476, 483–84, § 1.

179. If all provisions of section 3205 were to go into effect, defendants intend to require the use of a notice form prepared by PaDOH by all abortion providers during the informed consent process. The notice reads as follows:

COMMONWEALTH OF PENNSYLVANIA

DEPARTMENT OF HEALTH

NOTICES REQUIRED BY ABORTION CONTROL ACT

JULY, 1990

1. It is generally unlawful for any individual to coerce a woman to undergo [an] abortion.

2. Any physician who performs an abortion upon a woman without according her a private medical consultation may be liable to her for damages in a civil action at law.

3. The father of a child is liable to assist in the support of that child, even in instances where the father has offered to pay for an abortion. The availability of support payments will depend, in part, on the father's income. You may wish to consult a lawyer regarding the availability of support payments.

4. The law permits adoptive parents to pay costs of prenatal care, childbirth and neonatal care.

[Trial Testimony of Dr. Potrzebowski, Vol. III at 112–13, 136–37; Defendants' Exhibit 51].

180. If all provisions of section 3205 were to go into effect, defendants intend to require the use of a form which reads as follows:

### COMMONWEALTH OF PENNSYLVANIA

### DEPARTMENT OF HEALTH

### MEDICAL ASSISTANCE BENEFITS FOR PRENATAL CARE, CHILDBIRTH AND NEONATAL CARE

### JULY, 1990

You may or may not qualify for medical assistance benefits, depending on your income. For persons who qualify, the Medical Assistance Program will pay for doctor, clinic, hospital, and other related medical expenses so you can receive prenatal care, delivery services, and care for your newborn baby. You can apply for Medical Assistance benefits at your local County Assistance Office.

Under the Healthy New Beginnings Program you may be eligible for Medical Assistance because you are pregnant. A pregnant woman is allowed to have more income to qualify for this benefit and may receive prenatal care from certain providers while the formal application for assistance is being processed.

Your County Assistance Office can tell you which providers participate in the Medical Assistance Program and can answer your questions about other available benefits. County Assistance Offices are listed [on the following pages] for your information. The attached pamphlets on Medical Assistance and Healthy Beginnings also may be of assistance to you.

[Trial Testimony of Dr. Potrzebowski, Vol. III at 112, 136–37; Defendants' Exhibit 50].

181. In anticipation of the possibility that section 3205 will be permitted to go into effect, a "Directory of Social Service Organizations" to be provided to women seeking an abortion was prepared by PaDOH. For each county in Pennsylvania, the Directory provides a list of agencies that "provide a variety of services which may assist a woman through pregnancy, upon childbirth, and while the child is dependent." Examples of services provided by these agencies are "counseling, pregnancy testing, medical care, legal and financial assistance, transportation, childbirth instruction, housing, job placement, continuing education and adoption information." [Trial Testimony of Dr. Potrzebowski, Vol. III at 111; Defendants' Exhibit 49 at 1].

182. The PaDOH-created-list of social service organizations does not include, particularly for Monroe County and Allegheny County, some agencies that provide services to pregnant women. The list also includes crisis pregnancy centers and other organizations which provide women with misinformation and inflammatory literature which increases pre-abortion anxiety. [Trial Testimony of Ms. Roselle, Vol. II at 87–89, 91–92, 112; Trial Testimony of Ms. Dillon, Vol. III at 159–60].

183. Nothing in the Act prohibits abortion providers that would be required to supply this list to abortion patients from recommending a patient avoid a particular agency on the list. Nor does anything in

the Act prohibit abortion providers from recommending a particular agency, whether on the list or not, to a patient in light of that patient's individual needs.

184. Nothing in the record suggests that the Directory could not be supplemented by PaDOH to include those agencies omitted from the list.

185. The informed consent requirements of the Act represent a substantial departure from the ordinary medical requirements of informed consent. [Trial Testimony of Dr. Bowes, Vol. III at 71].

186. "Informed consent" as used in section 3205 has a medically and legally distinct meaning which is different than simple "consent." [Trial Testimony of Dr. Grodin, Vol. I at 96–97].

187. As a general rule, informed consent requires communications between the doctor or counselor and patient to assure that the patient has made a treatment choice based upon knowledge of his or her condition, the benefits and risks of a particular treatment and its alternatives. In order to be informed, consent must be made voluntarily and competently. [Trial Testimony of Dr. Grodin, Vol. I at 96–97; Trial Testimony of Dr. Allen, Vol. I at 40–41].

188. Although the informed consent dialogue may be brief (the length of the dialogue will depend in a great part upon the complexity of the procedure contemplated), personal contact between the patient and the person rendering the informed consent is essential. The physician's or counselor's observation of the person's demeanor and reactions to medical information provided is essential to permit the physician or counselor to determine whether the patient is competent to give informed consent and whether the patient fully understood the information imparted during the dialogue. Further, personal contact is necessary to determine whether the patient is under duress from extrinsic sources while providing informed consent. [Trial Testimony of Dr. Allen, Vol. I at 41; Trial Testimony of Dr. Grodin, Vol. I at 99–105]. Even defendants' expert witness testified that telephone informed consent could only be justi-fied, if subsequent face-to-face contact occurs. [Trial Testimony of Dr. Bowes, Vol. III at 69].

189. A patient's informed consent cannot be obtained through the use of a tape recorded message or printed materials. [Trial Testimony of Dr. Allen, Vol. I at 42; Trial Testimony of Dr. Grodin, Vol. I at 104].

a. *The Twenty–Four Hour Waiting Period.*

190. ACOG has taken an official position in opposition to a mandatory 24–hour waiting period. [Trial Testimony of Dr. Allen, Vol. I at 47].

191. A very small percentage of women are ambivalent concerning whether to have an abortion when they come to a clinic. Arrangements for special counseling sessions are made for women demonstrating any ambivalence about her decision. [Trial Testimony of Dr. Allen, Vol. at 44–45; Trial Testimony of Ms. Roselle, Vol. II at 77].

192. If a patient is ambivalent about having an abortion and decides to postpone the procedure to have additional counseling, that will cause a delay in the performance of the abortion. [Court's Exhibit 1–A at ¶ 98].

193. If it were to go into effect, the 24–hour waiting period of the Act will force every women seeking an abortion in Pennsylvania to make a minimum of two visits to an abortion provider. [Trial Testimony of Ms. Roselle, Vol. II at 80–81].

194. Two trips to the abortion provider would subject many women to the harassment and hostility of anti-abortion protestors demonstrating outside a clinic, such as WHS, on two separate occasions. [Trial Testimony of Dr. Allen, Vol. I at 43].

195. Because most of plaintiff-clinics and plaintiff-physicians do not perform abortions on a daily basis, the mandatory 24–hour waiting period will result in delays far in excess of 24 hours. For the majority of women in Pennsylvania, delays will range from 48 hours to two weeks. [Trial Testimony of Ms. Roselle, Vol. II at 81–82, 106].

196. In 1988, 58% of the women obtaining abortions in Pennsylvania resided in only five of the Commonwealth's counties. Women who live in any of the other 62 counties must travel for at least one hour, and sometimes longer than three hours, to obtain an abortion from the *nearest* provider. [Trial Testimony of Ms. Roselle, Vol. II at 80; Verification of Ms. Roselle at ¶ 9; Verification of Ms. Stengle at ¶ 10].

197. The mandatory 24–hour waiting period would force women to double their travel time or stay overnight at a location near the abortion facility. This will necessarily add either the costs of transportation or overnight lodging or both to the overall cost of her abortion. Additionally, many women may lose additional wages or other compensation as a result of the mandatory 24–hour delay, if forced to miss work on two separate occasions. Two trips to the abortion provider may cause the women to incur additional expenses for food and child care.

198. The costs incident to obtaining an abortion, excluding the actual cost of the procedure itself, will be greater if the 24–hour waiting period were to go into effect.

199. The mandatory 24–hour waiting period will be particularly burdensome to those women who have the least financial resources, such as the poor and the young, those women that travel long distances, such as women living in rural areas, and those women that have difficulty explaining their whereabouts, such as battered women, school age women, and working women without sick leave.

200. In some cases, the delays caused by the 24–hour waiting period will push patients into the second trimester of their pregnancy substantially increasing the cost of the procedure itself and making the procedure more dangerous medically.

201. A delay of 24 hours will have a negative impact on both the physical and psychological health of some patients, as well as increase the risk of complications. [Trial Testimony of Dr. Allen, Vol. I at 88; Trial Testimony of Dr. Walker, Vol. II at 42–43].

202. While an abortion is still substantially safer than carrying a pregnancy to term, after the eighth week of the pregnancy, delay in the performance of the abortion increases the risk of death to the woman. [Trial Testimony of Dr. Allen, Vol. I at 45; Trial Testimony of Dr. Bowes, Vol. III at 54–56]. A substantial increase in the risk of death from an abortion procedure occurs when the pregnancy moves from the earlier stages of the second trimester to the middle portion of the second trimester (16 to 20 weeks of gestation). [Trial Testimony of Dr. Bowes, Vol. III at 56].

203. A mandatory 24–hour waiting period between the receipt of informed consent information and the performance of the abortion serves no legitimate medical interest. If a physician has concluded that any other type of obstetrical or gynecological procedure is medically necessary and has obtained the informed consent of the patient, there is simply no medical reason to delay performance of the procedure any longer. [Trial Testimony of Dr. Allen, Vol. I at 43; Trial Testimony of Dr. Grodin, Vol. I at 118–19; Trial Testimony of Dr. Bolognese, Vol. I at 145–46].

b. *Physician–Only Disclosure Requirements.*

204. Prior to performing an abortion, trained counselors at plaintiff-clinics or plaintiff-physicians provide a patient with options counseling and obtain her informed consent to the procedure. [Trial Testimony of Dr. Allen, Vol. I at 44, 51; Trial Testimony of Ms. Roselle, Vol. II at 77–80, 113–15; Preliminary Injunction Hearing Testimony of Ms. Stengle at 26–27; *see also* Findings of Fact at ¶¶ 26–27, 50, 86–88, 100–01, 128–30].

205. ACOG and the American Public Health Association have taken an official position in favor of the use of trained, qualified counselors to provide informed consent information concerning abortions. [Trial Testimony of Dr. Allen, Vol. I at 52].

206. In the last twenty years, the field of medicine has broadened and increased in complexity causing an increase in medical

specialization. Accordingly, the importance of mid-level professionals to the provision of excellent, low-cost and personalized health care has grown correspondingly. [Trial Testimony of Dr. Allen, Vol. I at 52].

207. In the field of obstetrics and gynecology, a significant portion of patient care is routine, non-emergent and can be provided as effectively by trained counselors as by licensed physicians. [Trial Testimony of Dr. Allen, Vol. I at 52–53]. This is particularly true with respect to the performance of abortions.

208. Trained counselors, such as those employed or utilized on a volunteer basis by plaintiff-clinics and plaintiff-physicians, are fully capable, by virtue of their training and experience, to provide information to patients, to discuss the alternatives to abortion with the patient, and to secure the patient's informed consent to the abortion procedure. [Trial Testimony of Dr. Allen, Vol. I at 51; Trial Testimony of Ms. Roselle, Vol. II at 78–79; Preliminary Injunction Hearing Testimony of Ms. Stengle at 27].

209. None of the plaintiffs have physicians who perform abortions without the physician talking to the patient before the abortion procedure. [Court's Exhibit 1–A at ¶ 88].

210. Requiring physicians to give information personally will leave the physician less time to provide the medical services which he or she, as a licensed physician, can provide. [Trial Testimony of Dr. Allen, Vol. I at 51].

211. In many instances, trained counselors, who are women, are more understanding than physicians and have more time to spend with patients. Further, it is more economical for the plaintiff-clinics to utilize trained counselors to provide options counseling and informed consent information to patients seeking an abortion. If the physician-only disclosure requirements become law, the added costs incurred by abortion providers will be imposed upon the women seeking abortions. [Trial Testimony of Dr. Allen, Vol. II at 51].

212. The requirement of section 3205 that physicians personally provide information necessary for informed consent will require extensive changes in the operating schedules of plaintiff-clinics and plaintiff-physicians. Physicians' schedules will need to be expanded to include additional medical consultation and counseling sessions which would be required by the Act[23] or additional physicians will have to be hired to provide these additional services. It will be difficult to find available physicians to provide these additional services, because of the doctors' already busy schedules. [Trial Testimony of Dr. Allen, Vol. I at 50–51]. WHS has found it more difficult to maintain an adequate supply of physicians since the amendments to the Act. [Trial Testimony of Dr. Allen, Vol. I at 87].

213. The state's interest in ensuring that a woman's consent to an abortion procedure is informed and unpressured is in no way furthered by mandating the identity of the person that must obtain the informed consent. The state's interest is satisfied when a woman gives her informed consent to the procedure and receives any necessary counseling from a trained, qualified person, such as the counselors utilized by plaintiff-clinics.

c. *Content–Based Informed Consent.*

214. Content-based informed consent is the supply of specific information to all patients regardless of the specific circumstances and needs of each individual patient. Content-based informed consent is contrary to the standard medical practice that informed consent be specifically tailored to the needs of the specific patient. [Trial Testimony of Dr. Grodin, Vol. I at 101–02, 107].

215. Medical practice requires that the informed consent dialogue between physician or counselor and patient be specifically tailored to the needs of the patient—rather than a "reasonable patient." [Trial Testimony of Dr. Grodin, Vol. I at 107].

---

**23.** This would be further complicated if the 24–hour waiting period were also to go into effect.

216. The role of the physician or counselor during the informed consent dialogue is *not* to attempt to sway the patient's *decision in one way or another.* [Trial Testimony of Dr. Allen; Trial Testimony of Dr. Grodin; Trial Testimony of Dr. Bolognese; Trial Testimony of Dr. Rue; Trial Testimony of Dr. Bowes]. Options counseling is separate and distinct from informed consent. [Trial Testimony of Dr. Grodin, Vol. I at 102].

217. Section 3205(d) may actively discourage the free flow of information during the informed consent dialogue by relieving any physician "who complies with the provisions" of section 3205 from civil liability for failure to obtain informed consent. This may provide some physicians with an incentive to limit their informed consent dialogue to the four corners of section 3205 in an effort to avoid civil liability. [Trial Testimony of Dr. Allen, Vol. I at 59–60; Trial Testimony of Dr. Grodin, Vol. I at 117–18].

218. For many women, the medical information required by section 3205 is over inclusive. For example, the Act requires a disclosure of medical risks of carrying a pregnancy to term. If a woman has decided that abortion is in her best interests, no legitimate purpose is served by informing her of maternal mortality statistics or that many women require caesarian sections at the time of delivery. [Trial Testimony of Dr. Allen, Vol. I at 55; Trial Testimony of Dr. Grodin, Vol. I at 105–06, 108–09]. Similarly, a physician would not advise a woman who has decided to carry her pregnancy to term of the risks associated with an abortion procedure. [Trial Testimony of Dr. Allen, Vol. I at 54].

219. Prior to the scheduling of an appointment with an abortion provider, most women have already decided that an abortion is in their best interest. [Trial Testimony of Ms. Roselle, Vol. II at 109; Trial Testimony of Dr. Allen, Vol. I at 43–44]. For many women, the decision to have an abortion is a decision which they reach only after a good deal of careful thought, consultation with a family member or other trusted individual, or a medical provider. [Trial Testimony of Ms. Roselle].

220. In some cases, merely offering a woman the opportunity to read materials and examine pictures designed to inform her of the probable anatomical and physiological characteristics of the fetus at two week gestational increments and of the possibility of the unborn child's survival, as well as a state created list of agencies that will assist her in carrying her pregnancy to term, will create undesirable and unnecessary anxiety, anguish and fear. [Trial Testimony of Dr. Grodin, Vol. I at 109–10; Trial Testimony of Ms. Roselle, Vol. II at 91–92, 112].

221. The mandated information required by sections 3205 and 3208 will create the impression in women that the Commonwealth disapproves of the woman's decision. The information and material required by these sections is an attempt by the Commonwealth to alter a woman's decision after she has determined that an abortion is in her best interest.

222. Once the decision to terminate the pregnancy is made by a woman, requiring physicians or counselors to provide the information required by section 3205 and to offer exposure of the literature required by section 3208 will undermine the physician's or counselor's ability to counsel a patient according to her individual needs and will force the physician or counselor to act in a manner inconsistent with their professional judgment and training. [Trial Testimony of Dr. Grodin, Vol. I at 109–10; Trial Testimony of Ms. Roselle, Vol. II at 84].

223. Informing women of the availability of medical assistance benefits or paternal support for the child has no legitimate medical justification. Such information may mislead or confuse the patient, and, in the vast majority of the cases, is plainly inappropriate given the circumstances of the individual patient. [Trial Testimony of Dr. Allen, Vol. I at 56; Trial Testimony of Dr. Grodin, Vol. I at 110–11; Trial Testimony of Ms. Roselle, Vol. II at 83–85, 90].

224. The circumstances under which medical assistance benefits or child support

payments may, in reality, be available to a patient are well beyond the ordinary expertise of physicians or counselors. Advising a patient of the general availability of such benefits or payments may cause a woman to rely upon those statements and elect against an abortion only to later discover that the benefits or payments were unavailable or insufficient. [Trial Testimony of Dr. Allen, Vol. I at 56; Trial Testimony of Dr. Grodin, Vol. I at 110–11; Trial Testimony of Ms. Roselle, Vol. II at 90; Trial Testimony of Ms. Dillon, Vol. III at 154–55].

225. The requirements that a woman be advised that medical assistance benefits or child support payments may be available, as well as some of the other information required to be offered by section 3205, are poorly veiled attempts by the Commonwealth to disguise elements of discouragement of the abortion decision.

226. The requirement that a specific body of information be given in all cases, regardless of the individual needs of the patient, intrudes upon the discretion of the physician and the woman's decision-making process. [Trial testimony of Dr. Grodin, Vol. I at 99–102].

227. Section 3205's imposition of criminal penalties [24] upon doctors or counselors is a significant departure from existing informed consent law. In no other instance does an informed consent regulation provide for criminal penalties. [Trial Testimony of Dr. Allen, Vol. I at 61].

228. Fear of criminal sanctions by counselors or doctors will cause abortion providers to apply section 3205 with extreme caution. Some doctors may discontinue performing abortion procedures. [Trial testimony of Dr. Davidson, Vol. I at 34–35; Trial Testimony of Dr. Bolognese, Vol. I at 143–44].

(3) Parental Consent (Section 3206)

229. Section 3206 of the Act, as amended by Act 31, provides, in pertinent part, as follows:

> Except in a medical emergency, or except as provided in this section, if a pregnant woman is less than 18 years of age and not emancipated, or if she has been adjudged an incompetent ..., a physician shall not perform an abortion upon her unless, in the case of a woman who is less than 18 years of age, he first obtains the *informed consent* both of the pregnant woman and of one of her parents; or, in the case of a woman who is incompetent, he first obtains the *informed consent* of her guardian.

*See* 18 Pa.Con.Stat.Ann. § 3206(a) (emphasis added).

230. This section of the Act was not altered by the 1989 amendments to the Act. However, this section is distinct from the version that existed in 1982 inasmuch as the earlier version only required the "consent" of the pregnant woman and one of her parents—as opposed to the "informed consent" of both individuals. *See* 1982 Pa. Laws 476, 481–83, § 1.

231. Inasmuch as this section of the Act requires the "informed consent" of the parent and the pregnant woman, my earlier findings pertaining to informed consent apply with equal force to this section. Therefore, they shall be incorporated by reference herein.

232. The Act does not separately define "informed" parental consent. The Act does not explicitly state that the parent must visit the clinic personally in order to give his or her informed parental consent.

233. ACOG has taken a position against forced parental notification by minors. [Trial Testimony of Dr. Allen, Vol. I at 65].

234. Clinics in Pennsylvania that offer abortion counseling services and abortion services encourage parental involvement in the minor's decision to have an abortion whenever possible. [Verification of Ms. Roselle at ¶¶ 10, 20; Preliminary Injunction Hearing Testimony of Ms. Stengle at 28; Verification of Ms. Stengle at ¶¶ 12, 19; *see*

24. *See* 18 Pa.Con.Stat.Ann. § 3205(c).

*also* Findings of Fact at ¶¶ 29, 54–57, 80–81, 102, 106–09, 124–27].

235. There can be delays in performing an abortion on a minor who chooses to wait for her parent to be able to come to the clinic, which delay can exceed two weeks. [Court's Exhibit 1–A at ¶ 100].

236. Most minors come to a clinic in the company of an adult, even if not a parent. [Trial Testimony of Dr. Allen, Vol. I at 64].

237. Approximately 54% of AWC's minor patients have parental consent for abortions. In all cases, AWC requires that some adult is available to care for the minor patient. [Preliminary Injunction Hearing Testimony of Ms. Stengle at 28–29].

238. Under Act 31, and in accordance with standard medical principles of informed consent, the plaintiff-clinics intend to require in-person consultation with the parent to assure the parent's consent is informed. Plaintiff-clinics consider it necessary to require in-person parental informed consent to avoid the heightened risk of criminal and civil liabilities. [Preliminary Injunction Hearing Testimony of Ms. Roselle at 11; Preliminary Injunction Hearing Testimony of Ms. Stengle at 30–31; Verification of Ms. Roselle at ¶ 21; Verification of Ms. Stengle at ¶ 25].

239. The plaintiff-clinics are unwilling to secure parental informed consent over the telephone, or by any means other than an in-person visit to the clinic. [Trial Testimony of Ms. Roselle, Vol. II at 81; Preliminary Injunction Hearing Testimony of Ms. Roselle at 10; Preliminary Injunction Hearing Testimony of Ms. Stengle; Verification of Ms. Roselle at ¶ 21].

240. An in-person visit by a parent for informed consent counseling may cause delays of several days or possibly weeks, even in cases where the parent is prepared to consent. [Verification of Ms. Stengle at ¶¶ 24, 26, 28; Verification of Ms. Roselle at ¶ 24].

241. Delays in obtaining parental consent could be both dangerous and prohibitive since a substantial number of minors decide to have an abortion much later in their pregnancy. [Trial Testimony of Dr. Allen, Vol. I at 63; Preliminary Injunction Hearing Testimony of Ms. Roselle at 14; Verification of Ms. Roselle at ¶ 24; Verification of Ms. Stengle at ¶ 28].

242. Adolescents as a group are generally more reluctant to initiate contact with an unfamiliar group or organization. For this reason, a pregnant minor may delay the initial step of contacting the clinic until further into their pregnancies. [Verification of Ms. Roselle at ¶ 27; Verification of Ms. Stengle at ¶ 33].

243. Adolescents as a group tend to deny their pregnancies out of guilt and postpone making any decisions as to what course of action is in their best interests. [Trial Testimony of Dr. Allen, Vol. I at 63; Verification of Ms. Stengle at ¶ 33].

244. Many adolescents are unaware of their pregnancy for weeks or months because of ignorance about their menstrual cycles, pregnancy and their own irregular menstrual cycles. [Trial Testimony of Dr. Allen at 63].

245. Further delays can arise from a minor's fear and hesitation in divulging to her parents: first, she has been sexually active; second, that she is pregnant, and third, that she wishes to have an abortion. Because of the disruption and trauma associated with these disclosures, a minor will delay telling her parents that she is pregnant for days or even weeks. [Preliminary Injunction Hearing Testimony of Ms. Roselle at 14; Preliminary Injunction Hearing Testimony of Ms. Stengle at 29; Verification of Ms. Stengle at ¶ 30].

246. The clinics often find themselves having to expedite a minor's testing, counseling and procedure because the minor has delayed going to the clinic until she is near or into the second trimester of her pregnancy. [Trial Testimony of Dr. Allen, Vol. I at 63; Trial Testimony of Ms. Roselle; Preliminary Injunction Hearing Testimony of Ms. Roselle at 15].

247. The additional costs, burdens and delays incurred by minors and her parents, if the parent is required to make an in-per-

son visit to the facility, could be extremely costly and burdensome.

248. More second trimester abortions are performed on minors in the United States than any other age group. [Verification of Ms. Stengle at ¶ 33]. Late abortions, particularly second trimester abortions, pose a greater risk to the woman's health. [Trial Testimony of Dr. Allen, Vol. I at 46–47; Trial Testimony of Dr. Bowes, Vol. III at 55–58; Preliminary Injunction Hearing Testimony of Ms. Stengle at 37; Verification of Ms. Stengle at ¶ 34]. Because teenagers have never experienced a prior dilation of the cervix, later abortions can be an especially dangerous procedure for them. [Preliminary Injunction Hearing Testimony of Ms. Stengle at 37].

249. Many minors have great difficulty tolerating scheduling difficulties and delay. They tend to postpone the abortion decision because of fear and anxiety. Thus, once the decision has been made, they are likely to react negatively to scheduling delay and obstacles in obtaining an abortion. Some may lie about their age to attempt to avoid the requirements of section 3206; others may decide to carry their pregnancy to term; and some may resort to self-abortion. [Preliminary Injunction Hearing Testimony of Ms. Stengle at 37–38].

250. In some cases, where parents are prepared to consent, he or she will be unable to come to the clinic for several days for the necessary counseling because of work schedules, family obligations, travel distance, or other commitments. [Verification of Ms. Stengle at ¶ 26; Verification of Ms. Roselle at ¶ 21]. Still in other cases, a parent may refuse to accompany their daughter to the facility even though he or she has agreed to consent to the daughter's abortion. [Trial Testimony of Ms. Roselle, Vol. II at 92–93].

251. Implementation of parental informed consent requirements of the Act will create scheduling and administrative difficulties for plaintiff-clinics and alter their current practices and procedures drastically. Counseling sessions will have to be scheduled at times and on days not presently within their staffing capabilities

to accommodate the schedules of parents of minor patients. [Verification of Ms. Roselle at ¶¶ 22–23; Verification of Ms. Stengle at ¶¶ 27].

252. If the parental consent provision of the Act goes into effect, PPSP will counsel parents who attend with their minor child at the same time they counsel the minor. [Court's Exhibit 1-A at ¶ 118].

253. If the parental consent provision of the Act goes into effect, parents may receive counseling sessions at any of PPSP's clinics. [Court's Exhibit 1-A at ¶ 119].

254. The requirement of parental informed consent for minor women seeking abortions adds significant expense and delay to the expense and delay already existing in the Act. Taken together, the provisions of the Act, as applied to minors, will create layers of obstacles which could unduly burden a minor woman's ability to get an abortion. [Trial Testimony of Ms. Roselle, Vol. II at 81–82].

255. The additional financial cost of travel, lost wages and child care expenses incurred by minors and their parents because of the parental informed consent requirements of the Act would unduly burden a minor woman's ability to get an abortion. In some cases, the provisions may act in such a way as to deprive her of her right to have an abortion. [Preliminary Injunction Hearing Testimony of Ms. Roselle at 14–15; Preliminary Injunction Hearing Testimony of Ms. Stengle at 35; Verification of Ms. Roselle at ¶ 25].

256. In order to avoid the risk of criminal or civil penalties, the plaintiff-clinics and plaintiff-physicians will be extremely conservative as to their requirements for proof of age and parenthood. [Preliminary Injunction Hearing Testimony of Ms. Stengle at 31; Preliminary Injunction Hearing Testimony of Ms. Roselle at 10; Verification of Ms. Stengle at ¶ 31; Verification of Ms. Roselle at ¶ 26].

257. On many occasions, members of the public enter plaintiff-clinics posing as clients or pregnant women seeking information about abortion in order to scrutinize the procedures and controls in effect at the

clinic. [Preliminary Injunction Hearing Testimony of Ms. Roselle; Preliminary Injunction Hearing Testimony of Ms. Stengle].

258. Plaintiff-clinics reasonably fear that members of anti-abortion groups will send minors to the clinic posing as patients to test the clinic's compliance with section 3206. [Preliminary Injunction Hearing Testimony of Ms. Roselle].

259. All of the clinics anticipate increased expenses resulting from the parental consent provisions of section 3206. [Preliminary Injunction Hearing Testimony of Ms. Roselle at 14; Verification of Ms. Stengle at ¶ 32].

260. Pennsylvania law governing consent for medical or health services on minors provides as follows:

> Any minor who is eighteen years of age or older, or has graduated from high school, or has married or has been pregnant, may give effective consent to medical, dental and health services for himself or herself, and the consent of no other person shall be necessary.

35 Pa.Stat.Ann. § 10101 (Purdon 1977). Further, a minor parent may give effective consent to medical, dental or health services for his or her child. *See* 35 Pa.Stat.Ann. § 10102.

261. Pennsylvania law governing consent for medical or health service on pregnant minors provides as follows:

> Any minor may give effective consent for medical and health services to determine the presence of or to treat pregnancy, and venereal disease....

35 Pa.Stat.Ann. § 10103.

262. Finally, 35 Pa.Stat.Ann. § 10104 states:

> Medical, dental and health services may be rendered to minors of any age without the consent of a parent or legal guardian when, in the physician's judgment, an attempt to secure consent would result in delay of treatment which would increase the risk of the minor's life or health.

263. Section 3206(b), regarding "Unavailability of parent or guardian," provides:

> If both parents have died or are otherwise unavailable to the physician within a reasonable time and in a reasonable manner, consent of the pregnant woman's guardian or guardians shall be sufficient. If the pregnant woman's parents are divorced, consent of the parent having custody shall be sufficient. If neither any parent nor a legal guardian is available to the physician within a reasonable time and in a reasonable manner, consent of any adult person standing in loco parentis shall be sufficient.

18 Pa.Con.Stat.Ann. § 3206(b).

264. In part because of the failure to define the terms "reasonable time," "reasonable manner," and "person standing in loco parentis," the plaintiff-clinics will likely take a conservative approach in applying section 3206(b).

265. Many of the plaintiff-clinic's patients are minors who live with non-parents, such as aunts, grandmothers or siblings. Often the arrangement is an informal one rather than a legal guardianship, with natural parents living in another city or perhaps having abandoned the minor. The plaintiff-clinics intend to be wary of permitting the adult "caretaker" to consent to the minor's abortion for fear of criminal or civil sanctions if officials believe that the parents could have been available in a reasonable time and manner. [Preliminary Injunction Hearing Testimony of Ms. Stengle at 32–33].

266. The provisions of section 3206 relating to the judicial by-pass procedure are self-executing on their face. There was no testimony at the trial concerning whether the various Courts of Common Pleas in Pennsylvania were adequately prepared to implement the judicial by-pass procedures and protect the confidentiality of minors availing themselves of these procedures.

### (4) Spousal Notification (Section 3209)

267. Pertinent portions of section 3209 read as follows:

**(a) Spousal notice required.**—In order to further the Commonwealth's interest in promoting the integrity of the marital relationship and to protect a spouse's interests in having children within marriage and in protecting the prenatal life of that spouse's child, no physician shall perform an abortion on a married woman, except as provided in subsections (b) and (c), unless he or she has received a signed statement, which need not be notarized, from the woman upon whom the abortion is to be performed, that she has notified her spouse that she is about to undergo an abortion. The statement shall bear a notice that any false statement made therein is punishable by law.

**(b) Exceptions.**—The statement certifying that the notice required by subsection (a) has been given need not be furnished where the woman provides the physician a signed statement certifying at least one of the following:

(1) Her spouse is not the father of the child.

(2) Her spouse, after diligent effort, could not be located.

(3) The pregnancy is a result of spousal sexual assault as described in section 3128 (relating to spousal sexual assault), which has been reported to a law enforcement agency having the requisite jurisdiction.

(4) The woman has reason to believe that the furnishing of notice to her spouse is likely to result in the infliction of bodily injury upon her by her spouse or by another individual.

Such statement need not be notarized, but shall bear a notice that any false statements made therein are punishable by law.

**(c) Medical Emergency.**—The requirements of subsection (a) shall not apply in the case of a medical emergency.

18 Pa.Con.Stat.Ann. § 3206(a)—(c). The husband notification provisions of this section are new to the Act.

268. "Spousal sexual assault" is defined as follows:

**(a) Sexual assault.**—A person commits a felony of the second degree when that person engages in sexual intercourse with that person's spouse:

(1) by forcible compulsion;

(2) by threat of forcible compulsion that would prevent resistance by a person of reasonable resolution; or

(3) who is unconscious.

**(b) Involuntary spousal deviate sexual intercourse.**—A person commits a felony of the second degree when that person engages in deviate sexual intercourse with that person's spouse:

(1) by forcible compulsion;

(2) by threat of forcible compulsion that would prevent resistance by a person of reasonable resolution; or

(3) who is unconscious.

18 Pa.Con.Stat.Ann. § 3128 (1990 Supp.).

269. If the husband notification provisions of the Act were to go into effect, PaDOH has prepared a form to be filled out by married women seeking an abortion prior to performance of the procedure. This form reads as follows:

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF HEALTH
ABORTIONS: SPOUSAL NOTICE
CERTIFICATION REGARDING SPOUSAL
NOTICE

I understand that as a married woman, I am required to notify my spouse of the fact that I am about to undergo an abortion, prior to obtaining such abortion, unless I am exempt from the notification requirements due to one of the reasons set forth below. Pursuant to this requirement, I hereby certify that:

CHECK APPROPRIATE BLANK(S)

\_\_\_\_ I have notified my spouse that I am about to undergo an abortion.

\_\_\_\_ I have not notified my spouse that I am about to undergo an abortion for the following reason(s):

_____ My spouse is not the father of the child.

_____ My spouse, after diligent effort, could not be located.

_____ The pregnancy is a result of spousal sexual assault which has been reported to a law enforcement agency having the requisite jurisdiction.

_____ I have reason to believe that the furnishing of notice to my spouse is likely to result in the infliction of bodily injury upon me by my spouse or by another individual.

I understand that any false statement made herein is punishable by law.

_____
Signature/Date

NOTICE: ANY FALSE STATEMENT MADE HEREIN IS PUNISHABLE BY LAW.

[Trial Testimony of Dr. Potrzebowski, Vol. III at 111; Defendants' Exhibit 48].

270. Dr. Potrzebowski was unable to explain why the Commonwealth felt it necessary to include the warning against criminal penalties on the spousal notice twice. [Trial Testimony of Dr. Potrzebowski, Vol. II at 134–35].

271. The woman making a false statement under section 3209 is subject to the penalties for a third degree misdemeanor. The physician is subject to license suspension or revocation and civil or criminal penalties for violation of this provision. _See_ 18 Pa.Con.Stat.Ann. § 3209(e).

272. ACOG has taken an official position against forced husband notification. [Trial Testimony of Dr. Allen, Vol. I at 66].

273. The vast majority of women consult their husbands prior to deciding to terminate their pregnancy. [Trial Testimony of Ms. Roselle, Vol. II at 67–68].

274. The requirement that a married woman notify her husband prior to having an abortion will cause delay in performance of the abortion procedure. Those women without full knowledge of the provisions of the Act will be required to make two visits to the abortion provider.

275. The Act does not define the term "after diligent effort" contained in 18 Pa. Con.Stat.Ann. § 3209(b)(2).

276. The requirement that a woman make a "diligent effort" to locate her husband in order to comply with section 3209 will delay compliance with section 3209. [Trial Testimony of Dr. Walker, Vol. II at 46].

277. The criminal and civil penalties of section 3209 will force physicians and counselors to interpret "diligent effort" in a narrow fashion in order to avoid civil and criminal liability, and to counsel the patient properly so that the patient would not be subject to criminal penalties. [Trial Testimony of Dr. Davidson, Vol. I at 34–35; Trial Testimony of Dr. Bolognese, Vol. I at 143–44].

278. Section 3209(b)(4) only permits a woman to claim an exception from husband notification when she has reason to believe she is in danger of the infliction of bodily injury upon her by her husband or by another individual.

279. The "bodily injury" exception could not be invoked by a married woman whose husband, if notified, would, in her reasonable belief, threaten to (1) publicize her intent to have an abortion to family, friends or acquaintances; (b) retaliate against her in future child custody or divorce proceedings; (c) inflict psychological intimidation or emotional harm upon her, her children or other persons; (d) inflict bodily harm on other persons such as children, family members or other loved ones; or (e) use his control over finances to deprive of necessary monies for herself or her children. [Trial Testimony of Dr. Walker, Vol. II at 23, 50].

280. Because of the difference in the definition of abuse, a woman protected from her husband by a restraining order pursuant to the Protection From Abuse Act

or a child protected under the Juvenile Act and Child Protective Services Act may not fall within an exception to section 3209(b).

281. Studies reveal that family violence occurs in two million families in the United States. This figure, however, is a conservative one that substantially understates (because battering is usually not reported until it reaches life-threatening proportions) the actual number of families affected by domestic violence.[25] In fact, researchers estimate that one of every two women will be battered at some time in their life. [Trial Testimony of Dr. Walker, Vol. II at 12, 21].

282. A wife may not elect to notify her husband of her intention to have an abortion for a variety of reasons, including the husband's illness, concern about her own health, the imminent failure of the marriage, or the husband's absolute opposition to the abortion. [Trial Testimony of Ms. Roselle, Vol. II at 69–70].

283. The required filing of the spousal consent form would require plaintiff-clinics to change their counseling procedures and force women to reveal their most intimate decision-making on pain of criminal sanctions. The confidentiality of these revelations could not be guaranteed, since the woman's records are not immune from subpoena. [Trial Testimony of Ms. Roselle, Vol. II at 71–72].

284. Women of all class levels, educational backgrounds, and racial, ethnic and religious groups are battered. [Trial Testimony of Dr. Walker, Vol. II at 14].

285. Wife-battering or abuse can take on many physical and psychological forms. The nature and scope of the battering can cover a broad range of actions and be gruesome and torturous. [Trial Testimony of Dr. Walker, Vol. II at 15; Trial Testimony of Ms. Dillon, Vol. III at 147–48].

286. Married women, victims of battering, have been killed in Pennsylvania and throughout the United States. [Trial Testimony of Dr. Walker, Vol. II at 17, 22].

287. Battering can often involve a substantial amount of sexual abuse, including marital rape and sexual mutilation. [Trial Testimony of Dr. Walker, Vol. II at 12–14, 17; Trial Testimony of Ms. Dillon, Vol. III at 155–56].

288. In a domestic abuse situation, it is common for the battering husband to also abuse the children in an attempt to coerce the wife. [Trial Testimony of Dr. Walker, Vol. II at 12; Trial Testimony of Ms. Dillon, Vol. III at 151–52].

289. Mere notification of pregnancy is frequently a flashpoint for battering and violence within the family. The number of battering incidents is high during the pregnancy and often the worst abuse can be associated with pregnancy. [Trial Testimony of Dr. Walker, Vol. II at 41, 44; Trial Testimony of Ms. Dillon, Vol. III at 144]. The battering husband may deny parentage and use the pregnancy as an excuse for abuse. [Trial Testimony of Ms. Dillon, Vol. III at 144].

290. Secrecy typically shrouds abusive families. Family members are instructed not to tell anyone, especially police or doctors, about the abuse and violence. Battering husbands often threaten their wives or her children with further abuse if she tells an outsider of the violence and tells her that nobody will believe her. A battered woman, therefore, is highly unlikely to disclose the violence against her for fear of retaliation by the abuser. [Trial Testimony of Dr. Walker, Vol. II at 48; Trial Testimony of Ms. Dillon, Vol. III at 150–51, 160–62].

291. Even when confronted directly by medical personnel or other helping professionals, battered women often will not ad-

---

25. *See also Hodgson v. Minnesota*, —— U.S. ——, —— n. 25, 110 S.Ct. 2926, 2939 n. 25, 111 L.Ed.2d 344 (1990).

mit to the battering because they have not admitted to themselves that they are battered. [Trial Testimony of Dr. Walker, Vol. II at 13, 49].

292. Battered women are monitored very closely by their abusers. Battered women are often expected to explain any absence from the home or work. Therefore, the opportunities of battered women to disclose battering to others are few, if any. [Trial Testimony of Dr. Walker, Vol. II at 19, 43; Trial Testimony of Ms. Dillon, Vol. III at 157, 162–63].

293. Battered women would find it extremely difficult to get to an abortion clinic because of the problem of accounting for her time. A 24–hour waiting period would be especially harsh upon battered women, since she would have to make two trips to the clinic. [Trial Testimony of Dr. Walker, Vol. II at 57; Trial Testimony of Ms. Dillon, Vol. III at 157].

294. A woman in a shelter or safe house unknown to her husband is not "reasonably likely" to have bodily harm inflicted upon her by her batterer, however her attempt to notify her husband pursuant to section 3209 could accidentally disclose her whereabouts to her husband. Her fear of future ramifications would be realistic under the circumstances.

295. Marital rape is rarely discussed with others or reported to law enforcement authorities, and of those reported only few are prosecuted. [Trial Testimony of Dr. Walker, Vol. II at 23, 47, 48; Trial Testimony of Ms. Dillon, Vol. III at 154–55].

296. It is common for battered women to have sexual intercourse with their husbands to avoid being battered. While this type of coercive sexual activity would be spousal sexual assault as defined by the Act, many women may not consider it to be so and others would fear disbelief. [Trial Testimony of Dr. Walker, Vol. II at 22, 47–48, 55; Trial Testimony of Ms. Dillon, Vol. III at 155–56].

297. The marital rape exception to section 3209 cannot be claimed by women who are victims of coercive sexual behavior other than penetration. The 90–day reporting requirement of the spousal sexual assault statute, 18 Pa.Con.Stat.Ann. § 3128(c), further narrows the class of sexually abused wives who can claim the exception, since many of these women may be psychologically unable to discuss or report the rape for several years after the incident. [Trial Testimony of Dr. Walker, Vol. II at 13].

298. Because of the nature of the battering relationship, battered women are unlikely to avail themselves of the exceptions to section 3209 of the Act, regardless of whether the section applies to them. [Trial Testimony of Dr. Walker, Vol. II at 46–49].

299. Battered women are often victims of psychological abuse, including verbal degradation, food and sleep deprivation, isolation and monitoring. This psychological abuse would fall within the definition of psychological torture utilized by Dr. Walker and Amnesty International. However, such abuse does not fall within any exception to the husband notification requirement in the Act. [Trial Testimony of Dr. Walker, Vol. II at 18–19].

300. Battered women who experience serious psychological abuse, who are sexually abused by a way not covered by the sexual assault statute, and who are fearful of the physical and sexual abuse of their children would not be covered by the exceptions to the Act. [Trial Testimony of Dr. Walker, Vol. II at 48–50].

301. Physical and sexual abuse of children is an aspect of the battering relationship in over half of the cases studies by Dr. Walker. In addition, many batterers use economic coercion against women and children. [Trial Testimony of Dr. Walker, Vol. II at 20].

302. Many medical and surgical procedures, including, but not limited to, sterilization, prostate operations and chemotherapy, affect the capacity of males to have children within the marriage. The Commonwealth does not require that a hus-

band notify his wife of his intent to obtain a vasectomy or other surgical procedure affecting his capacity to be a father. [Trial Testimony of Dr. Allen, Vol. I at 65]. Further the Commonwealth does not require a woman to notify her husband of other surgical procedures, such as a hysterectomy, which would affect her capacity to be a mother.

303. Women unable to reveal the battering or leave a battering relationship suffer from the psychological manifestations of battery called "battered women syndrome." Battered women syndrome is one form of Post–Traumatic Stress Disorder ("PTSD"), as defined in *The Diagnostic and Statistical Manual of Mental Disorders*, 3d edition (revised). [Trial Testimony of Dr. Walker, Vol. II at 30–31; Plaintiffs' Exhibit 89].

304. Among the psychological manifestations of PTSD in the case of battered women are "learned helplessness" and "the cycle of violence." [Trial Testimony of Dr. Walker, Vol. II at 24, 30–31].

305. Under the theory of learned helplessness, the battered woman develops a coping strategy, rather than an escaping mechanism, when she learns that her responses to the random and variable levels of abuse will not make a difference. [Trial Testimony of Dr. Walker, Vol. II at 24–30].

306. The battering ordinarily involves a three-phase recurring cycle of violence. First, there is a period of increasing tension in which the abusive behavior can be classified as mild or moderate on a scale of one to ten. This is followed by a period of acute battering during which the battering can attain life-threatening or endangering proportions. Lastly, the battering relationship enters into a period of "loving contrition." The final stage reinforces and perpetuates the violence and the relationship. [Trial Testimony of Dr. Walker, Vol. II at 30–34; Plaintiffs' Exhibit 88].

307. Due to learned helplessness and the cycle of violence, battered women deny and minimize the abuse in order to avoid the pain associated with discussing it. Most battered women do not have the psychological ability to avail themselves of the exceptions of section 3209. [Trial Testimony of Dr. Walker, Vol. II at 40–41, 49].

308. A woman's personal perception of the consequences which will likely result from notifying her husband is likely to be accurate. [Trial Testimony of Dr. Walker, Vol. II at 45]. Forced husband notification would not improve communication within a battering relationship nor improve the marital integrity. Instead, it would foster negative and abusive communication and increase the likelihood that a woman would be seriously battered. Dr. Walker likened forced husband notification in a battering situation to providing the husband with a hammer with which he can beat his wife. [Trial Testimony of Dr. Walker, Vol. II at 44–46, 50].

(5) Determination of Gestational Age (Section 3210)

309. Section 3210 of the Act, as amended, provides as follows:

Except in the case of a medical emergency which prevents compliance with this section, no abortion shall be performed or induced unless the referring physician or the physician performing or inducing it has first made a determination of the probable gestational age of the unborn child. In making such a determination, the physician shall make such inquiries of the patient and perform or cause to be performed such medical examinations and tests as a prudent physician would consider necessary to make or perform in making an accurate diagnosis with respect to gestational age. The physician who performs or induces the abortion shall report the type of inquiries made and the type of examinations and tests utilized to determine gestational age of the unborn child and the basis for the

diagnosis with respect to gestational age on forms provided by the department.

18 Pa.Con.Stat.Ann. § 3210(a).

310. Section 3210 does not identify which specific examinations or tests should be performed by a physician in making an "accurate" diagnosis of gestational age. Instead, the Act requires the physician to perform those tests that a "prudent physician would consider necessary to make an accurate" determination of gestational age.

311. If this portion of the Act were to go into effect, PaDOH proposes to use a form which would require a physician to provide a "clinical determination of gestational age at time of abortion," as well as identify the "types of inquiries/examinations/tests utilized" and the "basis for diagnosis" of gestational age. [Trial Testimony of Dr. Potrzebowski, Vol. III at 99–100; Defendants' Exhibit 47C].

312. There are various methods of determining gestational age, including physical examination, patient medical history, and ultrasound. [Court's Exhibit 1–A at ¶ 106]. However, gestational age can ordinarily be accurately determined by review of a woman's menstrual history and a pelvic examination. [Trial Testimony of Dr. Bowes, Vol. III at 78].

313. All plaintiffs make a determination of gestational age prior to performing an abortion. [Court's Exhibit 1–A at ¶ 107].

314. An accurate determination of gestational age is desirable to determine the possibility of viability of the fetus, to assess the health risks to the patient seeking the abortion, and to determine which abortion technique would be appropriate under the circumstances.

315. The plaintiff-clinics utilize the following methods of determining gestational age at the following charges:

a. RHCC—Pelvic examination—$10 and ultrasound—$70.

b. AWC—Medical history and pelvic examination which are included in the cost of the $280 fee for the abortion procedure and sonogram—$50.

c. WSC—Date of last menstrual period as told to WSC by client and pelvic examination by physician performing abortion just prior to starting the abortion. Occasionally, when a client is unsure of her last menstrual period or is late in her first trimester, the physician will do a pelvic examination separate from the procedure of abortion.

d. PPSP—Pelvic sizing is performed by the physician prior to each abortion procedure which is included in the fee for the abortion procedure. An ultrasound is performed on all patients in their last two weeks of the first trimester to determine gestational sizing. This is done by a staff RN or Medical Assistant whose pay ranges from $8.60 to $13.60. Each ultrasound requires approximately fifteen minutes to perform. Other staff involvement would include telephone scheduling of appointment at $9 per hour and intake procedure at $9.80 per hour. Cost to patient is $25 to $50. The clinic would incur additional costs for supplies and equipment.

e. WHS—Prior to the abortion, the length of the pregnancy during the first fourteen weeks is determined by the length of time since the first day of the last normal menstrual period. This is verified by pelvic examination prior to the performance of the abortion. No fee is charged for this examination. If the woman is uncertain of the date of her last menses or the date indicates the pregnancy is greater than fourteen weeks since LMP, the length of pregnancy is determined by a pelvic examination at a fee of $30 and ultrasonography at a fee of $100. [Court's Exhibit 1–A at ¶ 108].

316. PPSP performs sonograms if the gestational age is near the end of the first trimester. [Court's Exhibit 1–A at ¶ 112].

317. For abortions from 12 to 16 weeks from the last menstrual period an ultrasound is required at RHCC. [Court's Exhibit 1 at ¶ 14].

318. At Magee, an ultrasound or sonogram is used to determine gestational age

for pregnancies beyond 12 weeks. [Court's Exhibit 1–A at ¶ 86].

319. At WHS, an ultrasound or sonogram is used to determine gestational age for any pregnancies beyond 14 weeks. [Court's Exhibit 1–A at ¶ 87].

320. WSC never uses a sonogram in determining gestational age. Instead, gestational age is determined by questioning the woman and the performance of a pelvic examination by the physician. If an ultrasound is ordered, it is performed at another facility. [Court's Exhibit 1–A at ¶ 132].

321. AWC determines gestational age by a woman's menstrual history and pelvic examination and, if AWC is unclear of the length of the woman's pregnancy, it will do a sonogram. The fee for a sonogram is $50 but is frequently waived. [Court's Exhibit 1–A at ¶ 147].

322. Section 3210 does not require physicians to perform those tests which will provide the *most* accurate determination of gestational age.

323. Section 3210, if implemented, would not cause physicians or other abortion providers to alter their current practices in determining the gestational age of the fetus.

(6) Public Disclosure and Reporting Requirements (Sections 3207 and 3214)

324. PaDOH's Division of Health Statistics and Research ("the Division") is responsible for the receipt, compilation and storage of all forms submitted under the Act. The Division is comprised of two sections—Statistical Registry Section and Statistical Support Section. The Statistical Registry Section is responsible for the collection and processing of data, while the Statistical Support Section analyzes the data received and prepares the annual report. [Trial Testimony of Dr. Potrzebowski, Vol. III at 88–90].

325. The Division is responsible for five forms under the Act: (1) the Abortion Facility Registration Form [Defendants' Exhibit 45]; (2) the Abortion: Quarterly Facilities Report [Defendants' Exhibit 46]; (3) the Report of Induced Termination of Pregnancy [Defendants' Exhibit 47B]; [26] (4) the Abortions: Report of Complications [Defendants' Exhibit 44]; and (5) the Maternal Death Report. [Trial Testimony of Dr. Potrzebowski, Vol. III at 90].

326. The content of the forms is determined by PaDOH's interpretations of the requirements of the Act and federal guidelines applicable to the collection of data on induced terminations of pregnancy. [Trial Testimony of Dr. Potrzebowski, Vol. III at 98].

327. The Division and its employees are familiar with maintaining the confidentiality of various reports and records. PaDOH's "Policies and Procedures for Confidentiality and Data Release" and the Division's "Handbook of Policies and Procedures" both address the non-release of confidential information. [Trial Testimony of Dr. Potrzebowski, Vol. III at 96–97; Defendants' Exhibits 41 and 42].

328. Under Pennsylvania law, the Division is directed to gather data and maintain such data's confidentiality in additional areas other than abortion. For example, records must be kept confidential, other than in limited, strictly supervised exceptions, under the Disease Prevention and Control Law of 1955, 35 Pa.Stat.Ann. § 521.15 (Purdon 1977); the Vital Statistics Law of 1953, 35 Pa.Stat.Ann. §§ 450.801, 450.805 (Purdon 1977); and the Pennsylvania Cancer Control, Prevention and Research Act, 35 Pa.Stat.Ann. § 5636 (Purdon 1990 Supp.).

329. In respect to each set of forms, PaDOH follows the following standard procedure: (1) the envelope containing the

---

**26.** Defendants' Exhibit 47B is the form presently being used. Defendants' Exhibit 47A is a version of the form PaDOH intended to use prior to the preliminary injunction, and Defendants' Exhibit 47C is the version of the form PaDOH proposes to use should the injunction be lifted completely. [Trial Testimony of Dr. Potrzebowski, Vol. III at 98].

form is opened and date stamped by a secretary in the Division; (2) the secretary returns the form to the envelope and takes it to the desk of the person within the Division responsible for processing the form; (3) that person reviews the form for completeness, enters the data on her personal computer, and checks certain forms against a master list; (4) that person, if necessary, contacts the facility to obtain additional or clarifying information; (5) the form is placed into a locked cabinet. The cabinet and computer diskettes are locked when not in use. The computer is password controlled and only three other persons have the password. [Trial Testimony of Dr. Potrzebowski, Vol. III at 91–93, 95]. After the forms reach a certain number, they are placed in a secure room within the Division where they are kept for two years. Thereafter, the forms are transferred to the Division's section of the state records center where they are preserved in accordance with a retention schedule. When in the state records center, these forms are only accessible to authorized personnel from the Division. [Trial Testimony of Dr. Potrzebowski, Vol. III at 126–28, 139–40].

330. At the end of the year, the Statistical Support Section is given access to the computer records for the purpose of preparing the annual report. The same security measures are in place. [Trial Testimony of Dr. Potrzebowski, Vol. III at 93].

331. PaDOH's annual reports do not release or reveal the names of any performing or referring physician, any facility that is submitting the reports, or any woman who has had an abortion. [Trial Testimony of Dr. Potrzebowski, Vol. III at 97].

332. Ms. Wall of PPSP has no knowledge of any case where PaDOH released the identity of a physician who performs abortions. [Court's Exhibit 1–A at ¶ 121].

a. *Public Disclosure.*

333. Section 3207(b), as amended, provides:

Within 30 days after the effective date of this chapter, every facility at which abortions are performed shall file, and update immediately upon any change, a report with the department, containing the following information:

(1) Name and address of the facility.

(2) Name and address of any parent, subsidiary or affiliated organizations, corporations or associations.

(3) Name and address of any parent, subsidiary or affiliated organizations, corporations or associations having contemporaneous commonality of ownership, beneficial interest, directorship or officership with any other facility.

The information contained in those reports which are filed pursuant to this subsection by facilities which receive State appropriated funds during the 12–calendar-month period immediately preceding a request to inspect or copy such reports shall be deemed public information. Reports filed by facilities which do not receive State appropriated funds shall only be available to law enforcement officials, the State Board of Medicine and the State Board of Osteopathic Medicine for use in the performance of their official duties. Any facility failing to comply with the provisions of this subsection shall be assessed by the department a fine of $500 for each day it is in violation hereof.

18 Pa.Con.Stat.Ann. § 3207(b).

334. Section 3207(b) of the Act was not amended by Act 64. However, the existing version of section 3207(b) is more narrowly drawn than its 1982 predecessor. Under the earlier version, all reports filed under this section were available for public inspection and copying. *See* 1982 Pa.Laws 476, 493, § 1. The same applies to section 3214(f). *Id.* at 487–91.

335. Section 3214(f), as amended, provides:

Every facility in which an abortion is performed within this Commonwealth during any quarter year shall file with the department a report showing the total number of abortions performed within the hospital or other facility during that quarter year. This report shall also show the total abortions performed in

each trimester of pregnancy. Any report shall be available for public inspection and copying only if the facility receives State-appropriated funds within the 12–calendar-month period immediately preceding the filing of the report. These reports shall be submitted on a form prescribed by the department which will enable a facility to indicate whether or not it is receiving State-appropriated funds. If the facility indicates on the form that it is not receiving State-appropriated funds, the department shall regard its report as confidential unless it receives other evidence which causes it to conclude that the facility receives State-appropriated funds.

18 Pa.Con.Stat.Ann. § 3214(f).

336. PaDOH presently receives Abortion Facility Registration Forms [Defendants' Exhibit 45] and Quarterly Facilities Reports [Defendants' Exhibit 46] from abortion providers as required by the Act. Both forms would be made available for public inspection and copying if sections 3207(b) and 3214(f) were permitted to go into effect, but only if the facility received state appropriated funds within the preceding twelve month period. Currently, the forms are maintained in accordance with PaDOH's confidentiality procedures. [Trial Testimony of Dr. Potrzebowski, Vol. III at 93–94, 95, 109–11].

337. Records of state appropriations and expenditures are maintained and generally available at the present time under Pennsylvania's Right–to–Know Law, 65 Pa. Stat.Ann. §§ 66.1 to 66.4 (Purdon 1990 Supp.), unless the information fits within the exceptions enumerated within the statute.

338. Facilities at which abortions are performed, including plaintiff-clinics, hospitals and physician's offices, have traditionally received funding in the form of Medicaid payments for a wide variety of medically necessary services, including a narrow class of abortions for victims of rape and incest and women with life-threatening conditions. [Trial Testimony of Ms. Roselle, Vol. II at 65, 73–74; Verification of Ms. Roselle at ¶¶ 7, 29].

339. Facilities where abortions are performed, including clinics, hospitals and physician's offices, may also receive state appropriated funds for related medical care, as well as building and construction costs and other purposes unrelated to the provision of abortion services. [Trial Testimony of Ms. Roselle, Vol. II at 65–66, 117; Verification of Ms. Roselle at ¶ 29].

340. In 1987, AWC, which serves approximately 350 patients a month, received less than $4,000 in medical assistance funds. [Verification of Ms. Stengle at ¶¶ 2, 7].

341. In 1988, WHS, which performs 6500–7000 abortions annually and has 3,000 client contacts monthly, received medical assistance reimbursement for only 249 patients. [Trial Testimony of Ms. Roselle, Vol. II at 74; Verification of Ms. Roselle at ¶¶ 7, 31].

342. All clinics receiving state appropriated funds apply the funds only to the services for which they are allocated.

343. Because facilities at which abortion services and counseling are offered are subjected to acts of harassment and violence, plaintiff-clinics are concerned that their reports will be open for public inspection and copying under sections 3207(b) and 3214(f). [Trial Testimony of Ms. Roselle, Vol. II at 93; Verification of Ms. Roselle at ¶ 30; Verification of Ms. Stengle at ¶ 37].

344. WHS, as well as other abortion providers, has experienced harassment from anti-abortionists, including daily leafleting or picketing by few individuals, occasional false patient visits, and "hate" mail. [Trial Testimony of Ms. Roselle, Vol. II at 93, 95, 100; Preliminary Injunction Hearing Testimony of Ms. Roselle at 12–13; Preliminary Injunction Hearing Testimony of Ms. Stengle at 33–34]. Other incidents include: break-ins; picketing the residences of physicians and employees; bomb, kidnapping, and death threats against the clinics, employees and employee's family members.

[Trial Testimony of Ms. Roselle, Vol. II at 96].

345. At WHS, the harassment has escalated since September 1988. During September 1988, anti-abortion protestors blockaded WHS's doors. This resulted in the arrests of 370 anti-abortion protestors. [Trial Testimony of Ms. Roselle, Vol. II at 96, 121].

346. Also since that time, the hostility of the threats has escalated. [Trial Testimony of Ms. Roselle, Vol. II at 101].

347. One year later, on September 30, 1989, five individuals carrying buckets of tar forced their way into WHS as an employee arrived for work. While inside, these individuals positioned themselves in the hallway of the main patient care area with their feet in the tar. In the ensuing arrests, the buckets of tar spilled onto the floor and splashed against the walls. Also, the tar was tracked across the carpet by police officers while making the arrests.[27] Repairs cost in excess of $27,000. [Trial Testimony of Ms. Roselle, Vol. II at 96–98, 100; Plaintiffs' Exhibit 86].

348. More recent sources of demonstration and harassment at WHS have been organized by "Operation Multitude." Operation Multitude conducted three demonstrations at WHS on February 17, 1990, April 21, 1990, and in June 1990. During the February event, approximately 1200 anti-abortion demonstrators assembled outside WHS for five hours which crowded the sidewalks on both sides of the streets leading to the clinic. Women required pro-choice escorts to reach the doors of the clinic. For the first time in the experience of Ms. Roselle, women refused to attempt to reach the clinic on April 21, 1990 because of the hostility of the crowd. [Trial Testimony of Ms. Roselle, Vol. II at 98–100].

349. The anti-abortion incidents described herein are commonplace and most facilities providing abortion services are subjected to such incidents. [Verification of Ms. Stengle at ¶ 37]. The harassment extends to the patients and staff members of the facilities.

350. Some anti-abortion demonstrations could adversely affect the ability of the clinic to operate their business and offer valuable services to the public, including such things as contraceptive counseling or AIDS testing.

351. I find plaintiff-clinics' fears of increased harassment if these reports are subject to public inspection to be reasonable.

352. Because of its concern with public disclosure of reports filed with PaDOH, AWC has determined that it will discontinue accepting all state appropriated funds, including medical assistance funds for poverty level women. [Verification of Ms. Stengle at ¶¶ 37–38]. Other clinics may also seriously consider following the same course of action.

353. I find it likely that clinics will refuse to accept patients who are on medical assistance. The likely result will be that indigent patients who have been the victims of rape or incest or who suffer from a life-threatening condition will find it difficult, if not impossible depending upon what part of the state the woman resides, to obtain abortion services.

b. *The Reporting Requirements.*

354. Section 3214(a), as amended, states:

**General Rule.** For the purpose of promotion of maternal health and life by adding to the sum of medical and public health knowledge through the compilation of relevant data, and to promote the Commonwealth's interest in protection of the unborn child, a report of each abortion performed shall be made to the department on forms prescribed by it. The report forms shall not identify the individual patient by name and shall include the following information:

(1) Identification of the physician who performed the abortion, the concurring physician as required by section

---

**27.** Later, the trespassers were found guilty of criminal mischief, conspiracy and defiant trespass.

3211(c)(2) (relating to abortion on unborn child of 24 or more weeks gestational age), the second physician as required by section 3211(c)(5) and the facility where the abortion was performed and of the referring physician, agency or service, if any.

(2) The county and state in which the woman resides.

(3) The woman's age.

(4) The number of prior pregnancies and prior abortions of the woman.

(5) The gestational age of the unborn child at the time of the abortion.

(6) The type of procedure performed or prescribed and the date of the abortion.

(7) Pre-existing medical conditions of the woman which would complicate pregnancy, if any, and, if known, any medical complication which resulted from the abortion itself.

(8) The basis for the medical judgment of the physician who performed the abortion that the abortion was necessary to prevent either the death of the pregnant woman or the substantial and irreversible impairment of a major bodily function of the woman, where an abortion has been performed pursuant to section 3211(b)(1).

(9) The weight of the aborted child for any abortion performed pursuant to section 3211(b)(1).

(10) Basis for any medical judgment that a medical emergency existed which excused the physician from compliance with any provision of this chapter.

(11) The information required to be reported under Section 3210(a) (relating to determination of gestational age).

(12) Whether the abortion was performed upon a married woman and, if so, whether notice to her spouse was given. If no notice to her spouse was given, the report shall also indicate the reason for failure to provide notice.

18 Pa.Con.Stat.Ann. § 3214(a).

355. Act 31 required the reporting of the same basic information as the current version of section 3214(a) with the exception of that information tailored for specific provisions of the Act at the time. *See* 1988 Pa.Laws 262, 271–74, § 8. The 1982 version of the Act required that the report include the following additional information not presently contained in section 3214(a): (i) the woman's age, race and marital status; (ii) date of the woman's last menstrual period; (iii) the length and weight of the aborted fetus when measurable; (iv) how the abortion was paid for; (v) the date the determination of pregnancy was made; and (vi) other facts relating to specific sections of the 1982 version of the Act. *See* 1982 Pa.Laws 476, 487–91, § 1.

356. In addition to the information listed in section 3214(a), PaDOH, if permitted, intends to collect other data, including marital status (even if the husband notification provisions were not in place); Hispanic origin; race; level of education; and date since last menses. [Trial Testimony of Dr. Potrzebowski, Vol. III at 100–01].

357. The reports are not public records within the meaning of Pennsylvania's Right-to-Know law, 65 Pa.Stat.Ann. §§ 66.1 to 66.4. 18 Pa.Con.Stat.Ann. § 3214(e)(2). Disclosure may be made to law enforcement officials only upon an order of the Court of Common Pleas after application showing good cause. *Id.* PaDOH's statistical report shall not lead to the disclosure of the identity of any physician, facility, or patient. *See* 18 Pa.Con.Stat.Ann. § 3214(e)(1).

358. PaDOH recognizes that this information is not required by law, but maintains that it is authorized to seek more information than is required by law. [Trial Testimony of Dr. Potrzebowski, Vol. III at 100–01].

359. According to the testimony of Dr. Potrzebowski, this information is sought to (1) be consistent with the federal standards for the collection of data on induced terminations of pregnancy which were developed by the Center for Disease Control and (2) better study the three outcomes of pregnancy (live births, fetal deaths, and induced terminations of pregnancy) for which the Division collects data. [Trial Testimony of Dr. Potrzebowski, Vol. III at 101–02, 107;

Defendants' Exhibit 43 (Handbook on the Reporting of Induced Terminations of Pregnancy ("Federal Handbook")) ].

360. The federal government, through the National Center for Health Statistics, United States Department of Health and Human Services has prepared a "Standard Report of Induced Termination of Pregnancy" ("Federal Standard Report") which is intended to serve as a model for the states. Other than requiring some information pursuant to the Act, Pennsylvania's "Report of Induced Termination of Pregnancy" ("Pennsylvania Report") [Defendants' Exhibit 47C] is virtually identical to the Federal Standard Report. [Defendants' Exhibit 43 at 14].

361. The Federal Handbook states:

Data from reports of induced termination of pregnancy provide unique information on the characteristics of women having induced abortions. Uniform annual data of such quality are nowhere else available. Medical and health information is provided to evaluate risks associated with induced abortion at various lengths of gestation and by the type of abortion procedure used. Information on the characteristics of the women is used to evaluate the impact that induced abortion has on the birth rate, teenage pregnancy, and out-of-wedlock births. The data also help measure the role that induced abortion plays in birth prevention as compared with contraception. Because these abortion data provide information necessary to promote and monitor health, it is important that the forms be completed carefully.

[Defendants' Exhibit 43 at 2].

362. Both the Pennsylvania Report and the Federal Standard Report request the information listed in paragraph 356. The items of information required on the Pennsylvania Report but not required on the Federal Standard Report are: name of the referring physician and medical complications information.

363. Marital status, race and date of last normal menses are elements of "the woman's personal history." *Thornburgh*, 476 U.S. at 766, 106 S.Ct. at 2181.

364. Abortion is another "pregnancy outcome," in addition to births and fetal death, upon which the Division of PaDOH gathers information. [Court's Exhibit 1–A at ¶ 104].

365. On the Certificate for Fetal Death which must be submitted to PaDOH on each instance of fetal death after 16 weeks of gestation, the physician or reporting entity must include information concerning Hispanic origin, race, educational background of the mother and father, marital status, and date of last normal menses. [Defendants' Exhibit 52].

366. On the Certificate of Live Birth which must be submitted to PaDOH upon each instance of live birth, the physician or reporting entity must include information concerning Hispanic origin, race, educational background of the mother and father, marital status, and date of last normal menses. [Defendants' Exhibit 53].

367. Thirty-three states and New York City collect information on marital status and race of women having induced terminations of pregnancies; thirty-two states and New York City collect information concerning the date of last menses; twenty-eight states and New York City collect information relating to educational background; and sixteen states and New York City collect information concerning Hispanic origin. [Trial Testimony of Dr. Potrzebowski, Vol. III at 105–06].

368. As part of the patient's medical history, two (one of which makes disclosure of this information optional) of the plaintiff-clinics collects data concerning the abortion patient's education, religion, and ethnic group. Three of the plaintiff-clinics collect information concerning the abortion patient's marital status and all of the plaintiff-clinics collect information concerning the patient's menstrual history. [Plaintiffs' Exhibits 6, 12, 18, 36, 44].

369. The requirement that the identity of the referring physician or agency be identified serves no legitimate scientific purpose.

370. Many physicians who refer patients for abortions are extremely protec-

tive of their anonymity because of fears (often based upon past experience) that any kind of documentation or record-keeping connecting them with any phase of the abortion decision could have adverse effects on their medical practices and patients or their ability to reside peacefully in their communities. [Preliminary Injunction Hearing Testimony of Ms. Roselle at 20–21; Verification of Ms. Roselle at ¶ 36; Verification of Ms. Stengle at ¶ 42].

371. There are two medical doctors who, although they do not perform abortions, refer clients to WHS for abortions on the strict condition that WHS not use their names in any of its reports. These doctors insist upon this because each has been subjected to public abuse and harassment in the past. Under no circumstances would either doctor refer any patients to WHS or any other clinic if his name is reported under section 3214(a) even if there were no risk of public disclosure of the report. [Preliminary Injunction Hearing Testimony of Ms. Roselle at 21; Verification of Ms. Roselle at ¶ 37]. Even though the information is available to these doctors, their patients would be unable to receive information concerning abortion services from their own physician and these women would have to go elsewhere for this information.

372. Several of AWC's current referring physicians will not permit AWC to send correspondence to their offices for fear that members of their own staffs would divulge to anti-abortion groups that they refer patients for abortions. [Verification of Ms. Stengle at ¶ 42]. One doctor has discontinued referring patients to AWC because of threats from anti-abortionists. [Verification of Ms. Stengle at ¶ 44].

373. On occasion the Division has had to contact a physician directly concerning forms submitted after the performance of an abortion, even when the facility at which the procedure was performed has a contact person that ordinarily handles such inquiries. [Trial Testimony of Dr. Potrzebowski, Vol. III at 133].

374. Many physicians that have performed abortions have been subjected to harassment from anti-abortion demonstrators. As a result some physicians have ceased performing abortions. [Verification of Ms. Roselle at ¶ 37; Verification of Ms. Stengle at ¶ 41].

375. For this reason, some physicians reasonably prefer to keep the fact that they perform abortions out of the realm of public information. [Preliminary Injunction Hearing Testimony of Ms. Stengle at 39; Verification of Ms. Stengle at ¶ 42].

376. One physician that performed abortions at AWC prior to the enactment of the new Act has discontinued working for AWC out of fear of public disclosure. Further, he has stopped performing abortions in his private practice as well. [Preliminary Injunction Hearing Testimony of Ms. Stengle at 39; Verification of Ms. Stengle at ¶ 43].

377. No physician has stopped performing abortions for PPSP because her or his identity was included on the Individual Reporting Form to PaDOH. [Court's Exhibit 1–A at ¶ 120].

378. Ms. Hollos, the Executive Director of WSC, knows of no physicians who have stopped performing abortions because their identity is on the Pennsylvania Individual Report of Termination of Pregnancy Form. [Court's Exhibit 1–A at ¶ 131].

379. The evidence of record persuades me that the expectation of plaintiff-clinics that referring physicians and, to a lesser extent, performing physicians will terminate their relationship with the clinics is reasonable.

380. Section 3214(a) requires a physician who has performed an abortion to report the basis for his medical judgment to support his determination of gestational age, including the tests performed, under section 3210(a) or his conclusion that the abortion was necessary to prevent the death or a serious risk of substantial and irreversible impairment of a major bodily function under any of the sections of the Act. This subsection also requires that the physician report whether a married patient informed her husband she was undergoing

an abortion and, if not, the reason for her failure to do so.

381. These provisions of section 3214(a) serve no useful scientific purpose and unjustifiably interfere with the physician's exercise of his or her best medical judgment. [Preliminary Injunction Hearing Testimony of Dr. Dratman at 58–59].

382. Compliance with section 3214(a) costs WHS approximately $12,000 annually. [Trial Testimony of Ms. Roselle, Vol. II at 72–73].

383. Section 3214(h) requires every physician called upon to provide medical care and treatment to a woman suffering from medical complications resulting from an abortion or attempted abortion to file a report with PaDOH within thirty days of first seeing the patient. *See* 18 Pa.Con. Stat.Ann. § 3214(h).

384. No other surgical procedure has a complications reporting requirement. [Verification of Dr. Dratman at ¶ 14].

385. If a patient is treated by more than one physician, a single abortion complication may be reported by two or more treating physicians pursuant to section 3214(h). Since the reports omit the identity of the patient, they cannot be matched with complication reports filed by other physicians. Also, since complications from the abortion procedure can also be reported on the Pennsylvania Report, the same problem exists for these reports. This may result in double counting of complications from abortion procedures.

386. Some women are hesitant to advise a physician, at least initially, that they have had an abortion because of the stigma and harassment emanating from anti-abortionists. This may cause physicians to provide inappropriate treatment for post-abortion symptoms or complications. Still other women delay in seeking post-abortion medical care for a complication. Thus, because of the delay, a minor problem may progress into a serious medical problem. [Verification of Dr. Dratman at ¶ 17, 18, 20].

387. While the problems noted above may result in a degree of misinformation or unreliable reporting of post-abortion complications, I conclude that data received will not be statistically meaningless. The information sought, though not perfectly collected, is relevant to a legitimate medical and public health purpose.

## III.

## DISCUSSION

### THE CONSTITUTIONAL STANDARD

The hostility of Pennsylvania's legislature to the protection of a woman's right of privacy to choose abortion is apparent from the history of the legislation purporting to regulate abortion in Pennsylvania. *See supra* at 1326–28. In 1986, the Supreme Court determined that "[c]lose analysis of [the] provisions of [the Act] ... shows that they wholly subordinate constitutional privacy interests and concerns with maternal health in an effort to deter a woman from making a decision, that with her physician, is hers to make." *Thornburgh,* 476 U.S. at 759, 106 S.Ct. at 2178. Of the informed consent requirements of the 1982 version of the Act, the Supreme Court determined that the information sought was not "medical information that is always relevant to the woman's decision, and it may serve only to confuse and punish her and to heighten her anxiety, contrary to accepted medical practice." *Id.* at 762, 106 S.Ct. at 2179. Similarly, when addressing the reporting requirements, the Court stated that "the reports required under the Act before us today go well beyond the health-related interests that served to justify" them and "raise the specter of public exposure and harassment of women ... [and] pose an unacceptable danger of deterring the exercise" of a woman's right to end a pregnancy. *Id.* at 766, 767–68, 106 S.Ct. at 2181, 2182.

This hostility is equally apparent in the 1988 and 1989 amendments to the Act. In fact, substantial portions of Act 64 are nothing more than a reenactment of provisions of the Act found unconstitutional by the Third Circuit and United States Supreme Court not too long ago in *Thornburgh.* Clearly, the Commonwealth of

Pennsylvania seeks to challenge the very foundation of *Thornburgh* and those cases that preceded it, including *Roe v. Wade.*

Without question, the issue of abortion has generated much debate and controversy over the past several years. And, undoubtedly, it will likely engender continued debate and controversy over the next several years—perhaps decades. However, my function is not to debate the philosophical and moral dilemmas raised by a decision which Justice Blackmun aptly described as follows:

> Few decisions are more personal and intimate, more properly private, or more basic to individual dignity and autonomy, than a woman's decision—with the guidance of her physician and within the limits specified in *Roe*—whether to end her pregnancy. A woman's right to make that choice freely is fundamental. Any other result, in our view, would protect inadequately a central part of the sphere of liberty that our law guarantees equally to all.

*Thornburgh*, 476 U.S. at 772, 106 S.Ct. at 2184. Instead, my function is to "uphold the law even when its content gives rise to bitter dispute." *Id.* at 771, 106 S.Ct. at 2184; *see also Cooper v. Aaron*, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958).

Defendants seem to argue that the constitutional standard applicable to judicial review of abortion regulations has somehow been modified by recent Supreme Court decisions. For reasons explained fully below, I most respectfully disagree. Whatever the Supreme Court may decide to do with this issue in the future, one thing is presently clear—many of the challenged provisions of the Act are unconstitutional under *Roe v. Wade* and its progeny, including *Thornburgh*. "[O]nly [the Supreme] Court may overrule one of its precedents," *Thurston Motor Lines, Inc. v. Jordan K. Rand Ltd.*, 460 U.S. 533, 535, 103 S.Ct. 1343, 1344, 75 L.Ed.2d 260 (1983), for "unless we wish anarchy to prevail within the federal judicial system, a precedent of [the Supreme] Court must be followed by lower federal courts no matter how misguided the judges of those courts

think it to be." *Hutto v. Davis*, 454 U.S. 370, 375, 102 S.Ct. 703, 705, 70 L.Ed.2d 556 (1982). The Supreme Court has recently stated:

> If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.

*Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, ——, 109 S.Ct. 1917, 1921, 104 L.Ed.2d 526 (1989); *see also National Ass'n for the Advancement of Colored People v. Medical Center, Inc.*, 657 F.2d 1322, 1329–30 (3d Cir.1981) ("The prerogative of overruling its cases rests with the Supreme Court, and not with us").

Relying upon prior cases which held that the fundamental constitutional right of privacy which guarantees freedom of personal choice in matters of marriage and family life, *see, e.g., Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) (Massachusetts statute permitting married persons to obtain contraceptives to prevent pregnancy but preventing distribution of contraceptives to single persons for same purpose was unconstitutional); *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (invalidating Virginia miscegenation statute which prohibited marriages between people solely on the basis of race); *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (Connecticut statute prohibiting use of contraceptives unconstitutionally intrudes upon the right of marital privacy), the Supreme Court concluded that a woman's right to choose an abortion is encompassed in that right. *Roe v. Wade*, 410 U.S. at 153, 93 S.Ct. at 726. In the nearly two decades since the landmark decision of *Roe v. Wade* was announced, this basic principle has frequently been reaffirmed. *See, e.g., Thornburgh*, 476 U.S. at 759, 106 S.Ct. at 2178; *Akron*, 462 U.S. at 420 n. 1, 103 S.Ct. at 2487 n. 1.

 This fundamental right may be significantly limited only where the state

demonstrates that its regulation is narrowly drawn to serve a compelling state interest. *Casey I,* 686 F.Supp. at 1125; *see also Roe v. Wade,* 410 U.S. at 155, 93 S.Ct. at 728. Where abortion regulations do not impose a legally significant burden, the state need only show a rational basis for the regulation. *American College I,* 552 F.Supp. at 796. However, a state may not, under the pretense of protecting maternal health or potential life, restrict a woman's right to obtain an abortion or otherwise intimidate her into continuing her pregnancy. *Thornburgh,* 476 U.S. at 759, 106 S.Ct. at 2178. Simply stated, "[p]rovisions which wholly subordinate constitutional privacy interests and concerns with maternal health in an effort to deter a woman from exercising her right to choose abortion will not be tolerated." *Casey I,* 686 F.Supp. at 1125 (citing *Thornburgh* ).

"[R]estrictive state regulation of the right to choose abortion, as with other fundamental rights subject to searching judicial examination, must be supported by a compelling state interest." *Akron,* 462 U.S. at 427, 103 S.Ct. at 2491; *see also Roe v. Wade,* 410 U.S. at 155, 93 S.Ct. at 728. In the context of a woman's right to elect to terminate her pregnancy, two compelling state interests have been identified—the protection of a fetus capable of meaningful life and the protection of maternal health. *American College II,* 737 F.2d at 291. Recognizing other interests in cases involving minors—"the interest in the welfare of the pregnant minor, the interest of the parents, and the interest of the family unit"—the state may limit the right of a minor woman to obtain an abortion in a manner which would not be permissible in the case of an adult.[28] *Id.* at 296. The relative "strength" of either of these interests varies depending upon the trimester of pregnancy involved.[29]

"Because abortion is a medical procedure requiring the advice and assistance of competent, trained medical personnel, a woman cannot exercise her fundamental right alone." *American College II,* 737 F.2d at 283. In the first trimester, only regulations which do not significantly burden the woman's decision and are justified by important state objectives will be permitted. *Ashcroft,* 462 U.S. at 489–90, 103 S.Ct. at 2523–2524. In light of the relative simplicity and safety of the abortion procedure, regulations that restrict competent medical personnel do not appreciably advance the state's interest in maternal health. *Akron,* 462 U.S. at 428–30 & n. 11, 434, 103 S.Ct. at 2492 & n. 11, 2495. Due

---

**28.** I will discuss these interests in greater detail when addressing section 3206 of the Act relating to parental informed consent.

**29.** Critics of *Roe v. Wade* argue that the critical elements of its framework—trimesters and viability—are somehow inconsistent with our Constitution and unworkable in practice. There is certainly room for disagreement over this complex issue. But "[t]o overturn a constitutional decision is a rare and grave undertaking. To overturn a constitutional decision that secured a fundamental personal liberty to millions of persons would be unprecedented in our 200 years of constitutional history." *Webster,* —— U.S. at ——, 109 S.Ct. at 3078 (Blackmun, J., dissenting in part and concurring in part).

The trimester framework provides a mechanism, in the context of abortion, from which the right to privacy can be restricted so as to accommodate, when appropriate, the state's legitimate interests in protecting maternal health and in preserving potential human life. "[E]stablishing benchmarks and standards with which to evaluate the competing claims of individuals and government, lies at the very heart of consti-

tutional adjudication." *Id.* at ——, 109 S.Ct. at 3073.

Justice Scalia attacks the trimester as an improper creation of "an Abortion Code," *Hodgson,* —— U.S. at —— 110 S.Ct. at 2960 (Scalia, J., dissenting in part and concurring in judgment in part); *see also Webster,* —— U.S. at ——, 109 S.Ct. at 3064 (Scalia, J., dissenting in part and concurring in judgment in part). Isn't it a court's function to draw narrow differentiations in all areas, including the rights of prisoners and criminal defendants, of constitutional law?

Finally, some, in the past, have argued that *Roe v. Wade* was "on a collision course with itself." *See Akron,* 462 U.S. at 458, 103 S.Ct. at 2507 (O'Connor, J., dissenting). The presently prevailing medical information establishes that the development of the crucial organs necessary for extrauterine survival occurs during the 23rd or 24th week of gestation. "The threshold of fetal viability is, and will remain, no different from what it was at the time *Roe* was decided. Predictions to the contrary are pure science fiction." *Webster,* —— U.S. at —— n. 9, 109 S.Ct. at 3075 n. 9 (Blackmun, J., dissenting in part and concurring in part).

to the absence of a compelling state interest in the first trimester, the abortion decision must be free from state interference and its effectuation must be left to the woman and the medical judgment of her attending physician. *Id.; Roe v. Wade*, 410 U.S. at 163–64, 93 S.Ct. at 732. However, certain regulations which do not significantly impact upon a woman's decision in the first trimester may be permissible, if the state can prove that they further an important state interest without interfering with the woman's choice and the independent medical judgment of her physician. *See Ashcroft*, 462 U.S. at 486–90, 103 S.Ct. at 2522–25; *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 65–67, 79–81, 96 S.Ct. 2831, 2839–40, 2845–46, 49 L.Ed.2d 788 (1976) (*"Danforth"*).

At approximately the beginning of the second trimester of pregnancy, the state's interest in promoting maternal health becomes compelling. "[T]o the extent that the regulation reasonably relates to the preservation of maternal health," the state may justify regulations which significantly burden the woman's right to terminate her pregnancy. *Roe v. Wade*, 410 U.S. at 164, 93 S.Ct. at 732. However, these regulations must not depart from accepted medical practice, *Akron*, 462 U.S. at 431, 103 S.Ct. at 2493; *see also American College II*, 737 F.2d at 292, and cannot "directly restrict[ ] a woman's decision whether or not to terminate her pregnancy." *Colautti v. Franklin*, 439 U.S. at 386, 99 S.Ct. at 681.

Finally, at "viability," a state may regulate, and even proscribe, abortion in the name of its interest in the potentiality of human life, *except* when necessary, in appropriate medical judgment, for the preservation of the life or health of the mother. *Id.* at 387–88, 99 S.Ct. at 681–82; *Roe v. Wade*, 410 U.S. at 164–65, 93 S.Ct. at 732. The point of viability is not for this court or the legislature to determine. Instead, this task must be left to the attending physician's medical judgment as to whether, based upon the facts of the particular case

before him or her, there is "a reasonable likelihood of the fetus' 'sustained survival' and 'meaningful life' outside the womb." *American College II*, 737 F.2d at 292 (quoting *Colautti v. Franklin*, 439 U.S. at 386, 99 S.Ct. at 681).

Once the plaintiffs have demonstrated that a regulation imposes a significant burden on the woman's right to an abortion, the Commonwealth has the burden of proving that the regulation is narrowly tailored to the precise compelling interest at stake. *Casey I*, 686 F.Supp. at 1125–26; *see also Akron*, 462 U.S. at 433–34, 103 S.Ct. at 2494–95; *Roe v. Wade*, 410 U.S. at 155, 165, 93 S.Ct. at 728, 732; *American College II*, 737 F.2d at 292. For example, the Commonwealth must make a reasonable effort to limit the effect of its regulation to that portion of the trimester during which its interests will be furthered. *Akron*, 462 U.S. at 434, 103 S.Ct. at 2494–95.

The three recent Supreme Court decisions relating to abortion regulation have not changed or modified these basic tenets. In *Webster*, the Supreme Court reviewed provisions of the Missouri statute which: (1) bans the performance of abortions by public employees and in public facilities except to save the life of the mother; and (2) requires physicians to perform "such medical examinations and tests as are necessary to make a finding of the gestational age, weight, and lung maturity of the unborn child" on any woman the physician had reason to believe was 20 weeks or more pregnant. In addition, the Court also considered the preamble to the Missouri statute which declares that life begins at conception.[30]

The Court determined that "none of the challenged provisions of the Missouri Act properly before [it] conflict with the Constitution." *Webster*, — U.S. at —, 109 S.Ct. at 3059. Indeed, a plurality of the Court was prepared to modify *Roe v. Wade*, but only "to the extent" required to uphold the Missouri statute. *Id.* Provid-

---

**30.** In respect to the preamble, the majority of the Court determined that it need not address its constitutionality because the clause was "abor-

tion-neutral." *See Webster*, — U.S. at —, 109 S.Ct. at 3049–50; *id.* at —, 109 S.Ct. at 3059 (O'Connor, J., concurring).

ing the decisive fifth vote, Justice O'Connor, declined the plurality's invitation to revisit *Roe v. Wade* even in the slightest degree. Concurring in judgment on this issue, Justice O'Connor stated "[t]he Court today has accepted the State's every interpretation of [Missouri's] abortion statute and has upheld, *under our existing precedents*, every provision of the statute which is properly before us." *Id.* at ——, 109 S.Ct. at 3061 (O'Connor, J., concurring in judgment) (emphasis added). After *Webster* the standard of review for abortion legislation remained unchanged. *See id.* at ——, 109 S.Ct. at 3067 (Blackmun, J., dissenting) ("the Court extricates itself from [*Webster*] without making a single, even incremental, change in the law of abortion"); *see also Lewis v. Pearson Foundation, Inc.*, 908 F.2d 318, 320 (8th Cir.1990) (*Webster* and *Hodgson* both "recognized the continuing viability of *Roe v. Wade*" and, therefore, *Roe v. Wade* remains controlling); *Massachusetts v. Secretary of Health and Human Services*, 899 F.2d 53, 54 (1st Cir.1990) ("The [*Webster*] Court relied upon and reaffirmed the holdings of [*Harris v.*] *McRae* [448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980)] and *Maher v. Roe* [432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977)] and upheld the validity of *Roe v. Wade*"); *Arnold v. Board of Educ. of Escambia County, Alabama*, 880 F.2d 305, 311 & n. 6 (11th Cir.1989) (reaffirming the principles of *Roe v. Wade* and concluding that *Webster* did not affect its decision); *Florida Women's Medical Clinic, Inc. v. Smith*, No. 79–6063, slip op. at 2 (S.D.Fla. Aug. 1, 1990) ("Defendants['] reading of *Webster* is simply wrong. *Webster* did not overrule or modify *Roe*"); *In re Air Crash Disaster at Detroit Metropolitan Airport on August 16, 1987,* 737 F.Supp. 427, 429 (E.D.Mich.1989) ("The *Webster* Court nei-

ther overturned *Roe* with respect to viability nor found as a matter of law that viability occurs at twenty weeks").

Further, nothing in *Hodgson* or *Ohio v. Akron Center for Reproductive Health*, —— U.S. ——, 110 S.Ct. 2972, 111 L.Ed.2d 405 (1990), the Supreme Court's recent decisions dealing with the rights of minors to obtain abortions, modifies *Roe v. Wade*. In these two cases, the Court struck down a Minnesota statute requiring minor women to notify both their parents, without a judicial by-pass procedure, before obtaining an abortion; upheld another section of the Minnesota statute which required two-parent notice but included judicial by-pass procedures; upheld a 48–hour waiting period, after notification was given to the parents, for all minor women; upheld Ohio's single-parent notice requirement which included a by-pass mechanism; and upheld Ohio's requirement that the physician notify the parent personally.[31]

Neither *Hodgson* nor *Ohio* overrules *Roe v. Wade*. Justice Marshall wrote:

> *Roe* remains the law of the land. Indeed, today's decision reaffirms the vitality of *Roe*, as five Justices have voted to strike down a state law restricting a woman's right to abortion. Accordingly, to be constitutional, state restrictions on abortion must meet the rigorous test [of strict judicial scrutiny].

*Hodgson*, —— U.S. at ——, 110 S.Ct. at 2952 (Marshall, J., concurring in part, concurring in judgment in part, and dissenting in part) (citations omitted).

Moreover, in neither case did a majority of the Court articulate a new standard of review in abortion cases. In *Hodgson*, Justice Kennedy, joined by three other members of the Court, upheld the by-pass procedure because it "comports in all respects

---

**31.** Justice Scalia's understanding of the opinions in *Hodgson* and *Ohio* is as follows:

One Justice holds that two-parent notification is unconstitutional (at least in the present circumstances) without judicial bypass, but constitutional with bypass....; four Justices would hold that two-parent notification is constitutional with or without bypass....; four Justices would hold that two-parent notification is unconstitutional with or without

bypass, though the four would apply two different standards....; six Justices hold that one-parent notification with bypass is constitutional, though for two different sets of reasons....; and three Justices would hold that one-parent notification with bypass is unconstitutional....

*Hodgson*, —— U.S. at ——, 110 S.Ct. at 2960 (Scalia, J., concurring in judgment in part and dissenting in part).

with our precedents.... In providing for the bypass, Minnesota has done nothing other than attempt to fit its legislation into the framework that we have supplied in our previous cases." *Id.* —— U.S. at ——, 110 S.Ct. at 2970. Once again, the critical fifth vote came from Justice O'Connor. Justice O'Connor's opinion relied upon the Court's prior decisions in *Danforth* and *Bellotti v. Baird,* 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (*"Bellotti II"*) in which the Court approved the use of a by-pass mechanism to ameliorate the unconstitutional burdens imposed by parental consent statutes. *Id.* —— U.S. at ——, 110 S.Ct. at 2949–50 (O'Connor, J., concurring). In *Ohio,* the majority opinion concluded that the Ohio statute was constitutional because it "meets the requirements for parental consent statutes in *Danforth, Bellotti, Ashcroft,* and *Akron." Ohio,* —— U.S. at ——, 110 S.Ct. at 2979. Finally, a majority of the Court emphasized that its opinions in *Hodgson* and *Ohio* did not conflict or modify *Akron. See id.* —— U.S. at ——, 110 S.Ct. at 2983 ("The distinction between notifying a minor's parents and informing a woman of the routine risks of an abortion has ample justification"); *see also Hodgson,* —— U.S. at —— n. 35, 110 S.Ct. at 2944 n. 35.

With these principles in mind, I turn to the specific challenges raised by plaintiffs in this action.

## THE DEFINITION OF MEDICAL EMERGENCY

■ As noted above, the Commonwealth may not adopt abortion regulations which depart from accepted medical practices. *Akron,* 462 U.S. at 434, 103 S.Ct. at 2494–95; *American College II,* 737 F.2d at 292. At every stage of the pregnancy, the woman's health must always remain the paramount consideration. *See Colautti v. Franklin,* 439 U.S. at 400, 99 S.Ct. at 688; *see also American College II,* 737 F.2d at 300. For this reason, the Commonwealth's interest in promoting the integrity of the marital relationship and the prenatal life of a spouse's child (assuming that such a legitimate interest does in fact exist) or encouraging informed consent and parental involvement in abortion decisions must take the back seat to any immediate and serious threat to maternal health. Therefore, to pass constitutional muster, regulations of a woman's right to choose to terminate her pregnancy must contain an adequate exception for medical emergencies. *Casey I,* 686 F.Supp. at 1137.

While the Act does contain an exception for medical emergencies, I find that is far from adequate. The definition of medical emergency within the Act interferes with the physician's independent medical judgment. Without question, the definition of medical emergency is more restrictive than any other as applied in medical situations. *Compare* 18 Pa.Con.Stat.Ann. § 3203 *with* 35 Pa.Stat.Ann. § 6923 and Findings of Fact (¶ 152), *supra* at 1345. Previously, I concluded:

> [T]he narrow definition of medical emergency contained in Section 3203 may compel a physician to act against his own best judgment and creates an unconstitutional trade off between the woman's health and the life or health of the fetus, or between the minor's health and the involvement of her parent in the abortion decision.

*Casey I,* 686 F.Supp. at 1137. This conclusion applies with equal force today. If anything, the record established herein makes this conclusion more certain.

Under the Act, the physician may only act in the best interests of his or her patient, if a delay would create a serious risk of substantial and irreversible impairment of [a] major bodily function" or death. At the risk of license suspension or revocation, as well as rather substantial potential criminal penalties, a physician is asked under the Act to proceed with the care of his or her pregnant patient in a manner inconsistent with his or her best medical judgment and incompatible with the best interests of his or her patient. This trade-off cannot be tolerated.

Defendants argue that the plaintiffs cannot demonstrate any situations in which a pregnant woman would be suffering from

a condition requiring immediate medical care under generally accepted medical standards that would not also fall within the definition of medical emergency. The record before me is very much to the contrary. Plaintiffs have identified three serious conditions, *e.g.* preeclampsia, inevitable abortion, and premature ruptured membrane, arising out of pregnancy that could pose a serious threat to a woman's health without creating a serious risk of substantial and irreversible impairment to a major bodily function. In such instances, delay might cause a risk of an impairment to a bodily function, but not a "serious risk of substantial and irreversible impairment to major bodily function." A pregnant woman, or any other person for that matter, should not be required to bear that risk. The Act's definition of medical emergency would hinder a physician's ability to respond rapidly to emergency circumstances and cause delay which could jeopardize a woman's health.

Defendants also argue that the definition of medical emergency in the Act is less restrictive than the definition of medical emergency contained in the Missouri statute upheld in *Hodgson.* This argument is without merit. Without question, the Missouri statute does narrowly define the term "medical emergency," however, neither the lower courts nor the Supreme Court had occasion to consider its constitutionality.

I will, therefore, permanently enjoin the enforcement of all provisions of the Act containing the term "medical emergency." [32] Since this conclusion enjoins all those provisions challenged by plaintiffs substantively, I technically need not reach the merits of the remaining challenges to the Act. However, to avoid potential piecemeal appellate review, I shall address the remainder of the issues raised.

## TWENTY–FOUR HOUR WAITING PERIOD

■ Section 3205 of the Act requires a mandatory 24–hour delay between the time the woman's consent for an abortion is obtained and the actual time the procedure is performed. Section 3205 applies to all abortions regardless of which trimester of pregnancy is involved. Essentially, the Commonwealth seeks a decision which would effectively overrule *Akron,* as well as reverse the result reached in *American College I,* 552 F.Supp. at 797–98, and conceded by the Commonwealth in *American College II,* 737 F.2d at 293. This is something which I cannot, and will not, do, based upon the weight of authority and the record before me. While increasing the cost and risk of delay of abortions by requiring two trips to an abortion facility, this arbitrary and inflexible waiting period does not further the state's interest in maternal health and it impermissibly infringes the physician's discretion to exercise sound medical judgment. Therefore, a mandatory 24–hour waiting period unconstitutionally imposes a legally significant burden on a woman's rights to seek an abortion.

This issue is identical to the issue addressed by the Supreme Court in *Akron.* The Court invalidated a provision that required women, capable of consenting to abortion, to wait a period of 24 hours after giving consent before undergoing an abortion. The Court determined that "if a woman, after appropriate counseling, is prepared to give her written informed consent and proceed with the abortion, a State may not demand that she delay the effectuation of that decision." *Akron,* 462 U.S. at 450–51, 103 S.Ct. at 2503.

The record before me amply supports this result. However, I shall only briefly summarize my findings. Only a very small percentage of women are ambivalent concerning whether to have an abortion when

---

**32.** I decline to reach the merits of plaintiffs' vagueness argument. However, I note that the Supreme Court has stated that a statute is unconstitutionally vague if " 'it fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute' ... [and] is so indefinite that 'it encourages arbitrary and erratic arrests and convictions.' "

*Colautti v. Franklin,* 439 U.S. at 390, 99 S.Ct. at 683. It can be persuasively argued that, like the provision at issue in *Colautti,* the Act "conditions potential criminal liability on confusing and ambiguous criteria" and, therefore, presents "serious problems of notice, discriminatory application, and chilling effect on the exercise of constitutional rights." *Id.*

they arrive at the facility.[33] Once a woman gives her informed consent to the abortion procedure, there is absolutely no medical reason for delay. In fact, a mandatory 24–hour waiting period could, in reality, lead to delays in excess of 24 hours and perhaps as long as two weeks given the current practices of abortion providers and the individual circumstances of each patient. Any such delay presents an increased risk to the health of the patient. In some cases, the delay could force the woman into the second trimester of her pregnancy. This would increase the cost of the procedure, as well as the risk.

Moreover, a mandatory 24–hour waiting period would require two visits to the abortion provider. This would double the woman's travel time,[34] her exposure to the harassment of demonstrators located outside of most abortion facilities on a regular basis, and significantly increase her costs in obtaining the procedure. Further, women that work in the home and have children will have to expend additional sums for day care or baby sitting services, and women working outside the home will be required to take additional time off work. The economic impact of this provision will be most burdensome upon those women with the least financial resources, the poor and the young. Finally, women living in rural areas and those women that have difficulty explaining their whereabouts, such as school age women, battered women, and working women without sick leave, will also experience significant burdens in attempting to effectuate their abortion decision, if a mandatory 24–hour waiting period were in place.

The Court's recent validation, in *Hodgson*, of a 48–hour waiting period for minors seeking an abortion to permit parental involvement in their decision does not alter this conclusion. In fact, a majority of the Court explicitly distinguished the situation before it from that presented in *Akron*. *See Hodgson*, —— U.S. at —— n. 35, 110 S.Ct. at 2944 n. 35; *see also Ohio*, —— U.S. at ——, 110 S.Ct. at 2983 ("The distinction between notifying a minor's parents and informing a woman of routine risks of abortion has ample justification"). Significantly, the statute in *Hodgson* did not require any delay once the minor obtained the affirmative consent of a substitute decision-maker—either the court or a parent.

Based upon the record before me, I conclude that the 24–hour waiting period in section 3205 is unconstitutional.

## PHYSICIAN–ONLY DISCLOSURE REQUIREMENT

■ Plaintiffs challenge the provision of section 3205(a)(1) requiring that the information required to be disclosed to the patient pursuant to (a)(1) [35] be imparted by the physician and not his agent. The 1982 version of the Act contained the same requirement. Based upon virtually identical language, the Supreme Court found such a provision unconstitutional. *Akron*, 462 U.S. at 446–49, 103 S.Ct. at 2501–02. As with the 24–hour waiting period provision, the Commonwealth conceded the unconstitutionality of the physician-only disclosure requirement before the Third Circuit. *American College II*, 737 F.2d at 793. I find that no basis exists in the record before me to reach a contrary conclusion.

The Supreme Court concluded in *Akron* that it was "unreasonable for a State to insist that only a physician is competent to provide the information and counseling relevant to informed consent," *Akron*, 462 U.S. at 449, 103 S.Ct. at 2502, since "the State's interest is in ensuring that the woman's consent is informed and unpressured; the critical factor is whether she

---

**33.** Special arrangements are made for counseling sessions for women demonstrating any ambivalence about their decision.

**34.** I note that many women must travel substantial distances to reach the nearest abortion provider.

**35.** Specifically, section 3205(a)(1), quoted *supra* at 1348–49, requires the physician to orally inform the woman of (1) the nature of the proposed treatment and procedure and of the risks and alternatives to the procedure; (2) the probable gestational age of the fetus at the time the abortion is to be performed; and (3) the medical risks associated with carrying the pregnancy to term.

obtains the necessary information and counseling from a *qualified person,* not the identity of the person from whom she obtains it." *Id.* at 448, 103 S.Ct. at 2502 (emphasis added).

The record before me establishes that prior to performing an abortion, trained counselors at plaintiff-clinics provide a patient with options counseling and obtain her informed consent for the procedure. The record further establishes that these counselors are well-trained and extremely competent to impart such information to patients seeking to terminate their pregnancy. A physician-only disclosure requirement will require the plaintiff-clinics to substantially alter their current practices. Any changes of this nature would necessarily increase costs to the plaintiff-clinics for providing the service, which would undoubtedly be passed along to patients seeking an abortion.

Trained counselors, such as those employed or utilized on a volunteer basis by plaintiff-clinics, are fully capable, by virtue of their training and experience, to provide information to patients, to discuss the alternatives to abortion, and to secure the patient's informed consent. In many instances, trained counselors, who are women, are more understanding than physicians and have more time to spend with the patients. Consequently, in certain cases, the state's interest "in ensuring that the woman's consent is informed and unpressured" may be better served when trained counselors are able to impart the necessary information to the patient. A physician-only disclosure requirement is not narrowly tailored to serve the Commonwealth's interest in protecting maternal health.

Accordingly, I find that the physician-only informed consent requirements set forth in section 3205(a)(1) of the Act are unconstitutional.

## CONTENT–BASED INFORMED CONSENT

■ "The validity of an informed consent requirement ... rests on the State's interest in protecting the health of the pregnant woman." *Akron,* 462 U.S. at 443, 103 S.Ct. at 2499. Plaintiffs do not dispute that a requirement that the woman give what is truly a voluntary and informed consent is proper and constitutional. *Thornburgh,* 476 U.S. at 760, 106 S.Ct. at 2178; *Danforth,* 428 U.S. at 67, 96 S.Ct. at 2840. However, a state, under the guise of informed consent requirements, "may not require the delivery of information designed 'to influence the woman's informed choice between abortion or childbirth.'" *Thornburgh,* 476 U.S. at 760, 106 S.Ct. at 2178 (quoting *Akron,* 462 U.S. at 443–44, 103 S.Ct. at 2500). Also, rigid requirements that a specific body of information be imparted to a woman in all cases, regardless of the needs of the patient, improperly intrudes upon the discretion of the pregnant woman's physician and thereby imposes an "undesired and uncomfortable straitjacket." *See Danforth,* 428 U.S. at 67 n. 8, 96 S.Ct. at 2840 n. 8 (quoted in *Thornburgh,* 476 U.S. at 762, 106 S.Ct. at 2179).

Section 3205 of the Act states that five specific types of information, three of which must be presented by a physician, must be delivered to the woman at least 24 hours prior to the abortion. The five are: (a) the "nature of the proposed procedure or treatment and of those risks and alternatives to the procedure or treatment that a reasonable patient would consider material to the decision," (b) the "probable gestational age of the unborn child at the time the abortion is to be performed," (c) the "medical risks associated with carrying her child to term," (d) the fact that the "father of the unborn child is liable to assist in the support of her child," and (e) that "Medical Assistance benefits may be available for prenatal care, childbirth and neonatal care." *See* 18 Pa.Con.Stat.Ann. § 3205(a)(1) and (2). The woman must also be advised that materials printed and supplied by the Commonwealth that describe the fetus and that "list agencies which offer alternatives to abortion" are available for her review. *See* 18 Pa.Con.Stat.Ann. § 3205(a)(2)(i). If the woman elects to review the printed materials, a copy of the materials must be provided to her. *See* 18

Pa.Con.Stat.Ann. § 3205(a)(3). Finally, the pregnant woman must certify, prior to the abortion, that all of this information has been provided to her. *See* 18 Pa.Con.Stat. Ann. § 3205(a)(4).

Pursuant to section 3208 of the Act, PaDOH must prepare, publish and update, on an annual basis, easily comprehensible printed materials which would comply with the informed consent provisions of section 3205(a) of the Act. First, PaDOH must prepare "[g]eographically indexed materials designed to inform the woman of public and private agencies" available to assist her through pregnancy. *See* 18 Pa.Con. Stat.Ann. § 3208(a)(1). Second, PaDOH must prepare "[m]aterials designed to inform the woman of the probable anatomical and physiological characteristics of the unborn child at two-week gestational increments from fertilization to full term, including pictures representing the development of unborn children at two-week gestational increments." *See* 18 Pa.Con.Stat. Ann. § 3205(a)(2).

The Supreme Court's assessment in *Thornburgh* of the content-based informed consent imposed by sections 3205 and 3208 of the Act applies with equal force today. For this reason, I shall quote *Thornburgh* at length. Justice Blackmun wrote:

The printed materials required by §§ 3205 and 3208 seem to us to be nothing less than an outright attempt to wedge the Commonwealth's message discouraging abortion into the privacy of the informed-consent dialogue between the woman and her physician. The mandated description of fetal characteristics at 2–week intervals, no matter how objective, is plainly overinclusive. This is not medical information that is always relevant to the woman's decision, and it may serve only to confuse and punish her and to heighten her anxiety, contrary to accepted medical practice. Even the listing of agencies in the printed Pennsylvania form presents serious problems; it contains names of agencies that may well be out of step with the needs of the particular woman and thus places the physician in an awkward position and infringes upon his or her professional

responsibilities. Forcing the physician or counselor to present materials and the list to the woman makes him or her in effect an agent of the State in treating the woman and places his or her imprimatur upon both the materials and the list. All this is, or comes close to being, state medicine imposed upon the woman, not the professional medical guidance she seeks, and it officially structures—as it obviously was intended to do—the dialogue between the woman and her physician.

The requirements of §§ 3205(a)(2)[ (ii) and (iii) ] that the woman be advised that medical assistance benefits may be available, and that the father is responsible for the support of the child similarly are poorly disguised elements of discouragement for the abortion decision. Much of this would be nonmedical information beyond the physician's area of expertise and, for many patients, would be irrelevant and inappropriate. For a patient with a life-threatening pregnancy, the "information" in its very rendition may be cruel as well as destructive of the physician-patient relationship. As any experienced social worker or other counselor knows, theoretical financial responsibility often does not equate with fulfillment.... Under the guise of informed consent, the Act requires the dissemination of information that is not relevant to such consent, and, thus, it advances no legitimate state interest.

*Thornburgh*, 476 U.S. at 762–63, 106 S.Ct. at 2179–80 (citations and footnotes omitted); *see American College II*, 737 F.2d at 295–96; *see also Akron*, 462 U.S. at 444– 45, 103 S.Ct. at 2500–01 (invalidating substantially similar informed consent provisions).

The type of compelled informed consent contemplated by sections 3205 and 3208 of the Act is the antithesis of informed consent and goes far beyond merely describing the general subject matter relevant to the woman's decision. For this reason, I find that sections 3205 and 3208 are unconstitu-

tional on their face. *Thornburgh*, 476 U.S. at 764, 106 S.Ct. at 2180.[36]

## PARENTAL INFORMED CONSENT [37]

[T]he potentially severe detriment facing a pregnant woman, *see Roe v. Wade*, 410 U.S. [at 153, 93 S.Ct. at 726] is not mitigated by her minority. Indeed, considering her probable education, employment skills, financial resources, and emotional maturity, unwanted motherhood may be exceptionally burdensome for a minor. In addition, the fact of having a child brings with it adult legal responsibility, for parenthood, like attainment of the age of majority, is one of the traditional criteria for the termination of the legal disabilities of minority. In sum, there are few situations in which denying a minor the right to make an important decision will have consequences so grave and indelible.

*Bellotti II*, 443 U.S. at 642, 99 S.Ct. at 3047–48.

 Except in the case of a "medical emergency," section 3206 requires a physician to obtain the informed consent of a parent or guardian before performing an abortion on an unemancipated minor or an incompetent woman. Because section 3206 does not define "informed parental consent," I must look to the provisions of section 3205(a) to give meaning to the term. To be "informed" within the meaning of the Act, the physician must have orally informed the parent of all the information required by section 3205(a)(1). In addition, the parent must also be informed of the information required by section 3205(a)(2).

To be constitutional, a parental consent provision must not unduly burden the minor's right to seek an abortion. *Bellotti II*, 443 U.S. at 640, 99 S.Ct. at 3046. Although parents may not exercise "an absolute, and possibly arbitrary veto" over the decision, *Danforth*, 428 U.S. at 74, 96 S.Ct. at 2843, the state's reasonable judgment that the decision should be made after notification to and consultation with a parent has never been questioned. *Id.* at 75, 96 S.Ct. at 2844; *see also Ohio*, —— U.S. at —— – ——, 110 S.Ct. at 2978–81; *Akron*, 462 U.S. at 428 n. 10, 439, 103 S.Ct. at 2491 n. 10, 2497; *H.L. v. Matheson*, 450 U.S. 398, 409–10, 101 S.Ct. 1164, 1171, 67 L.Ed.2d 388 (1981). "[P]arental notice and consent are qualifications that typically may be imposed by the State on a minor's right to make important decisions. As immature minors often lack the ability to make fully informed choices that take account of both immediate and long-range consequences, a State reasonably may determine that parental consultation often is desirable and in the best interest of the minor." *Bellotti II*, 443 U.S. at 640–41, 99 S.Ct. at 3046–47.

While not explicitly requiring the parent to make an in-person visit to the abortion facility, I conclude, based upon the evidence of record, that an in-person visit to the facility will be necessary under generally accepted medical principles of informed consent in order for the facility to obtain the informed consent of the parent.[38] Addressing the requirement that a parent make an in-person visit to the facility, I wrote:

> Any requirement that a parent make an in-person visit to the clinic would

---

**36.** The Court in *Thornburgh* concluded as follows: "These statutory defects cannot be saved by any facts that might be forthcoming at a subsequent hearing." *Id.* I note, however, that my holding does not bar the Commonwealth from preparing the documents required by section 3208. Instead, I merely enjoin the requirement that these items must be offered to the pregnant woman during the informed consent process as outlined by section 3205.

**37.** To the extent that section 3206 required that at least one parent give "informed consent" to the minor's decision, this section must be deemed unconstitutional given the unconstitutional content-based informed consent require-

ments of section 3205. However, I shall review the constitutionality of parental "informed consent" under the assumption that the informed consent requirements imposed by the Act were in fact constitutional.

**38.** I recognize that I reached a contrary conclusion previously. *Casey I*, 686 F.Supp. at 1126–27. However, I am not bound by my earlier findings. The weight of the evidence at the preliminary injunction hearing did not support plaintiffs' argument. The same, however, cannot be said for the record as it now exists given the credible testimony of Dr. Grodin, a medical ethicist.

carry with it the risk of a delay of several days or possibly weeks in obtaining an abortion, even where the parent is willing to consent. It may create additional financial and emotional burdens for the minor and her family. The parent may be obliged to take time off from work, which may entail loss of wages and scheduling difficulties. The parent may incur child care or travel expenses. The parent may be reluctant to explain his or her absence from work, or may not wish to be seen entering an abortion clinic. Such a requirement would also increase the clinics' costs, which would eventually be passed on to their patients.

Because a delay of even a few days can significantly increase the risks and costs associated with abortion, particularly where the minor is near or into her second trimester before she seeks the abortion, the delays inherent in any requirement of an in-person parental consultation could effectively deprive some minors of the right to obtain an abortion. If there is a less burdensome means of achieving the Commonwealth's goal of parental involvement in the minor's decision it must be applied.

*Casey I,* 686 F.Supp. at 1126.

One could not reasonably dispute that "informed" parental consent would support the Commonwealth's interest in encouraging involvement in the minor's abortion decision so as to enable the parent to determine whether an abortion is in her best interests. *Id.* However, this interest can be served without requiring an in-person visit by the parent to the abortion provider. Therefore, section 3206 is not narrowly drawn to serve the Commonwealth's interest and unduly burdens the minor's rights. *See Planned Parenthood Ass'n of Atlanta*

*Area, Inc. v. Harris,* 670 F.Supp. 971, 987–88 (N.D.Ga.1987).

The question then becomes whether the existence of a judicial by-pass procedure eliminates this undue burden.[39] The Commonwealth may require the consent of one parent as long as it provides "an alternative procedure whereby a pregnant minor may demonstrate that she is sufficiently mature to make the abortion decision herself, or that, despite her immaturity, an abortion would be in her best interests." *Akron,* 462 U.S. at 439–40, 103 S.Ct. at 2497; *see also Ohio,* — U.S. at —, 110 S.Ct. at 2972 (upholding a single-parent notice requirement with alternative of judicial by-pass); *Hodgson,* — U.S. at —, 110 S.Ct. at 2926 (upholding two-parent notice requirement with alternative of judicial by-pass). The purpose of the by-pass procedure is to eliminate the need for a minor to notify a parent of her decision or the need to obtain a parent's consent. Judicial by-pass acts as a safeguard against the possibility that a parent might attempt to exercise an absolute veto over his or her daughter's decision to obtain an abortion.

No abortion statute considered by the Supreme Court, including *Hodgson* and *Ohio,* has required parental "informed" consent. Nor have the parties identified any such statute for the court. A requirement of informed parental consent, if implemented, would greatly expand the instances in which judicial by-pass would be necessary. Under the requirements of section 3206, a minor who has obtained the consent of a parent will be burdened by the judicial by-pass procedure in order to effectuate her decision, if the parent is unable or unwilling to make an in-person visit to give informed consent for the procedure.

---

**39.** Plaintiffs argue that the defendants have failed to sustain their burden of establishing the readiness of the Pennsylvania judiciary to implement the by-pass procedure contained in section 3206, *see* 18 Pa.Con.Stat.Ann. § 3206(c), (d), (e), and (f), in an expeditious and confidential fashion. Defendants argue that the burden rests with the plaintiffs to establish the non-readiness of the Pennsylvania judiciary to implement the by-pass procedures. I must agree with defendants. Because there is no need to address the sufficiency of the by-pass mecha-

nism since section 3206 has been enjoined for other reasons and because there is no evidence of record to suggest that Pennsylvania's judiciary is not prepared to implement the by-pass procedure, I shall not reach this issue. However, should section 3206 go into effect in the future, plaintiffs may take appropriate action to challenge the sufficiency of the by-pass procedure at that time, if they can establish that Pennsylvania courts are ill-prepared to meet the needs of minor women seeking to avail themselves of the by-pass procedure.

Thus, a minor, after communicating with her parent about her decision (either because she was forced to do so under the Act or because she did so of her own volition) and having obtained the concurrence of a parent that an abortion is in her best interests, will nonetheless have to resort to the more burdensome judicial process, causing unnecessary delay and heightened apprehension and anxiety. Notwithstanding the fact that a by-pass procedure has been considered sufficient, in the judgment of the Supreme Court, both before and after *Webster, Hodgson,* and *Ohio,* to eviscerate the burden upon a minor's right to elect to terminate her pregnancy when the state requires notice or consent of a parent prior to the performance of the abortion, I conclude that requiring minors, who would not otherwise have to do so, to resort to a judicial by-pass procedure imposes an undue burden on the minor's abortion decision and is constitutionally impermissible. Section 3206 is distinct from the statutes considered in *Hodgson* and *Ohio* in that it will require minors who have consulted their parent to endure an otherwise unnecessary judicial by-pass procedure to effectuate their decision.

For the foregoing reasons, I agree with plaintiffs' argument that any requirement of informed parental consent is invalid even when a judicial by-pass procedure is in place. In addition, to the extent that section 3206 does not contain an adequate definition of medical emergency and the content-based informed consent required by section 3205 is impermissible, the Commonwealth will be permanently enjoined from implementing section 3206.

## HUSBAND NOTIFICATION

Of all the sections of the Act, this is probably the most problematic. Section 3209 of the Act requires that no physician may perform an abortion on a married woman unless he or she has received a signed statement from the woman stating that she has notified her spouse that she is about to undergo an abortion. *See* 18 Pa.Con.Stat.Ann. § 3209(a). However, such notice is not required if the woman certifies: (a) that her spouse is not the father of the child, 18 Pa.Con.Stat.Ann. § 3209(b)(1); (b) that she could not locate her spouse after diligent effort, 18 Pa.Con.Stat.Ann. § 3209(b)(2); (c) that the pregnancy is a result of spousal sexual abuse, 18 Pa.Con. Stat.Ann. § 3209(b)(3); and (d) that she has reason to believe that furnishing notice to her spouse would likely result in the infliction of bodily injury upon her by her spouse or by another individual. 18 Pa. Con.Stat.Ann. § 3209(b)(4). Also, spousal notification is not necessary in cases of a medical emergency as defined by section 3203. *See* 18 Pa.Con.Stat.Ann. § 3209(c). The Commonwealth argues that this section furthers its "interest in promoting the integrity of the marital relationship and to protect a spouse's interests in having children within the marriage and in promoting prenatal life of that spouse's child." 18 Pa.Con.Stat.Ann. § 3209(a). Because I conclude that section 3209 is constitutionally defective in that it impermissibly invades a woman's fundamental right to privacy in the abortion decision, I will permanently enjoin the enforcement of this section.

At the risk of repetition, interference with a woman's abortion decision may be justified only by a "compelling state interest" and then the interference must be "narrowly drawn to express only the legitimate state interest at stake." *Roe v. Wade,* 410 U.S. at 155, 93 S.Ct. at 728. In *Roe v. Wade,* the Supreme Court identified *only* two compelling state interests—(1) an interest in maternal health which becomes compelling after the first trimester of pregnancy and (2) an interest in the protection of a potential human life which becomes compelling at the point of viability. *Id.* at 154, 163, 93 S.Ct. at 727, 731. If a challenged regulation does not impinge upon a woman's decision to have a first trimester abortion and does not place obstacles in the path of effectuating that decision, the Commonwealth need only demonstrate a rational relationship to a legitimate purpose. *See, e.g., Maher v. Roe,* 432 U.S. 464, 478–80, 97 S.Ct. 2376, 2385, 53 L.Ed.2d 484 (1977) (upholding welfare regulations that fund childbirth but do not pay for an abortion unless a physician certifies the abor-

tion is "medically necessary"); *Connecticut v. Menillo*, 423 U.S. 9, 96 S.Ct. 170, 46 L.Ed.2d 152 (1975) (criminal statute proscribing unlicensed physician from performing an abortion does not impinge on abortion decision). However, when a regulation does impose a legally significant burden on the abortion decision and a state's interest has not yet become compelling, "a pregnant woman must be permitted, in consultation with her physician, to decide to have an abortion and to effectuate that decision 'free of interference by the State.' " *Akron*, 462 U.S. at 429–30, 103 S.Ct. at 2492 (quoting *Roe v. Wade*, 410 U.S. at 163, 93 S.Ct. at 731).

Moving through the requisite analysis, I conclude that any statute which requires a physician to notify a third party of a woman's abortion decision is, as a matter of law, a constitutionally significant burden on the woman's right to an abortion.[40] *See Planned Parenthood of Rhode Island v. Board of Medical Review*, 598 F.Supp. 625, 633 (D.R.I.1984) ("*PPRI* "); *see also Eubanks v. Brown*, 604 F.Supp. 141, 148 (W.D.Kent.1984); *Scheinberg v. Smith*, 482 F.Supp. 529, 537–38 (S.D.Fla.1979), *aff'd in part and vacated and remanded on other grounds in part*, 659 F.2d 476, 482–83 (5th Cir.1981), *on remand*, 550 F.Supp. 1112 (S.D.Fla.1982). However, even if such a notice requirement was not burdensome on its face, the evidence of record convinces me that enforcement of section 3209 would result in a severe impact on and interference with the abortion decision. Accordingly, strict judicial scrutiny of section 3209 would be required.

The pivotal inquiry is whether the challenged law places an obstacle, absolute or otherwise, in the path of a woman's free exercise of her decision. *Maher v. Roe*, 432 U.S. at 474, 97 S.Ct. at 2382; *see also PPRI*, 598 F.Supp. at 634 (a state regulation which merely has the potential to frustrate or delay a woman's abortion decision imposes a legally significant burden upon that decision). If Pennsylvania's spousal notification provision is enforced, it will have the effect of delaying or, in some cases, totally frustrating, a woman's decision to have an abortion. Women apprehensive about advising their husbands of their decision may delay in notifying him. Further, assuming one of the proffered interests for a notice requirement—promoting marital integrity—was valid, any notice could foster some delay to permit thoughtful marital communication. As previously stated, delay in the performance of an abortion could heighten the risk of complications and mortality. Perhaps more importantly, a forced notification requirement opens the door to total frustration of the woman's decision. Once advised, some husbands may exert pressure, physical or emotional, to coerce their wives to forego the abortion altogether. In addition, the woman who is forced to notify her husband (because she does not fall within the language of one of the exceptions contained in the Act) in order to obtain an abortion despite her better judgment to the contrary will be subjected to additional anxiety and stress. Finally, when faced with forced notice and her perceived view of the risk such notice poses to her or her family, a pregnant wife may elect a different alternative—carrying the pregnancy to term or an illegal abortion.[41]

---

**40.** I note that this situation is distinct from that presented by parental notice or consent provisions which have been upheld by the Supreme Court, *see, e.g., Hodgson, Ohio, Akron, Danforth,* because the state has a compelling interest in assuring familial integrity and the protection of adolescents *who may not be sufficiently mature or competent to make that decision.* For adult women, the same concern regarding competency and maturity to make this important decision does not exist. *See PPRI,* 598 F.Supp. at 639. Indeed, absent evidence to the contrary, adult women are presumed to be competent to make such medical decisions on their own behalf.

For that matter, under Pennsylvania law, a married minor or a minor having a child are *considered competent to provide informed consent* for any medical procedures. *See* 35 Pa.Stat. Ann. §§ 10101, 10102. Moreover, even in the context of a minor's abortion decision, the parent cannot bar her from obtaining an abortion, if a court determines that she is competent to make the decision without intervention by a third party.

**41.** *It would be disingenuous for the Common*wealth to claim that any burden placed upon a woman's right is not the result of state action. The Commonwealth cannot disclaim responsi-

Moreover, the existence of limited exceptions to the notice requirements of section 3209 do not alter this conclusion. The exceptions do not provide adequate protection for pregnant wives with perfectly valid reasons for not informing her husband of the decision. First, a pregnant wife, living apart from her husband, must make a "diligent effort" to locate her husband before she can claim an exception to the notice requirement. *See* 18 Pa.Con.Stat.Ann. § 3209(b)(2). This, as explained in the preceding paragraph, fosters delay and would, therefore, create an undue or legally significant burden. Second, section 3209 provides an exception to the notice requirement for women whose pregnancies resulted from spousal sexual assault, 18 Pa.Con. Stat.Ann. § 3209(b)(3), but does not provide an exception for women abused sexually in the past in ways not within the rather limited definition of spousal sexual assault. Third, the exceptions do not account for spouses that reasonably fear abuse to their children or for other types of spousal abuse, including psychological or economical, if her husband was notified of her decision. Lastly, the Act does not account for many other numerous legitimate reasons a wife may have for not advising her husband of her abortion decision.[42]

Having identified a legally significant burden upon the woman's right to terminate her pregnancy, I must now consider whether the Commonwealth can justify this burden with a compelling state interest. Admittedly, the Supreme Court has recognized the need to afford the institution of marriage and the family protection from state interference and intervention. *See, e.g., Moore v. East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977); *Griswold v. Connecticut,* 381 U.S. at 479, 85 S.Ct. at 1678. Similarly, the Court has determined that a husband has a constitutionally protected right to procreate. *Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942). It is important to note that these cases focused on the protection of these admittedly important rights.

I do not wish to denigrate the importance of these rights. However, in *Eisenstadt v. Baird,* the Supreme Court stated:

> [T]he marital couple is not an independent entity with a mind and heart of its own, but an association of two individuals each with a separate intellectual and emotional make-up. If the right to privacy means anything, it is the right of an *individual,* married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child.

*Eisenstadt v. Baird,* 405 U.S. at 453, 92 S.Ct. at 1038 (emphasis in original). No Supreme Court case has decided the issue of whether a mandatory spousal notification provision is constitutional. But while acknowledging the importance of protecting the marital relationship and the potential impact the abortion decision could have on the relationship, the Supreme Court concluded that conditioning a woman's abortion decision on the consent of her spouse

---

bility for the fact that a husband, once notified, may attempt to prevent an abortion altogether. But for the state requirement of notification, the woman would be able to effectuate her decision freely. *PPRI,* 598 F.Supp. at 636.

**42.** The list of justifications for a woman wishing not to involve her husband in the decision could include: (a) fear of physical or psychological abuse; (b) fear that such communication would jeopardize the marriage itself; (c) her husband is not the father of the fetus; (d) she was the victim of a rape which she has not disclosed to her husband and she subsequently becomes pregnant; (e) her husband is suffering from an illness and she fears communication concerning the decision could worsen his condition; (f) her husband has strong moral or religious beliefs which lead her to believe that he will object to her decision; (g) she fears her husband will attempt to prevent her from effectuating her decision; (h) she is a battered woman and fears such communication would precipitate future physical violence or other abusive behavior (including psychological and economic abuse) against her, her children or a loved one; and (i) she is recently separated or divorced from her husband. I doubt very seriously that this is an exhaustive list. For this reason, mandatory spousal notice provisions place a legally significant or undue burden on the right of women to decide to terminate their pregnancies.

was invalid.[43] *See Danforth,* 428 U.S. at 67–72, 96 S.Ct. at 2840–2842 (since the woman physically bears the child and is more affected by the pregnancy, the state lacks the constitutional authority to give the spouse the unilateral authority to veto his wife's decision to have an abortion).

It is important to note that neither *Danforth,* despite the clear opportunity to do so, or any other Supreme Court opinion has interposed an additional compelling state interest—either in the marital relationship, protecting the procreation interests of the husband or promoting prenatal life in the spouse's child—relating to the spouse of a woman seeking an abortion. For the reasons stated above and those contained in *PPRI,* 598 F.Supp. at 637–40, I conclude that none of these represent a compelling state interest.

The Fifth Circuit's opinion in *Scheinberg,* upon which defendants rely extensively, does not alter this conclusion. In that case, the court held that mandatory husband notification was justifiable if the state could establish that an abortion procedure interferes with a married woman's future capacity to have children and, hence, the husband's right to procreate within the marriage. *Scheinberg,* 659 F.2d at 486–87. After a remand for further consideration of this possibility, the district court found that abortion posed no increased risk to a married woman's future ability to bear children. *Scheinberg,* 550 F.Supp. at 1122–23. Because the Commonwealth has not presented any proof that abortion would affect a woman's future child bearing capacity or even advanced this argument, *Scheinberg* does not support the Commonwealth's argument and, in fact, supports the conclusions reached herein.[44]

Considering separately the state's asserted interest in promoting the prenatal life of the spouse's child, the state is essentially attempting to circumvent the holding of *Roe v. Wade* and its progeny. If the state's interest in the potentiality of life does not become sufficiently compelling until the point of viability so as to permit the state to prohibit abortions except those necessary to protect the life of the mother, then the state's interest in protecting the prenatal life of the spouse's child cannot become compelling until that point. *Cf. Danforth,* 428 U.S. at 69, 96 S.Ct. at 2841 (while recognizing the state's interest in promoting marital integrity and procreation choices, concluding that such interests are not sufficiently compelling for the state to validly delegate the power—a power which it does not possess itself—to veto the wife's abortion decision to the husband). Since the Act applies the notice requirement to all trimesters of pregnancy, it must be considered invalid for the state's alleged interest in protecting the prenatal life of a spouse's child could not become compelling until the point of viability, if at all.

Even assuming that the state has a compelling interest in promoting marital integrity, I conclude that section 3209 does not promote that interest. In a substantial number of cases, the decision to seek an abortion stems from the voluntary consultation of husband and wife. In fact, married couples are often encouraged to consult on important decisions, such as whether to terminate a pregnancy. I doubt that anyone would question the conclusion that a sound marital relationship is one in which communication on sensitive topics, like

---

**43.** Previously, the Supreme Court reserved decision on the question of whether a requirement that the consent by the spouse prior to the performance of an abortion could be constitutionally imposed. *Roe v. Wade,* 410 U.S. at 165 n. 67, 93 S.Ct. at 733 n. 67.

**44.** I also note that adoption of this argument could have potentially broad consequences upon a married, male or female, individual's autonomy to make procreative choices. An obvious extension of the Commonwealth's alleged interest would be to require an individual to be

notified prior to his or her spouse undergoing a sterilization procedure. After all, following the Commonwealth's argument to its logical extreme would suggest that since such operations are permanent, the Commonwealth would have an even more significant interest in requiring prior notice. I suspect that the reason that the Commonwealth is proffering this justification in the abortion context is solely because it really wishes to discourage abortion and not encourage marital integrity or protect a spouse's right to procreate within the marriage.

childbirth and abortion, is routine rather than unusual. However, I, as well as the Pennsylvania legislature, would be ignoring the stark, sometimes tragic, realities of a substantial number of present day marital relationships by assuming that all marriages are predicated on mutual communication, decision-making and respect. Dysfunctional marriages are not uncommon in our society. In many instances, a pregnant wife may be unwilling, or perhaps unable, to discuss the abortion decision with her husband. *See supra* at 1386 n. 42.

Writing for the Court in *Danforth*, Justice Blackmun commented:

> It seems manifest that, ideally, the decision to terminate a pregnancy should be one concurred in by both the wife and her husband. No marriage may be viewed harmonious or successful if the marriage partners are fundamentally divided on so important and vital an issue. But it is difficult to believe that the goal of fostering mutuality and trust in a marriage, and of strengthening the marital relationship and the marriage institution, will be achieved by giving the husband a veto power exercisable for any reason whatsoever or for no reason at all. Even if the State had the ability to delegate to the husband a power it itself could not exercise, it is not at all likely that such action would further ... the "interest of the state in protecting the mutuality of decisions vital to the marriage relationship."

*Danforth*, 428 U.S. at 71, 96 S.Ct. at 2841 (citation omitted). The reasoning of *Danforth* applies with equal force to compelled mandatory spousal notification.

Marital accord arises from within the relationship not from the intervention of the state. Therefore, forced spousal notification is a totally irrational vehicle to achieve any of the state's purported goals. The record clearly establishes that instead of fostering marital communication and bolstering the state's interest in marital integrity, the exact opposite effect would likely occur. *See also Eubanks v. Brown,* 604 F.Supp. at 148; *PPRI,* 598 F.Supp. at 640–42. Not only could forced notice hasten the dissolution of a troubled marriage, but it could have potentially disastrous consequences, including subjecting the woman to physical abuse.[45]

In the words of Governor Casey, "a state cannot intervene in a marital relationship to dictate the relationships between husband and wife." *See* Veto Message to House at 5 (December 17, 1987) (quoted at length *supra* at 1328–29 n. 13). For this reason and the reasons stated above, I will permanently enjoin section 3209 of the Act.

## DETERMINATION OF GESTATIONAL AGE

■ Except in the case of a medical emergency,[46] the Act provides that "no abortion shall be performed or induced unless the referring [or performing] physician ... first made a determination of the probable gestational age of the unborn child." 18 Pa.Con.Stat.Ann. § 3210(a). The Act further requires the physician to make "such inquiries of the patient and perform or cause to be performed such medical examinations and tests as a *prudent physician* would consider necessary to make or perform in making an *accurate diagnosis*

**45.** This is particularly true of battered women suffering from battered woman syndrome, a type of post-traumatic stress disorder. The record before me establishes that many battered women, because of learned helplessness and cycle of violence, would not even be able to avail themselves of the physical abuse exception to the notice requirement. Therefore, these women may elect to continue their pregnancy, seeing no other viable alternative. Dr. Walker's testimony clearly establishes that incidents of abuse are heightened during pregnancy. This heightened abuse during pregnancy coupled with a batterer's anger over his wife's attempt to obtain an abortion (if he somehow discovers this) could result in the serious injury or death of the woman.

**46.** To the extent that section 3210 contains the phrase "medical emergency," it is enjoined by earlier portions of this opinion. *See supra* at 1377–78. However, I shall briefly address plaintiffs' challenge to section 3210 which requires an "accurate diagnosis" of the gestational age of the fetus at the time the abortion is performed. The reporting requirements of section 3210 will be addressed below. *See infra* at 1393.

with respect to gestational age." *Id.* (emphasis added).

Plaintiffs argue that "Section 3210 requires that the doctor perform a battery of tests to make an 'accurate diagnosis,'" *see* Plaintiffs' Pretrial Memorandum of Law at 59, and, therefore, will significantly increase the cost of an abortion without any corresponding benefit to any legitimate state interest. On the other hand, defendants maintain that this section does not require the performance of tests to obtain the most accurate diagnosis of gestational age and only those inquiries and tests which a prudent physician would consider to be necessary under standard medical practice are required. *See* Defendants' Pretrial Memorandum of Law at 36–38. I agree with the Commonwealth's interpretation of section 3210(a).

A determination of probable gestational age is part of the routine care of a pregnant woman, regardless of whether she is considering terminating her pregnancy. In the abortion context, an accurate determination of gestational age is relevant to the physician's choice of abortion procedure, and the selection of the incorrect procedure could increase the risk of complications for the patient. Ordinarily, an accurate determination of gestational age can be made after review of a woman's menstrual history and a pelvic examination. Unless, considering the circumstances peculiar to the patient, a prudent physician would perform more tests to obtain an accurate diagnosis of gestational age, the Act requires no more than this.

The requirements of section 3210(a) are reasonably related to the Commonwealth's compelling interest in the protection of maternal health.[47] Section 3210(a) only requires the performance of those tests which a prudent physician would consider necessary to making a determination of

gestational age. Consequently, section 3210(a) does not seek a departure from generally accepted medical standards. Thus, I perceive no burden on the woman's right to choose an abortion under this section.

This conclusion is supported by the Supreme Court's decision in *Webster.* In that case, the Court upheld a Missouri statute which reads as follows:

> Before a physician performs an abortion on a woman he has reason to believe is carrying an unborn child of twenty or more weeks gestational age, the physician shall first determine if the unborn child is viable by using and exercising that degree of care, skill, and proficiency commonly exercised by the ordinarily skillful, careful, and prudent physician engaged in similar practice under the same or similar conditions. In making this determination of viability, the physician shall perform or cause to be performed such medical examinations and tests as are necessary to make a finding of gestational age ...

*Webster,* ——— U.S. at ———, 109 S.Ct. at 3054 (quoting Mo.Rev.Stat. § 188.029). The plurality determined that this section of the Missouri Act did not require a physician to perform tests which "would be irrelevant to determining viability or even dangerous to the mother and the fetus." *Id.* at ———, 109 S.Ct. at 3055 (plurality); *id.* at ———, 109 S.Ct. at 3060–64 (O'Connor, J., concurring in judgment); *id.* at ———, 109 S.Ct. at 3064 (Scalia, J., concurring in judgment).[48]

Because I conclude that section 3210(a) requires only those tests and inquiries that a prudent physician would consider necessary under standard medical practice for the determination of gestational age, and because this section protects the Commonwealth's compelling interest in protecting maternal health without imposing an undue

---

**47.** To the extent that a determination of gestational age may be useful as an indicator of viability for pregnancies near the end of the *second* trimester, then the state's interest in the potentiality of life also becomes compelling.

**48.** While I recognize that this conclusion was sharply criticized by the dissenting opinion of

Justice Blackmun joined by Justices Brennan and Marshall, *id.* at ———, 109 S.Ct. at 3068 n. 1, as well as the dissenting opinion of Justice Stevens, *id.* at ———, 109 S.Ct. at 3079–80, this reasoning did secure the approval, at least in the narrowest possible sense, of five members of the Court.

burden on a woman's right to choose an abortion, the requirement in section 3210(a) that a physician make a determination of gestational age is constitutional.[49]

## PUBLIC DISCLOSURE REQUIREMENTS

■ Record keeping and reporting requirements which are reasonably directed to the preservation of maternal health and which properly respect a patient's confidentiality and privacy are permissible. *Danforth,* 428 U.S. at 80–81, 96 S.Ct. at 2846; *see also Thornburgh,* 476 U.S. at 766, 106 S.Ct. at 2181; *Casey I,* 686 F.Supp. at 1129.

Sections 3207(b) and 3214(f) require that every facility at which abortions are performed file certain reports.[50] Plaintiffs argue that the provision which subjects these reports to public inspection, if the facility received state appropriated funds during the preceding 12 months regardless of the amount or the type of funding, is unconstitutional. The Commonwealth attempts to justify the reports on the ground that the public has a right to know how its tax dollars are spent.

When first presented with this issue in 1982, I concluded that plaintiffs had not established that disclosure would impose a legally significant burden on the abortion decision. *American College I,* 552 F.Supp. at 803–04. Similarly, the Third Circuit determined that the plaintiffs had not "as yet demonstrated a nexus between the disclosure of such information and the chilling of constitutional rights." *American College II,* 737 F.2d at 297. Not long after that, I found that public disclosure of these reports would impose a legally significant burden on a woman's fundamental right to obtain an abortion. *American College III,* 613 F.Supp. at 666. Only two years ago, I stated "[t]he evidence of record in this ac-

tion persuades me that the situation has not changed." *Casey I,* 686 F.Supp. at 1129. Once again, I am convinced, on the basis of the record presently before me, that the public disclosure requirements contemplated by sections 3207(b) and 3214(f) impose a legally significant burden on a woman's right to obtain an abortion.

Abortion facilities, physicians and their staffs remain under intense pressure from anti-abortion demonstrators. In fact, in recent months, this pressure has become more onerous. The pattern of hostile behavior which has developed in the past includes picketing and verbal harassment of clinic physicians and staff members at the facilities, their private offices and their homes. Pregnant women must also suffer extreme harassment upon entering a facility. While verbal harassment is most common, attempts to block egress and ingress at a facility, forced entries into abortion clinics as well as pushing and shoving have become more commonplace. Death, bombing and kidnapping threats also have been documented.

While this activity comes from members of the public, and not from the Commonwealth, any action of the Commonwealth which may increase the risk of harassment must be carefully scrutinized.[51] *Casey I,* 686 F.Supp. at 1129; *see also Brown v. Socialist Workers '74 Campaign Comm.,* 459 U.S. 87, 103 S.Ct. 416, 74 L.Ed.2d 250 (1982) (evidence of specific incidents of private and government hostility towards the Socialist Workers Party and its members during the four years preceding trial was sufficient to establish that disclosure would chill first amendment rights of association); *Buckley v. Valeo,* 424 U.S. 1, 74, 96 S.Ct. 612, 661, 46 L.Ed.2d 659 (1976) ("[t]he evidence offered need show only a reasonable

---

**49.** Plaintiffs filed a motion for partial summary judgment on this issue. By separate order, I shall deny this motion for the reasons stated herein.

**50.** Importantly, plaintiffs do not challenge the requirement that they file reports under sections 3207(b) and 3214(f).

**51.** The Commonwealth's argument that the plaintiff-clinics subject themselves to such

harassment by advertising in telephone directories is without merit. *American College III,* 613 F.Supp. at 669. I find that public disclosure of reports under sections 3207(b) and 3214(f) creates a reasonable probability that plaintiff-clinics, other abortion providers, and patients will be subjected to increased threats and harassment.

probability that the compelled disclosure of a party's contributors' names will subject them to threats, harassment, or reprisal from either Government officials or private parties"); *National Ass'n for the Advancement of Colored People v. Alabama ex rel. Patterson*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) (in light of evidence of past incidents of retaliation upon disclosure, compelled disclosure of the NAACP's membership is likely to affect adversely the ability of petitioner and its membership to pursue their collective effort).

A regulation designed to inform the public about public expenditures does not further the Commonwealth's interest in protecting maternal health. Therefore, such a regulation cannot justify a legally significant burden on a woman's right to obtain an abortion. Moreover, I once again note that there are less obtrusive means through which the Commonwealth may satisfy the public's need to know how funds are spent. *See Casey I*, 686 F.Supp. at 1129–30.

Therefore, I will permanently enjoin the provisions of sections 3207(b) and 3214(f) which provide for the public disclosure of reports.

## REPORTING REQUIREMENTS

■ Plaintiffs challenge various reporting requirements contained in sections 3214(a) and 3214(h). At the outset, it is important to note that the information to be reported under sections 3214(a) and 3214(h) will, by statute, remain confidential.[52] Further, the record before me suggests that the statutory provisions regarding the confidentiality of these reports will

be strictly enforced. PaDOH has taken the necessary measures to ensure compliance with the Act and that these reports will not be subjected to public disclosure. Standing alone, however, this may not be sufficient to withstand constitutional challenge. *Casey I*, 686 F.Supp. at 1130. Reporting requirements which "pose an unacceptable danger of deterring the exercise" of a woman's right to end a pregnancy must be invalidated. *Thornburgh*, 476 U.S. at 767–68, 106 S.Ct. at 2182.

Before turning to plaintiffs' specific challenges to these reporting requirements, I note that plaintiffs argue that the reporting requirements of section 3214 will impose a significant financial burden on the clinics, which will be passed on to their patients. The evidence of record suggests that plaintiff-clinics have, in fact, incurred additional administrative costs as a result of the reporting requirements. However, there was no testimony which suggests that any of the plaintiff-clinics have raised the fees for an abortion because of these added expenses. Further, I find that the additional cost to plaintiff-clinics is *not* so great that, in and of itself, it imposes a legally significant burden on the right to obtain an abortion.

Plaintiffs first specifically challenge the requirement of section 3214(a)(1) that the referring physician, if any, and the performing physician be identified on the individual abortion report.[53] Each requires a separate analysis. As to the performing physician, he or she is the best person to answer the questions of PaDOH which may arise as a result of the information contained on the report or errantly omitted from the report. While often plaintiff-clinics have contact persons to handle PaDOH

---

**52.** The reports are not public records within the meaning of Pennsylvania's Right-to-Know law, 65 Pa.Stat.Ann. §§ 66.1 to 66.4. 18 Pa.Con.Stat. Ann. § 3214(e)(2). Disclosure may be made to law enforcement officials only upon an order of the Court of Common Pleas after application showing good cause. *Id.* PaDOH's statistical report shall not lead to the disclosure of the identity of any physician, facility, or patient. *See* 18 Pa.Con.Stat.Ann. § 3214(e)(1).

**53.** It does not appear that plaintiffs challenge the requirement that the concurring physician

and second physician required by sections 3211(c)(2) and 3211(c)(5) also be reported. This would only apply to abortions performed at 24 or more weeks gestation. Therefore, I shall not address these requirements at length herein. However, for substantially the same reasons that the reporting of the identity of the performing physician is reasonably related to the Commonwealth's interest in promoting maternal health, I find these requirements to be constitutional.

inquiries concerning the reports, PaDOH has still, on occasion, been required to contact the performing physician directly. Further, for those abortion procedures not performed in abortion facilities, direct contact with the physician may be required. I am not unmindful of the fact that some physicians who previously performed abortions may be deterred from doing so under the Act. However, while plaintiff-clinics may have had more difficulty in locating doctors to perform abortion procedures, the record is void of any evidence that a physician refused to perform abortions for any of the plaintiff-clinics because of the reporting requirements and void of any evidence that plaintiff-clinics have not been able to sustain the apparent demand for the abortion services they provide. Because I conclude that the requirement that the performing physician be included on the abortion report is reasonably related to the Commonwealth's interest in promoting maternal health, and is narrowly tailored to serve that interest,[54] I will reject plaintiffs' challenge to this specific reporting requirement.

The requirement that the referring physician, if any, be identified on the individual report does not add to the pool of scientific knowledge concerning abortion. Nor is it reasonably related to the Commonwealth's interest in promoting maternal health. *See Casey I*, 686 F.Supp. at 1130. The evidence of record persuades me that, notwithstanding the provisions pertaining to confidentiality of reports submitted to PaDOH, many physicians, particularly those that previously discontinued performing abortions because of harassment, will refuse to refer patients to abortion clinics if their names will appear on these reports. This would result in the imposition of an undue burden on the woman's ability to obtain an abortion.

To the extent that the Commonwealth may seek missing information contained on the individual abortion report, the ability and responsibility to provide that information rests with the abortion facility and the performing physician, not the referring physician. The Commonwealth also asserts that disclosure of the referring physician's identity is necessary because "[t]he referring physician is capable of giving informed consent required by § 3205 and making a determination of gestational age required by § 3210." *See* Defendants' Pretrial Brief at 40. This argument is without merit. The abortion provider, especially an abortion clinic, will review informed consent information with the patient prior to performing the procedure, regardless of what the referring physician may or may not have done. The same holds true for a determination of gestational age. Failure to do so would be tantamount to inviting a malpractice suit. Therefore, the performing physician or abortion facility will have all information the Commonwealth might seek in either of these two areas at their disposal. Finally, to the extent that the referring physician is involved in the post-abortion care of the patient, he is required to make an appropriate report of any complications under section 3214(h).

Plaintiffs also challenge the requirement that the facility report any medical complications arising out of pregnancy or from the abortion procedure, 18 Pa.Con.Stat. Ann. § 3214(a)(7),[55] and that any treating

---

54. Plaintiffs suggest that the performing physician could be identified by license number, instead of by name, and the Commonwealth could easily cross-reference the number to obtain the physician's name if it needed to contact the physician directly. I assume that, if the physician's license number were to be disclosed in some manner, another party with sufficient interest could also determine the physician's name from the number. Similarly, requiring the Commonwealth to obtain the physician's name from hospital records would not be a less intrusive means for the Commonwealth to follow-up on individual abortion reports. *Casey I*, 686 F.Supp. at 1130–31.

55. Previously, plaintiffs challenged the section of the Report of Induced Terminations of Pregnancy, relating to medical complications of pregnancy. I concluded that this section was "unartfully drafted" but refrained from ruling on the merits of plaintiffs' constitutional challenge to this portion of the form. *See Casey I*, 686 F.Supp. at 1133. Since that time, the Commonwealth amended the form to eliminate the problem. Plaintiffs no longer make this challenge. *See* Defendants' Exhibit 47B.

physician file a report of complications arising from the abortion procedure. 18 Pa. Con.Stat.Ann. § 3214(h). Plaintiffs argue that these reports will yield scientifically inaccurate data because of (1) a facility's unawareness of post-abortion complications in many cases; (2) the absence of uniform definitions for complications; and (3) the possibility that there may be double-reporting of complications (by the facility and a subsequent treating physician). Essentially for the reasons stated in my earlier opinion, I find this argument to be without merit. *See Casey I*, 686 F.Supp. at 1131. While the data gathered by these reports may not perfectly reflect all medical complications, I am not persuaded that the information is statistically meaningless. Because sections 3214(a)(7) and 3214(h) are reasonably related to the Commonwealth's interest in protecting maternal health, I reject plaintiffs' challenge to these reporting requirements.

Next, the plaintiffs challenge the requirement that the physician report the basis for his medical judgment concerning viability (section 3214(a)(8)), the existence of a medical emergency (section 3214(a)(10)), and determining gestational age (section 3214(a)(11)). I will permanently enjoin the enforcement of these provisions for the reasons set forth in my ruling on plaintiffs' motion for a preliminary injunction. *See Casey I*, 686 F.Supp. at 1132 (for a "physician [to] justify his medical judgment by reporting the basis therefor in a written report impermissibly interferes with the woman's ability to effectuate her abortion decision" and has a chilling effect upon the physician's exercise of his judgment).

Finally, plaintiffs challenge the Commonwealth's attempt to include inquiries concerning Hispanic origin, race, educational level, and date of last normal menses on the Report of Induced Termination of Pregnancy. While none of these items appear in the Act, the Commonwealth argues that PaDOH may legally go beyond the requirements of the statute and request this additional information.[56] PaDOH's stated purpose in requesting this information is to (1) be consistent with the federal standards for the collection of data on induced terminations of pregnancy which were developed by the National Center for Health Statistics and (2) better study the three outcomes of pregnancy (live births, fetal deaths, and induced terminations of pregnancy) for which the Division of PaDOH collects data.

The Handbook on the Reporting of Induced Terminations of Pregnancy prepared by the federal government, through the National Center for Health Statistics, United States Department of Health and Human Services states:

> Data from reports of induced termination of pregnancy provide unique information on the characteristics of women having induced abortions. Uniform annual data of such quality are nowhere else available. Medical and health information is provided to evaluate risks associated with induced abortion at various lengths of gestation and by the type of abortion procedure used. Information on the characteristics of the women is used to evaluate the impact that induced abortion has on the birth rate, teenage pregnancy, and out-of-wedlock births. The data also help measure the role that induced abortion plays in birth prevention as compared with contraception. Because these abortion data provide information necessary to promote and monitor health, it is important that the forms be completed carefully.

*See* Defendants' Exhibit 43 at 2. The "Standard Report of Induced Termination of Pregnancy," intended to serve as a model for the states, is virtually identical to the Pennsylvania Report.

Moreover, abortion is another "pregnancy outcome," in addition to live births and fetal deaths, upon which the Division of PaDOH gathers information. The same information is collected on the Certificate

---

**56.** Indeed, a reading of the applicable statutory provisions seems to support this argument. For example, section 3214(a) requires only that the forms "include" the information listed in the statute. Similarly, section 3214(h) provides that the form shall contain "such other information except the name of the patient as the department from time to time require[s]."

for Fetal Death, which must be submitted to PaDOH on each instance of fetal death after 16 weeks of gestation, and on the Certificate of Live Birth, which must be submitted to PaDOH upon each instance of live birth. Therefore, the Commonwealth maintains that it must be able to collect this information to supplement the information already received on these two forms to enable it to better study the three possible pregnancy outcomes—specifically, through the examination of socio-economic information useful in examining fertility rates and for family planning purposes.

The Act, as originally enacted in 1982, required the individual abortion report to contain the same information regarding the woman's personal history.[57] In addition, the Act provided that each report "shall be made available for public inspection and copying within 15 days of receipt in a form which will not lead to the disclosure of the identity of any person filing a report." Similarly, the complications report was to be open for public inspection and copying. In respect to the individual reporting requirements and the availability of these reports for public inspection, the Supreme Court concluded:

> The scope of information required and its availability to the public belie any assertions by the Commonwealth that it is advancing any legitimate interest....
>
> The required Pennsylvania reports[,] ... while claimed not to be "public," are available nonetheless to the public for copying. Moreover, there is no limitation on the use to which the Commonwealth or the public copiers may put them.... The decision to terminate a pregnancy is an intensely private one that must be protected in a way that assures anonymity....
>
> A woman and her physician will necessarily be more reluctant to choose an abortion if there exists a possibility that her decision and her identity will become known publicly. Although the statute does not specifically require the reporting of the woman's name, the amount of information about her and the circumstances under which she had an abortion are so detailed that identification is likely. Identification is the obvious purpose of these extreme reporting requirements....
>
> ... Pennsylvania's reporting requirements raise the specter of public exposure and harassment of women who choose to exercise their personal, intensely private, right, with their physician, to end a pregnancy. Thus, they pose an unacceptable danger of deterring the exercise of that right, and must be invalidated.

*Thornburgh,* 476 U.S. at 765–68, 106 S.Ct. at 2181–82.

While the Commonwealth removed many of these same reporting requirements from the Act, PaDOH still seeks to collect information in these areas for the reasons expressed above. Based upon the record before me, I do not find any legally significant burden to a woman's right to choose to terminate her pregnancy by these requirements. These reports are now secure from public disclosure. *See* 18 Pa.Con.Stat.Ann. § 3214(e)(2); *see also* 18 Pa.Con.Stat.Ann. § 3214(e)(1) (the annual statistical report shall not disclose any information which would lead to the disclosure of the identity of any person about whom a report is filed). Public disclosure of these reports was of substantial concern to the Supreme Court in *Thornburgh.* But the same danger of public exposure and harassment does not exist given the current restrictions contained in the Act. Further, no substantial additional burden would be imposed upon the plaintiff-clinics or other abortion providers to gather and report this information. As stated previously, these additional costs are not legally significant. In fact, some, if not all, of this information is already collected on medical history forms by abortion providers.

Inasmuch as no legally significant burden has been demonstrated by plaintiffs,

57. The demands for information regarding Hispanic origin and educational level did not appear in the original Act.

the Commonwealth need only demonstrate a rational basis for the reporting require-, ments. *American College I*, 552 F.Supp. at 796. Based upon the fully developed record before me, I find that the Commonwealth has sustained that burden. This information will permit the Commonwealth to assimilate data pertinent to all three possible pregnancy outcomes, and compile useful information concerning fertility rates, family planning, and, hence, maternal health.

Because I conclude that compiling this information is rationally related to a legitimate government interest and does not impose a legally significant burden on a woman's right to end her pregnancy, I reject plaintiffs' argument that I should permanently enjoin the Commonwealth from seeking to collect this data.[58]

In summary, except insofar as the Act requires the reporting of the name of the referring physician and the basis for the physician's medical judgment, I conclude that the reporting requirements of sections 3214(a) and 3214(h), including the additional information sought by the Commonwealth but not required by the Act, are constitutionally valid.[59] I shall sever those two requirements and permit the Commonwealth to collect all other data required by the Act and approved of herein.

## SEVERABILITY

During argument, defendants contend that the Act's "very liberal severance provision" permits this court to strike "any word, phrase or provision" found to be unconstitutional.[60] *See* Trial Transcript, Vol. IV at 49. However, it is not my function to surgically repair legislation to bring it within constitutional limits, if such surgical reconstruction would result in a statute which would be virtually unrecognizable to the legislative body responsible for enacting the legislation in the first place. *See Thornburgh*, 476 U.S. at 764–65, 106 S.Ct. at 2181 (radical dissection of the Act which would leave it with little resemblance to that intended by the legislature is improper); *Akron*, 462 U.S. at 445 n. 37, 103 S.Ct. at 2501 n. 37 (rejecting invitation to sever subsections of informed consent provision despite presence of broad severability clause); *Carter v. Carter Coal*, 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160 (1936) (severability clause does not authorize court to give statute meaning entirely different than that intended by legislature); *Roe v. Casey*, 623 F.2d at 837 (court may not substitute its judgment for that of elected officials to rescue otherwise invalid statute). For this reason, I have exercised extreme caution in my determinations of whether to sever certain requirements of the Act.

While I have elected to sever certain of the reporting requirements from the Act, I decline the Commonwealth's invitation to engage in more substantial dissections of the Act. For example, I will not strike the word "informed" from section 3206, relating to the requirement of informed parental consent as suggested by the Commonwealth. *See* Trial Transcript, Vol. IV at 49. Because "consent" and "informed consent" have radically different meanings, striking the word "informed" from section 3206 would give the section a radically different meaning than that intended by the legislature and, therefore, be improper. The same is true for the language contained in

---

**58.** I recognize that I reached a contrary conclusion in my ruling on plaintiffs' motion for a preliminary injunction. *Casey I*, 686 F.Supp. at 1133. However, I am not bound by that ruling herein. After careful consideration of the more expansive record before me, I conclude that this situation is, in fact, distinguishable from that presented in *Thornburgh*.

**59.** Of course, the Commonwealth may not require the reporting of information relating to the husband notification and parental consent sections because those sections have been per-

manently enjoined by other sections of this opinion.

**60.** The severability clause states as follows:
The provisions of this Act are severable. If any word, phrase or provision of this Act or its application to any person or circumstance is held invalid, the invalidity shall not affect any other word, phrase or provision or application of this Act which can be given effect without the invalid word, phrase, provision or application.
*See* 1989 Pa.Laws 592, 603, § 6.

the Act's definition of "medical emergency."

## IV.

### CONCLUSIONS OF LAW

Inasmuch as I find that I have subject jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), (4) and based upon the foregoing findings of fact and discussion, I conclude that portions of the Act are unconstitutional and, therefore, the defendants must be permanently enjoined from enforcing those portions of the Act. Other portions of the Act, in my opinion based upon the record before me, are constitutional, and plaintiffs' challenges to those sections are rejected. My conclusions can be summarized as follows:

a. The definition of "medical emergency" contained in section 3203 is unconstitutional, and all sections of the Act containing the term must be permanently enjoined. This includes, but is not limited to, the following sections: section 3205 (informed consent), section 3206 (informed parental consent or judicial by-pass), section 3209 (spousal notification), section 3210 (determination of gestational age), and section 3211 (performance of abortions after 24 weeks of gestation).

b. Because any attempt to sever the constitutionally offensive aspects of the definition of "medical emergency" would result in language contrary to the intention of the legislature, I cannot utilize the Act's savings clause to prevent the permanent injunction of these sections.

c. The 24–hour waiting period, physician-only disclosure requirement, and the content-based informed consent requirements contained in section 3205 are constitutionally invalid and must be permanently enjoined. Any attempt to sever the constitutionally offensive language from these sections would be improper.

d. The requirement of informed parental consent, in and of itself, is unconstitutional, notwithstanding the existence of a judicial by-pass procedure, because it unduly burdens a minor woman's right to elect to end her pregnancy and is not narrowly drawn to serve the state's interest. Hence, section 3206 must be permanently enjoined for this reason. In addition, because of the absence of a constitutionally valid definition of "medical emergency" and "informed consent," section 3206 must be permanently enjoined for these reasons as well.

e. The requirement of husband notification contained in section 3209 is unconstitutional and, therefore, must be permanently enjoined in its own right.

f. Section 3210 which requires the physician to make such inquiries and perform or cause to be performed such tests to make an accurate diagnosis of gestational age is constitutional.

g. The requirement under sections 3207(b) and 3214(f) that certain forms be made available for public disclosure creates an unconstitutional burden upon the woman's abortion decision, and I shall enjoin the enforcement of these sections.

h. Except insofar as section 3214(a) requires the reporting of the name of the referring physician (section 3214(a)(1)) and the basis of the physician's medical judgment (section 3214(a)(8), (10), and (11)), I find the balance of section 3214(a) is constitutional. In addition, section 3214(h) requiring the submission of reports on complications is constitutional.

i. Because a woman's abortion decision is not unduly burdened by the reporting of information of marital status, Hispanic origin, date of last menses, race, and educational background and this information is reasonably related to the state's interest in protecting maternal health, I conclude that requiring these items to be reported are constitutional.

## V.

### CONCLUSION

For now, at least, the law of abortion remains undisturbed, because only the United States Supreme Court has the pow-

er to change it.[61] But those individuals who have felt secure over the past seventeen years with the fundamental right, and the protections which flow therefrom, guaranteed by *Roe v. Wade* would be wise to heed Justice Blackmun's admonition—"the signs are evident and very ominous, and a chill wind blows." [62]

What the future holds is not certain. But one thing must be evident. Individuals can no longer feel as secure with the protections provided by the judiciary in this area. Instead, a woman's privacy rights and individual autonomy may soon be subjected to the vicissitudes of the legislative process. Therefore, the protection afforded will depend on the ballot box, and the nature of the protection, if any, could vary from term-to-term depending on the composition of the legislature. If unprotected by their vote and the votes of other pro-choice advocates, many women will be forced to seek abortion services elsewhere. For those that can afford it, this may only mean traveling to another jurisdiction. For those that cannot, the result may well be disastrous and tragic. But for now, at least, the law of abortion remains undisturbed.

An appropriate order follows.

## ORDER

HUYETT, District Judge.

Upon consideration of evidence submitted by the parties during the trial, the evidence presented during the preliminary injunction hearing admitted for the purpose of trial, the pretrial memoranda and submissions of plaintiffs and defendants, the arguments of counsel, and the post-trial memoranda and submissions of the parties, and based upon the attached findings of fact, discussion and conclusions of law, it is ORDERED that

Judgment is entered in FAVOR of plaintiffs and AGAINST defendants in a manner consistent with the attached opinion.

IT IS FURTHER ORDERED that:

1. Defendants are hereby permanently enjoined from implementing and enforcing all provisions of the Pennsylvania Abortion Control Act of 1982, as amended by Act 31 and Act 64, that contain the term "medical emergency" as defined in section 3203 of the Act.

2. Defendants are hereby permanently enjoined from implementing and enforcing any and all provisions of section 3205 of the Pennsylvania Abortion Control Act of 1982, as amended by Act 31 and Act 64.

3. Defendants are hereby permanently enjoined from implementing and enforcing any and all provisions of section 3206 of the Pennsylvania Abortion Control Act of 1982, as amended by Act 31 and Act 64.

4. Defendants are hereby permanently enjoined from implementing and enforcing any and all provisions of section 3209 of the Pennsylvania Abortion Control Act of 1982, as amended by Act 31 and Act 64.

5. Defendants are hereby permanently enjoined from disclosing or otherwise making available for public inspection and copying any report that has been filed or that may be filed pursuant to sections 3207(b) or 3214(f) of the Pennsylvania Abortion Control Act of 1982, as amended by Act 31 and Act 64.

6. Defendants are hereby permanently enjoined from implementing or enforcing the provisions of section 3214(a)(1), insofar as it requires the identification of the referring physician, and sections 3214(a)(8), 3214(a)(10), and 3214(a)(11), insofar as they require the identification of the basis for the physician's medical judgment, of the Pennsylvania Abortion Control Act of 1982, as amended by Act 31 and Act 64.

7. Defendants are hereby enjoined from distributing or utilizing the Pennsylvania "Report of Induced Termination of Pregnancy" except in an appropriate form consistent with the discussion and conclusions of law contained in the foregoing opinion.

IT IS SO ORDERED.

---

**61.** This, of course, does not preclude the Third Circuit from disagreeing with the findings and conclusions reached herein.

**62.** *Webster,* —— U.S. at ——, 109 S.Ct. at 3079 (Blackmun, J., dissenting).

**1398**

## ORDER

HUYETT, District Judge.

Upon consideration of plaintiffs' motion for partial summary judgment and supporting memoranda, defendants' response, and for the reasons stated in my opinion issued this date,

Plaintiffs' motion is DENIED.

IT IS SO ORDERED.